# Exhibit 27

1

IN THE UNITED STATES DISTRICT COURT.
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA          )    Case No. 25 CR 693
                                  )
            v.                    )       REDACTED TRANSCRIPT
                                  )
                                  )
MICHAEL RABBITT,                  )
KATHERINE MARIE ABUGHAZALEH,      )
ANDRE MARTIN, CATHERINE           )
SHARP, BRIAN STRAW, and           )    Chicago, Illinois
JOSELYN WALSH                     )    May 21, 2026
            Defendants.           )    10:45 a.m.


                TRANSCRIPT OF PROCEEDINGS - HEARING
                BEFORE THE HONORABLE APRIL M. PERRY

APPEARANCES:

For the Government:    HON. ANDREW S. BOUTROS
                       UNITED STATES ATTORNEY
                       BY:  MR. ANDREW S. BOUTROS
                            MR. WILLIAM HOGAN
                            MR. MATTHEW D. SKIBA
                            MR. ANDRES ALMENDAREZ
                       219 S. Dearborn Street, Suite 500
                       Chicago, Illinois 60604

For Defendant          TAFT STETTINIUS & HOLLISTER, LLP
Michael Rabbitt:       BY:  MS. NANCY L. DePODESTA
                            MS. CARLY A. CHOCRON
                       111 East Wacker, Suite 2600
                       Chicago, Illinois 60601

For Defendant          LAW OFFICE OF JOSHUA G. HERMAN
K. M. Abughazaleh:     BY:  MR. JOSHUA G. HERMAN
                       53 West Jackson Boulevard, Suite 404
                       Chicago, Illinois 60604

                       LAW OFFICE OF MOLLY ARMOUR
                       BY:  MS. MOLLY ARMOUR
                       53 West Jackson Boulevard, Suite 1424
                       Chicago, Illinois 60604

2

APPEARANCES (Cont'd):

For Defendant             COTSIRILOS, POULOS & CAMPBELL, LTD.
Andre Martin:             BY:  MR. TERRENCE H. CAMPBELL
                               MS. MALLORY DAVENPORT
                               MR. THEODORE T. POULOS
                          55 East Monroe Street, Suite 3250
                          Chicago, Illinois 60603


For Defendant             CHERONIS & PARENTE
Brian Shaw:               BY:  MR. CHRISTOPHER PARENTE
                               MR. DAMON CHERONIS
                          140 South Dearborn Street, Suite 404
                          Chicago, Illinois 60603


For Intervenors:          MANDELL P.C.
                          BY:  MR. STEVEN P. MANDELL
                               MR. BRIAN SAUCIER
                          One North Franklin Street, Suite 900,
                          Chicago, Illinois, 60606


Court Reporter:           Noreen E. Resendez, CSR, RPR, CRR
                          Official Court Reporter
                          219 S. Dearborn Street, Room 1728
                          Chicago, Illinois 60604
                          312-582-5267
                          Noreen_Resendez@Ilnd.uscourts.gov

                          *   *   *   *   *

                PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE COURTROOM DEPUTY:  Calling case 25-CR-693, USA vs. Rabbitt, et al.

THE COURT:  Good morning, everyone.

If you can start by introducing yourselves, please. Start with the government, the defendants, and then the intervenors.

MR. HOGAN:  Good morning, Your Honor.

AUSAs Hogan, Skiba, and Almendarez.

MR. PARENTE:  Good morning, Your Honor.

Chris Parente for Brian Straw, who is present, and Damon Cheronis as well, Your Honor.

MR. CAMPBELL:  Good morning, Judge.

Terry Campbell, Ted Poulos and Mallory Davenport on behalf of Andre Martin who is present in court.

MR. HERMAN:  Good morning.

Josh Herman and Molly Armour on behalf of Kat Abughazaleh, who is present in court as well.

MS. DE PODESTA:  Good morning.

Nancy DePodesta and Carly Chocron on behalf of Michael Rabbitt, who is also present here.

MR. MANDELL:  Good morning, Your Honor.

Steve Mandell and Brian Saucier on behalf of potential intervenors, Chicago Sun-Times, 70 WBEZ, Chicago Tribune, and The Better Government Association.

THE COURT:  Good morning, everyone.

So let's start solely with the motion to intervene, and then we'll get to the merits.

So let me ask the government first, do you have a position on a motion to intervene?

MR. HOGAN:  We take no position.

THE COURT:  Okay.  Defendants, one at a time or all together if you are jointly.

MR. PARENTE:  Judge, I believe we all are in agreement that the hearing should be open to the press.

THE COURT:  We're starting with the motion to intervene.

MR. PARENTE:  I'm sorry, we agree that the motion should be granted.

THE COURT:  Okay.  The motion to intervene for the limited purpose of being heard on the unsealing of the hearing will be granted.

So let me ask to the intervenors, you filed the motion shortly after midnight last night.  I understand it was a short time frame.  Do you have anything that you want to add to your motion orally?

MR. MANDELL:  Yes, Your Honor, briefly.

THE COURT:  Make your way to the podium.

MR. MANDELL:  So I'd like to start, if I could, by borrowing a phrase from Your Honor, which is, to refer to an

oldie but goody case, which is --

THE COURT:  Technically that's my father's phrase. Technically that's probably a lot of fathers' people's phrases.

MR. MANDELL:  That's *Richmond Newspapers vs. Virginia*.  And really that case stands for the proposition that the First Amendment goes beyond just protecting freedom of speech and expression.  It also protects the right to gather information, to receive ideas, and most importantly to have access, public access to criminal trials.

And the reason for that is, there's an overriding interest that in a trial, in a criminal case, the public is able to scrutinize the judicial system and how it works, because that's essentially going back a long way important to our democracy and the admission of justice.

And I think that's especially important in this case, public scrutiny, because, respectfully, I don't think public skepticism, if not mistrust of government, has arguably ever been higher in this case.  And I think it's well placed because of the landscape that we're in.

And as Judge Fuentes put in his November 20th, 2025 opinion in the *US vs. Briggs* case, "these are not ordinary times at the Everett McKinley Dirksen Building."

And this is critical to acknowledge this because it's really important to our petition.  Because we acknowledge that

grand jury proceedings are ordinarily secret, but given the landscape here, we think Your Honor has discretion, we put that in our brief; and it should be exercised in the favor of transparency.

And I just want to tick off a few examples that were not specifically, I don't believe, called out in our brief.

And first you have Judge Cummings's determination in the *Nava vs. DHS* case that ICE violated a longstanding consent decree by conducting warrantless arrests.

Then you have Judge Ellis's determination that the federal agents had used unreasonable force toward protestors at the Broadview facility. And more importantly, that at least one federal agent lied about the events that took place there.

And I understand that her preliminary injunction was ultimately shot down by the Seventh Circuit, but these are findings that she made after evidentiary hearings.

Then, of course, you, Judge Perry, found that the government's evidence was unreliable in the *National Guard* case and a lack of candor and failure to reveal that grand juries had failed to return indictments against those whose arrests the government was relying on to request National Guard support.

Then you have the case in front of Judge Alexakis, *US vs. Martinez*. That's the case where a federal agent pumped

five bullets into Ms. Martinez's body and then bragged about it to his buddies, bragged about the fact that he got seven bullet holes out of the exercise.  Not to mention that the government car that supposedly rammed or -- that was supposedly rammed by Ms. Martinez's car mysteriously disappeared to Maine, Number 1, where bodywork was done on it; and, Number 2, when the agent admitted under oath that it wasn't really rammed.

Now Judge Alexakis chastised the government by allowing to remain on its website the assertion that she was a domestic terrorist long after they dismissed the charges against her, and also that the government mischaracterized the facts of the case in a brief in Your Honor's case to the U.S. Supreme Court.

Finally, you have Judge Fuentes's opinion in which he notes that the five arrest cases that came before him, all supported by sworn declarations that supposedly were corroborated by video evidence, all were dismissed, and in three instances a grand jury returned a no bill.

So he found it, as he stated, a sobering event that he had signed a complaint finding that the government's allegations supported a finding of probable cause, only to find out that the grand jury refused to find probable cause.

He closed his opinion by stating, "But the Court cannot help but note just how unusual and possibly

unprecedented it is for the U.S. Attorney's Office in this district to charge so hastily that it either could not obtain the indictment in the grand jury or was forced to dismiss, concluding the case is not provable in repeated cases of a similar nature."

And that's just here, Your Honor.  If you look to other jurisdictions, similar things are going on.

In the Minnesota federal court, you may be aware of the case against Journalist Don Lemon.  There a magistrate judge refused to sign a warrant for his arrest.  And in an unusual situation, the government went to the district judge and asked him to review that, and the district judge refused to question the magistrate judge's determination.  And not happy with that, they took it to the Eighth Circuit, who also refused to question the situation.

So -- and then the district judge in that case noted that the government had disobeyed scores of orders, court orders in that case.

So in sum, Judge, given the landscape that we've outlined here, this is a case, again, that calls for transparency, not sealing.

And I think, Number 1, if you look at the factors set forth in the *Craig* case, it's a Second Circuit case about unsealing grand jury testimonies, a lot of the factors there suggest -- and again, we're aware that grand jury materials

are often secret. But the proponents of secrecy in this -- or the factors that weigh in favor of secrecy are at their lowest strength in this case. The grand jury has been dismissed. Count 1 has been dismissed. There are ways -- the defendant is in favor of disclosure here. There are ways -- less restrictive ways that the Court can deal with the privacy of grand jurors or witnesses by, you know, anonymizing them in some way.

And so we ask Your Honor to -- we believe this is a case that warrants discretion, not only this individual case, but given all of the other cases where the government's conduct is, in the most charitable way of saying it, questionable, if not misconduct. We, therefore, believe that we've demonstrated a basis for an unsealing and an open process.

THE COURT: All right. I'm going to share some of my initial thoughts, and then I'm going to ask the parties to share theirs, because this is, obviously, an adversarial process.

I'm going to start just with the fact that I've had about ten hours, several of which were sleeping ones, to consider this.

Obviously, as everyone I think would agree, there are some exceedingly important First Amendment interests at stake here, for all of the reasons that you just stated,

transparency, accountability, openness, are all vitally important to our democracy.

But the First Amendment isn't the only one that is at play.  The Sixth Amendment and the Fifth Amendment right to a speedy trial, due process, and impartial jury, those are also really important to our democracy.

And I think this case would be a lot simpler if we weren't picking a jury in five days, less than five days at this point.

So we have two sets of extremely important, extremely weighty constitutional rights that are in tension here.

Selecting a fair and impartial jury in this case was always going to be extremely difficult.  There has been a tremendous amount of pretrial publicity.  Several of the defendants are public figures.  Pretty much everyone in this area has a strong feeling one way or the other about immigration and immigration enforcement activities that have been undertaken by this presidential administration.  That was always going to be something we had to deal with.

To flood the record a few days before jury selection with grand jury materials that are currently secret, and will never be admitted at trial, right, because we are talking about the colloquy between the prosecutors and in grand jurors.  In no way are those admissible.  They will never be admissible.  They will never be before the jury.  To put those

in the public record immediately before jury selection, I think, almost guarantees that we will not be able to seat a jury who has not been exposed and has not drawn strong conclusions about, not just the evidence in this case.

You have a lot of cases that involve judges sealing and perhaps getting into trouble sealing matters of public record that are going to at some point come into evidence. But what we're talking about here is something that will never come into evidence, that the jurors will then be exposed to before the trial, and just at this moment at least immediately before the trial.

So given that, my initial instinct and strong feeling at this point is that at this moment in time, today, Thursday, the before Tuesday trial, the interest in guaranteeing a fair jury to these defendants is more compelling than allowing access to this particular proceeding.

To be clear, it is not my intention to keep this proceeding under seal forever, and perhaps not even more than a few hours depending on how things going during the proceeding.

So to that extent, I believe the sealing is narrowly tailored to address the issue of upcoming jury selection at this moment, which we expect to be on Tuesday; and frankly, to allow the defendants to consider their position. I know you have one right now. You will get a chance to state it. But

the truth is, you haven't seen these transcripts either.  So to hold you to a position based upon a complete lack of information about what is in the transcripts, I think would be foolhardy.

So I will certainly let you state your position, but I think the more important interest for your clients' right to a fair trial is to allow you to see it first and talk about it first, and then consider your options before you have a chance to truly weigh in on this.

So those things make this case very different from those that are cited by the intervener, which involved sealing a 41-day preliminary hearing.  That's the *Press-Enterprise* case.  A criminal trial itself, that's the *Richmond Newspaper* case.  A gag order on the media that lasted for the entirety of the pretrial proceedings, which lasted for three months, that's the *Nebraska Press Association* case.

Especially considering that you are not only asking to come to the hearing, you are also asking for the grand jury transcripts themselves, which underlie the hearing.

Now, everybody knows, and I'm not going to belabor the point, that grand jury transcripts are secret.  They are secret by Federal Criminal Rule and by longstanding practice.  The Supreme Court has noted the tradition of grand jury secrecy is older than our nation itself.

And Rule 65 states that the Court must close any

hearing to the extent necessary to prevent disclosure of a matter occurring before the grand jury, which is what this hearing is going to be doing.

The intervenors have cited *Carlson vs. United States* for the proposition that the presumptive right of access to court records extends to grand jury transcripts.  I just don't read *Carlson* to say that at all.

What I understand *Carlson* to say, and this is a quote, is that, "When unsealing records, the Court has complete discretion over the manner of disclosure at a time and in a manner subject to any other condition it directs." And I think that's what we are talking about here.

There may be a time when unsealing some or even all of these grand jury records is appropriate.  I don't think that time is five days before trial, and it's certainly not before the defendants themselves have gotten access to them.

*Carlson* involved the disclosure of grand jury materials 70 years after they were created, which makes it obviously very distinguishable from this case.

So those are my initial thoughts.

Let me ask the government, do you have a position on sealing at this time?

MR. HOGAN:  Sealing or unsealing?

THE COURT:  Well, we haven't had it yet.  So there is nothing to unseal.  The question is whether it will be

conducted initially under seal.

MR. HOGAN: Yes, I think it should be conducted initially under seal for all of the reasons you just expressed.

THE COURT: All right. Do the defendants have a position at this time that you want to state on the sealing of the hearing?

MR. PARENTE: For Defendant Straw only right now, I just want -- and I understand I am flying blind. I hear what you're saying. But based on the order, it does seem there is something.

I just want to note for the Court, which is part of our argument that you'll hear about in the next hearing, Your Honor speculated, understandably, on what these transcripts might show, and you made a comment that you believed it was related to IT issues. They heard that. If this is not related to IT issues, our position is they should have alerted you immediately because there was press in the room who reported on that.

So our jury pool has now consumed what they think was said in the grand jury relates to IT-related issues.

So for, one, they let that stand out there without going sidebar or telling the Court, which I think is part of our bad-faith argument.

But, two, that's already out there. So we think --

if they're going to consume that, they should at least consume whatever the truth is.  And again, I understand that we don't know what the truth is.  So we'll wait.

But I just wanted to put that out there for Your Honor to consider.

THE COURT:  I mean, that is part of my problem with this, right, is that interactions between the grand jury and the prosecutors are not the types of things we will ever be talking about at trial.  Those are the types of things you will argue about separately, and we'll deal with separately.  But I don't think the answer to a little bad is a whole lot more bad.

MR. PARENTE:  It is, though, when a little bad benefits them for sitting on their hands and not alerting the Court to the misunderstanding that you were under.

THE COURT:  Let's pause on that until we talk later.

MR. MANDELL:  May I be heard, Your Honor?

THE COURT:  Of course.

MR. MANDELL:  We had a similar issue come up in front of Judge Wood in connection with the e-mail Jones trial, where there was a trial -- a mistrial, yet the jurors' names were secret.  We intervened.  Judge Wood expressed concern about that because there was going to be a retrial, and she was concerned that if the press interviewed the jurors that were in place during the mistrial, it might influence future jurors

on the retrial.  I think she properly came to the conclusion that that's what voir dire is for.

And I've tried enough defamation cases against the media to know that in the jury pool you have people that get their news from so many different sources, or don't read the news, that through voir dire, the parties are able to select a jury that's not influenced by anything that is printed by the press.

And when you balance against the public outcry over what's going on in this case, and their desire to know, like, what is their government doing, rightly or wrongly, I think it's a closer call than Your Honor may have articulated just now.

THE COURT:  I think reasonable minds can differ, certainly.

Mr. Campbell.

MR. CAMPBELL:  On behalf of Andre Martin, we would like to take a position after seeing what is in the grand jury transcripts.

MR. HERMAN:  Judge, on behalf of Ms. Abughazaleh, we're in the same boat.  We agree with intervenors' overarching positions and arguments, but for the sake of our client, we would like to take a look at the transcripts first and then make a decision.

MS. DE PODESTA:  On behalf of Mr. Rabbit, we would

like to do the same.  We'd like to see the grand jury transcripts and reserve our position.  But again, similarly we agree with the position of the intervenors.

THE COURT:  All right.  Anything else that you want to add?

MR. MANDELL:  One more thing, Your Honor, that I forgot to mention.  That is, in this district it has been sort of a pioneer, from my understanding, in that it recently amended local Criminal Rule 6.2.1 to make more transparency into the grand jury process.

Now, when there is a return of a no bill, although the jury foreman's name is redacted, that is now going to be filed as a public document.

So I think there is a movement.  I was not in on the meeting of the people on the committee who made that decision, but one would speculate that there's a sensitivity of the public's need to be able to scrutinize the conduct of its government, and that's a movement towards that goal.  And I think that's consistent with what we're -- what our goals are.

THE COURT:  Two thoughts.  I don't disagree with you on the utmost importance of that.

I will say that local rule change would not have affected this case because that applies only to cases in which a complaint is filed first and then a no bill was returned.  And I don't believe there was a complaint ever filed in this

matter.

I get your point, but somewhat inapplicable here.

Your motion to intervene for the purpose of challenging the sealing is granted.  Your motion to attend the hearing is denied.

I will absolutely reconsider when and for how long the sealing should occur as soon as we've had a chance to talk amongst ourselves, and the defendants have had a chance to see the relevant materials, speak with their clients, and weigh their options.

MR. MANDELL:  Understood, Your Honor.

Thank you for giving us consideration this morning on such short notice.

THE COURT:  Thank you, all.

So we will take a brief break to allow the courtroom to be cleared, and then we'll start with the 11:00 o'clock hearing.

THE COURTROOM DEPUTY:  Please rise.

(Recess at 11:06 a.m., until 11:08 a.m.)

(Exit Mr. Steve Mandell and Mr. Brian Saucier.)

THE COURT:  I see the four defendants.  I see a whole load, although I will not call you a mob, of defense attorneys, so I think we have the right people here.

MR. CORNELIUS:  I'm here just a representative of the office under the strictest interpretation of Your Honor's

order.  I was not involved in the supervisor chain.  I can be excluded on that basis, otherwise, I am just here.

THE COURT:  Can you state your name for the record?

MR. VANDENBERG:  Cornelius Vandenberg.

THE COURT:  All right.  You can stay.  We are working on getting the stream turned off.  We'll get IT to kill that in a second.

It's muted so there is no outgoing transmission.

So let me just say to the defendants themselves, this is under seal.  What that means is, at least for the moment, it is not open to be talked about or discussed outside of this particular courtroom.

I did think it was important for you to be present because you're going to have some decisions that you need to make with your counsel at some point today.

So let me just start with a quick overview of the timeline here for the record.

On April 8th, the defendants moved to compel the disclosure of the grand jury transcripts, or in the alternative for me to conduct an in-camera review.  The defendants' request was narrow.  They wanted only the presentment of the law and the conspiracy charge given to the grand jury and related exchanges.

The defendants expressed concern that, given the evolving theory of the government's case, the jury had perhaps

been misinstructed on the law in a way that would entitle the defendants to a dismissal of the indictment.

On April 9th I set a briefing schedule, to the extent the government objected to an ex-parte in-camera review of the transcripts. Because the government did not object, they filed, instead of briefing it, sealed transcripts for my review on April 23rd.

During my review of those transcripts, I did identify some infirmities in the legal instructions that had been provided to the grand jury, at least in regards to the very first grand jury appearance, which was on October 9th, 2025.

Those inaccuracies were corrected, at least in my view, by the final grand jury appearance, at which the indictment was obtained, during which a much more fulsome and accurate legal instruction presentation was given to the grand jurors.

I also noted at the time that I reviewed the transcripts that there were within the transcripts provided certain redactions that had been made by the government. I, therefore, asked the government to bring to the next hearing unredacted copies of the colloquy that I had received.

On April 29th, the government represented that it would be dismissing the conspiracy charge, which was the only felony charge, and proceeding with a superseding information on the misdemeanor charges.

The government further represented that the disclosure of the grand jury transcripts was mooted by the dismissal of the felony charge, and I agreed, as there is no right to an indictment with respect to a misdemeanor charge, and any missteps with respect to the legal instructions on that charge would be irrelevant.

On May 4th the defendants filed a renewed motion for the grand jury transcripts, noting that the redactions themselves in a document that was provided only to the Court raised red flags.

The defendants further argued that the presumption of regularity that typically protects government actions no longer should apply in light of the alleged increased misuse of the grand jury by the Department of Justice, and that there was a possibility of improper or prejudicial interactions between the AUSA and the grand jury.

On May 18th, at the pretrial conference, the defendants argued their motion for the disclosure of the unredacted grand jury transcripts to me.  When I asked if the government objected, they said they did not, and I received the unredacted transcripts on May 19th.

So let me ask first:  I asked everyone from the U.S. Attorney's Office who participated in the redaction process to be present today.  I have the three trial attorneys.  We have one in the back, who says that he's here

kind of sort of just to observe, but did not participate in the redaction process?

MR. HOGAN:  That's right.

THE COURT:  Okay.  So I guess that simplifies matters in that there are only three of you who we will have to talk to.

I will say that having reviewed the grand jury transcripts myself in full and unredacted form, there are significantly bigger problems than misinstructions to the grand jurors.

Although I am not going to prejudge the issue without a hearing, I will say that I was incredibly shocked by the redactions that were made.  I have read hundreds, if not thousands, of grand jury transcripts involving prosecutors who are the most junior of prosecutors to several U.S. Attorneys who appeared before the grand jury.  I have never seen the types of prosecutorial behavior before a grand jury that I saw in those transcripts.

At a high-level summary for the defendants, who do not have the benefit of having seen the transcripts yet, several potential issues jumped out at me immediately and glaringly.

First, improper prosecutorial vouching to the grand jurors, with the AUSA putting her personal credibility and trustworthiness on the line in support of the charges.

23

Second, improper prosecutorial communications of a substantive nature with the grand jurors outside of the grand jury room.

And, third, the prosecutor excusing grand jurors who disagreed with the government's case from the deliberations process.

Which brings me to problem Number 4, which is the fact that all of this was redacted out of the versions of the transcripts that I got. And frankly, it is that that I find the most problematic. Mistakes happen. They happen to all of us. But as I tell my children, you own it. You admit to it. You apologize for it, and you move on. What you do not do is hide it.

I relied on all of you and your personal representations in this case about what has been issued in discovery, about the types of searches you have done for exculpatory material, about what arguments you will and will not make in this case. And I do that because, first of all, I treat every attorney who appears before me as an officer of the court. But secondly, because I put even more reliance on Department of Justice attorneys. Your sole goal is to do justice. Your client is justice itself.

I do believe deeply in the presumption of regularity and that most government attorneys are doing the best they can to do the right thing. That trust has been broken.

The defendants have argued that prosecutorial misconduct would entitle them to a dismissal of the indictment with prejudice, including the misdemeanor charges that are set for trial next week.  I'm not sure that's true, given that there was no need for the grand jury at all.  I think there is a dearth of case law -- well, there's a lot of case law now about misconduct before the grand jury.  What I have not seen is much case law about the dismissal being with prejudice.  There have been a lot of dismissals of indictments.  In all of the ones I have seen, at least, the government is allowed to try again.  So -- but that's not to say it doesn't deserve to be briefed and it doesn't deserve to be argued.  But I am looking for case law on that issue.

Also, what I think rears its head again is this idea of vindictive prosecution.

On March 13th, the defendants had brought a motion to compel discovery on the issue of vindictive prosecution.  You all stated repeatedly that you are not alleging any misconduct that occurred at the U.S. Attorney's Office level.  The motion was based solely on the theory that someone external to this U.S. Attorney's Office had urged this prosecution.

The motion was ultimately denied on the grounds that there was no evidence of any outside influence at play in this case.  I specifically said that, given that you hadn't said you were proceeding on any discriminatory intent inside the

U.S. Attorney's Office, and without any evidence of those outside of it having any influence here, there is no evidence of discriminatory purpose or intent.

Now, obviously, none of us know what we don't know and none of us knew about this at the time. At the time of your motion and my ruling, there was no reason to believe that there had been anything vindictive or selective about the prosecutors' actions. We all took the government attorneys' word on a great many things.

I, at the time, was operating on a presumption of regular grand jury proceedings, which these were very clearly not.

So based upon what I've seen in the grand jury transcripts, the calculus has changed and it has changed considerably.

So I also think you are entitled to a briefing and perhaps a hearing on the issue of vindictive prosecution should you choose to raise it.

I think there is also a potential here, separate and apart from the merits of this case and how this case ends up proceeding, on sanctions for prosecutorial misconduct and for potential ethical violations, including lack of candor to the Court. That is a separate issue from how you all proceed with the trial and the motions that you bring, and it will be dealt with separately.

So in terms of next steps, I think you all have some decisions to make, and unfortunately you are going to need to make them quickly.

You have potential motions to be brought on complicated legal issues that have, frankly, very limited case law. We have been searching for any vindictive prosecution case where a case was dismissed on that basis and the dismissal was upheld by the court of appeals, because those two things together are important. We have not found much. And what we have found is pretty factually distinct.

So, you know, that's going to be something you're going to have to research and do some homework on.

And there's also, of course, the potential with either of those motions for an evidentiary hearing perhaps.

We aren't going to be able to accomplish all of that before Tuesday. I know the Speedy Trial Act is very important to your clients. I know that they are -- they've had this weight over their heads for a long time. We are ready to go on Tuesday. I have 90 jurors showing up on Tuesday. So I think you all have to weigh the likelihood of success on these motions with their desire to go forward to trial on Tuesday.

I am prepared to do either, strike the trial date or proceed to trial.

I think one other thing you will you have to research is whether we have to resolve these issues before trial. I

don't know the answer to that.  We have been doing some research on our end.

It seems clear that a vindictive prosecution motion would need to be filed before trial.  I'm not certain that it would have to be ruled upon with all the evidence collected before trial.

But that would be perhaps a third option, is go to trial, see how it goes, and then litigate these issues separately and later.

So I have thrown a lot at you.  Do you want to take a break to discuss?

MR. CAMPBELL:  The answer for me is, yes, we want to take a break to discuss.

Is it possible for us to get a copy of the grand jury materials before we come back with an answer?

THE COURT:  You certainly will be provided with a copy of the grand jury materials, both the redacted and the unredacted forms.  There is a lot there though.  So we'll probably need an answer before you've had a chance to fully analyze them.

But I will do what you all want to do here.  If you want to give me an initial thought after discussing, and then a final answer --

MR. CAMPBELL:  Yep.

THE COURT:  -- I'm hoping for tomorrow midday, so

that we have time to call everybody off if that is your choice.

Mr. Parente.

MR. PARENTE:  A point of clarity, Judge.  If what you're saying at a summary level is as explosive as it sounds to me, I have significant doubts that it stayed with these three.  I just want to make sure that we have an understanding of what you have actually asked the U.S. Attorney's Office. You wanted anyone involved in the decisionmaking process to redact these, not who actually redacted them; is that correct?

THE COURT:  I wanted anyone at an attorney level who reviewed the transcripts and weighed in on any way on what should be redacted from them.

MR. PARENTE:  Up to the U.S. Attorney?

THE COURT:  Yes.

MR. PARENTE:  Okay.  Just so we are clear on that.

THE COURT:  Given that we have no supervisors here, I'd be surprised if they went straight to the U.S. Attorney.

MR. PARENTE:  But it would shock me for having come out of that office, if what you're saying is in there happened and that nobody raised this above these three guys.  I mean, that is ...

THE COURT:  If I had to guess based on my reading of the transcripts, which at this moment I do, there were other people in the office who knew of problems occurring before the

grand jury, because they were corrected at various points.

So, for example, in the third hearing, no one gets kicked out. And I think that's the one where your indictment was ultimately returned.

So my guess, although there will be time to sort through these issues, is that somebody at some point weighed in and said, you aren't allowed to do that.

MS. DE PODESTA: I would just join Mr. Parente's request to make sure. Knowing how the office works and how things are done, it seems highly unlikely that the redactions were made without consulting others. And I'd just like confirmation on the record.

THE COURT: Yes. To be clear, I did not ask for everyone who knew about anything that might have gone suboptimally before the grand jury. I asked only for people at this point who weighed in on what should be kept out of the transcripts that I received.

So I would like the representation that you three are the only ones who weighed in on, made any decisions about the redactions made from these transcripts.

MR. HOGAN: Mr. Skiba was out of town and he did not --

MR. SKIBA: Your Honor, I'm just here. I'm a member of the trial team. I was also present in the grand jury. That's why I'm here.

THE COURT: Okay. All right. So it is you two who looked at the transcripts and made a decision about what would be redacted and only you two?

MR. HOGAN: Yes, mostly me.

THE COURT: Okay.

MR. HOGAN: I'll take responsibility for it.

THE COURT: Okay.

MR. PARENTE: And, Judge, along those lines, you did lay out a timeline. I just want to be clear, before that motion, we had made multiple requests through discovery letters for transcripts of what happened in the grand jury.

My understanding is Mr. Skiba was in the grand jury, as he just said. So he was certainly on notice that we were looking for those things. So I know that the formal motion wasn't filed until April, but as you start looking at this, they were on notice from back in December when we first asked for this. And he who had sat through that, should have raised it.

And I think there might be a motion here down the road that I don't know if I want someone who participated in this process trying this case.

THE COURT: Understood.

MR. SKIBA: I'm happy to speak to that, Your Honor, if I may.

MR. PARENTE: Sure.

MR. SKIBA:  So in full candor, Your Honor, I started with this office on July 14th.  I had been with the office for less than two months.  This was the second time I was before a grand jury.  The first time was a simple PSN case.

Ms. Mecklenberg is not here to defend herself.  I am not trying to deflect blame, but I was with a 20-years-plus senior veteran.

I remember what you referred to as the vouching incident.  I remember thinking at the time that I would never make that statement as a matter of personal style.  What I did not know then, and what only became apparent as we were discussing dismissing these charges, is that's beyond personal style, and that is, at a minimum, arguably misconduct.

So that's the first incident.

THE COURT:  And let me -- I appreciate all of that so far, and I'll let you continue.  But let me just say, based upon, again, my high-level research so far, vouching is not itself a constitutional violation.

So for what it is worth, they seem to divide on the case law between things that are constitutionally problematic prosecutorial misconduct, and other, and that falls into the other category.

MR. SKIBA:  And to put an additional finer point on it, what I remembered in the aftermath of that grand jury presentation was not the very start of it.  It was the very

end.  Because we were -- the grand jury returned a no bill that day.

So that was the thing that most top of mind up until the discussions about each of the three episodes before the grand jury.

The second and third incident, I'm happy to speak to as well, as Your Honor flagged, that was elevated beyond just Ms. Mecklenberg and myself.

THE COURT:  And by "the second," you're referring to the asking of grand jurors who had made up their minds already to not partake in the second hearing?

MR. SKIBA:  That's correct, Your Honor.  And that was the reason that that was flagged to the criminal chief.  The criminal chief said we need to call this off for the day to gather, understand the right protocol.  And then the third day I believe was also elevated as well.

THE COURT:  And can I ask, because defendants will be asking and it is not clear from the transcripts, was there also a no bill after the second presentation?

MR. SKIBA:  There was no presentation of the indictment that day.

THE COURT:  Okay.

MR. SKIBA:  The agent victim, Agent Woemmel, was there that day.  My recollection is, midway through his testimony we had gotten the call to call it off for the day.

THE COURT:  It says in the transcript something like testimony ended abruptly.

MR. SKIBA:  And that was the reason, Your Honor, for the restarting of the law presentation on both 372 and Section 111.  And I believe, we just restarted Agent Woemmel's testimony anew as if -- and there were people that were there the third day that were not there the second day.  There weren't even the ones who said -- who made comments and then walked out.  They just weren't there.  So we started entirely anew on that third day.

THE COURT:  How many grand jurors absented themselves after they were told?

MR. SKIBA:  To my recollection it was -- there was one individual ███████████████████████

████████████████████████████████████

██████████████

████████████████████

█████████████████████████████

██████████████████████████████

██████████████████████

THE COURT:  Was he the only one who left?

MR. SKIBA:  No.  There was, I believe, two or three additional ones.  It was not a large quantity.

I think he -- my recollection is he was the only one who had left on his own volition, if you will.

MR. PARENTE:  Judge, was the agent in the grand jury for this?

THE COURT:  No.  It doesn't appear from the transcript as though he was, at least.

MR. SKIBA:  If I can correct that, Your Honor?

THE COURT:  Yes.

MR. SKIBA:  I think what it appears -- and this is not -- I don't recall this in the moment, but it's reflected in the transcript on the first day, was Agent Hylton was in the room during the vouching.

Again, that's not my recollection from the day of, but it could have just been, again, lots of things happened that day.  The agent being in there when he should have been in the hallway, which is not top of mind.

THE COURT:  I think Mr. Parente was asking about the second time when the grand jurors were leaving whether the witness was present for that.

Did I understand the question right?

MR. SKIBA:  I can speak to that.  I do want to be careful, because I want to take a look at the transcript again.

My recollection is what we had done on Day 2 and Day 3 is we presented the law first before we had called any witnesses, because not only did we not have a lot of time to present the law on Day 1, I think as Your Honor noted, it

wasn't potentially accurate.

So my recollection is it was during the law presentation, or even right before the law presentation, that these grand jurors walked out.

Again, I want to be careful and not make a categorical statement.  That's my recollection.  I'm happy to, again, review the transcript again just to clarify.

THE COURT:  All right.  Prefatory gating question here, do you all want to go to trial on Tuesday?

So take a break; talk amongst yourselves.  If you can't make a decision in this moment, then fine.  We can reconvene at some point later.

(Recess at 11:30 a.m., until 11:44 a.m.)

THE COURT:  All right.  You've had some time to talk amongst yourselves.  Do you have a plan at this moment or a plan to make a plan?

MR. PARENTE:  We do, Judge.  We definitely are going to need more time.  So we agree that the trial date should be vacated based on what you just informed us of.

We are obviously going to be filing significant motions based on what you just previewed for us.  I think we're going to ask for a briefing schedule at least 21 days on our side.

Given that, we would also ask that Your Honor reconsider the decision to unseal the transcript of today's

proceedings since this trial is not going to happen any time soon.  So that concern is sort of lifted.

And just, again, based on what's going on in this country right now, I think the public has a right to know about what you just told us, because I think it does impact other cases.  I know there are other cases right now where people are trying to get grand jury transcripts, and other judges are trying to weigh, like, is the U.S. Attorney's Office acting in the right way.  And based on what I heard having come out of that office, I'm sick to my stomach about what you just described to me.  And if it happened here, I can tell you that it's probably happened in other offices, and I think the public's need to know trumps any picking of a jury in this case.  Because I don't know if we are ever going to get there based on what you said.  And I don't think these three prosecutors will be trying this case, in my opinion.

MR. CAMPBELL:  I agree with that.

On behalf of Andre Martin, our request is that you unseal both the transcript of today and the grand jury transcripts, anonymized to the extent that it's necessary. But it sounds like what we're talking about is colloquy, not anything that is truly presumed or intended to be kept secret under 60.  But at a minimum the transcript from today should be released immediately.

MS. DE PODESTA:  We absolutely join that request.

MR. HERMAN:  Yes, we join on behalf of Abughazaleh.

THE COURT:  All right.  Let's do this:  The trial date will be vacated.  It sounds like no one is asking for a new trial date to be set at this time.

Do you want a briefing schedule on kind of everything just as one?

MR. CAMPBELL:  So, Judge, at least on behalf of Mr. Martin, we know that there's going to be a motion and probably a request for a hearing with respect to dismissal with prejudice, okay.  I think I need to figure out if there are other things, which is why we're asking for some time.  And so if we can set 21 days on that particular item, from my perspective, and then if there are other things and we need more time, we will ask you for that.  But 21 days to brief the issues that have arisen out of this hearing.

Can I have a moment, Your Honor?

(Counsel conferring.)

MR. CAMPBELL:  Maybe 28 days.

But, Judge, we've got to digest all of this and figure out what all we need to brief.

THE COURT:  30 doesn't actually help you because that gives you a weekend, so ...

I'll give you the time you want, and you can take an extension of time if you have still not figured things out by then.

So let's just set the initial briefing for 28 days, and if there's a motion for an extension of time, we will extend it.

So it will June 18th for opening briefs on these topics.

Response on these topics?  How long?

MR. HOGAN:  Equal time.

THE COURT:  July 16th for the response.

Let's talk about the unsealing.

MR. CAMPBELL:  Can we get a reply 14 days thereafter?

THE COURT:  Sure.  Sorry.

July 30th for the reply.

And then we will set a hearing, if necessary, sometime after that, if it is appropriate to do so.

So the unsealing -- I mean, there's a few different ways we can go about this.  The first question is unsealing of this particular hearing.

Question Number 2, which I think is a different question, is unsealing of the grand jury transcripts.

Question Number 3 is what redactions, if any, would be appropriate to the grand jury transcripts.

I will tell you straight off, my initial instinct, having done no legal research at this point, and not heard anyone's arguments, is that the grand jurors' personal opinions about the case probably should stay under seal,

because to the extent there is an interest in secrecy and promoting full and free discourse amongst grand jurors, that is where I see the interest to be strongest.

So that is my initial thought, but I would like you all to think about it. You have to read them still. So read them. And then I would like -- tell me how many days you would like to submit something on unsealing of this hearing, unsealing of the colloquy portions as a whole. I don't think we're asking for unsealing of, like, the witness portions, right? We're talking about the colloquy between the prosecutors and the grand jurors and then what redactions, if any, would be appropriate.

MR. PARENTE: Would you consider just the unsealing of today's hearing instanter right now, because I think -- again, there is a compelling interest now that the jury is not going to be picked any time in the near future, that interest is gone. And I don't think you said anything today that would interfere with the grand jury matter.

THE COURT: There are a few things that were said today that impact the grand jurors' thoughts, responses, et cetera.

So tell me how quickly you can brief your position.

Also, the government needs a chance to quickly respond.

So if you want to do it orally, you can. If you want

to do it in writing because there are a few things to think through, even if it's a 24-hour date.

MR. PARENTE:  We can do it orally right now.  We are okay with you -- at least team Straw is okay with you redacting what you have expressed about the grand jurors' personal opinions.

I think your summary of what occurred there is critical.  And I think our clients have been dragged through the mud repeatedly by this office.  And knowing that this is -- that they were sitting on this the whole time is just infuriating.  I mean, it is going to be very hard for my client to not be able to talk to his family about this, his kids about this.

I think the public has a need to know.  Things are happening in this country every minute.  There is a weaponization fund that I think we are now eligible for.  And I think people need to see what this DOJ is doing.

MR. CAMPBELL:  On behalf of Andre Martin, if you have any concerns that relate to, you know, disclosing what a grand juror said, redact it from the transcript.  That ought to be out there by the close of business today.  We can deal with the grand jury transcript in time, we can brief that.  But the transcript of today's proceeding with the Court's judgment on what, if anything, ought to be redacted should be out today.

MS. DE PODESTA:  We agree with the understanding that

any opinions of the grand jurors with respect to the facts that it probably should remain secret under the rules of the grand jury.  But we would ask that anything else with respect to today's hearing be released today.

MR. HERMAN:  Judge, we agree, and we would also inquire, if the press is still outside, if there could be a short summary of what happened.  Using Your Honor's judgment about saying whatever you feel comfortable saying to the press.  I believe they're still out there right now.

THE COURT:  Let me think about that.  I'm not wild about creating a court proceeding just for the purposes of letting the press know.

MR. POUTROS:  Your Honor, perhaps just to advise the press that --

THE COURT:  Sure.  We can go on the record to strike the trial date.

Okay.  Anybody else?

That's it.

Okay.  Does the government have a response at this time about the -- it sounds like the only thing on the table at the moment is the unsealing of today's proceeding.

MR. HOGAN:  I think we'd like to get some guidance before we give a response.

THE COURT:  Let's do this:  I am going to invite anybody who wants to come in.  We will put on the record that

42

the trial date has been vacated.  We will put on that the trial date -- that a briefing schedule has been set for motion practice based upon the grand jury transcripts, and that you, of course, still need to see them.  We'll put on the public record the amount of time that the government has to give you those transcripts.  And then we can take a break for some period of time.  And the government can come back and state on the public record what its position is on the unsealing of today's hearing.

Does that sound like a plan?

MR. CAMPBELL:  Yes, Judge.

THE COURT:  All right.  Let me figure out how logistically we open the courtroom.

(Recess at 11:53 a.m., until 11:55 a.m.)

THE COURT:  All right.  We are back on the public record.

The May 26th trial date has been vacated at the request of the defendants, and no new trial date will be set at this time.

The parties have requested a briefing schedule for briefing of potential motions based upon the grand jury matter.

The defendants' brief will be due on June 18th, 2026.

The responsive brief by the government will be due on July 16th.

The reply brief will be due on July 30th.

The government has -- the defendants have again requested the unsealing of today's hearing.  And the government has asked for a brief time to consult with their front office about their position on that.

How long do you need?  It is currently 11:55.

MR. HOGAN:  15 minutes.

THE COURT:  Oh, 15 minutes.  Okay.

MR. HOGAN:  I think, assuming people --

THE COURT:  It is lunch time.

How about we resume at 1:00 p.m., and the government will present its position on the unsealing of today's hearing.  With the understanding that the Court at this point plans to redact out from the transcript portions of the hearing that discussed the grand jurors' personal opinions about the case, because the interest in secrecy I think is still present for those.

The government is to provide the grand jury transcripts, both the unredacted form and the form that I was given initially, the redacted form, to the defendants by 3:00 p.m. today, please.

I will give a heads up to the defendants, there are portions that are obviously redacted, meaning blacked out lines, there are also pages missing.  So you will need to look at both of those things when you get the two sets together.

44

MR. PARENTE:  Judge, on that point, I meant to raise this earlier, is somewhere in the record just so it is clear what they gave you initially, is that going to be somewhere?

THE COURT:  That's what I just attempted to say.

MR. PARENTE:  Okay, got it.  Sorry, I just have missed it.

THE COURT:  There are two sets of documented, the redacted version, the unredacted version.

And then the defendants will submit in how long your position papers on the unsealing of the grand jury transcripts and any potential redactions for those?

MR. CAMPBELL:  Can we have until end of day Tuesday?

THE COURT:  Sure.

MR. CAMPBELL:  I'm sorry, taking into account the holiday, can we have until Wednesday?

THE COURT:  Sure.  The 27th then.

And then how long does the government want to respond on the issue of the unsealing of the grand jury colloquy?

MR. HOGAN:  Wednesday?

THE COURT:  They're doing Wednesday.

MR. HOGAN:  Friday.

THE COURT:  Okay.  So we will reconvene on the public record at 1:00 p.m. for the government to state its position about the unsealing of today's hearing.

Is there anything else that we need to address at the

moment?

MR. CAMPBELL:  No, Your Honor.

MR. PARENTE:  No.

THE COURT:  All right.  Thank you very much.

(Recess at 11:58 a.m., until 1:02 p.m.)

(Enter Mr. Andrew S. Boutros, Mr. Steve Mandell, and Mr. Brian Saucier.)

THE COURTROOM DEPUTY:  Recalling 25-CR-693, USA vs. Rabbitt, et al.

MR. BOUTROS:  Good afternoon, Your Honor.  I was looking to see if it was noon or not.

Andrew Boutros on behalf of the United States as the United States Attorney.

THE COURT:  Good afternoon.  We have three others here.  Can you state your names for the record?

MR. HOGAN:  We do.  AUSAs Hogan, Skiba and Almendarez.

THE COURT:  Thank you.

MR. PARENTE:  Good afternoon, Your Honor.

Chris Parente, Damon Cheronis, for Mr. Brian Straw, who is present in the courtroom.

MR. CAMPBELL:  Good afternoon, Judge.

Terry Campbell, Mallory Davenport, and Ted Poulos on behalf of Mr. Andre Martin, who is also present in court.

MR. HERMAN:  Good afternoon.

Josh Herman, Molly Armour on behalf of Kat Abughazaleh, who is present.

MS. DE PODESTA:  Good afternoon, Your Honor.

Nancy DePodesta and Carly Chocron on behalf of Michael Rabbitt who's also here present in court.

MR. MANDELL:  Good afternoon, Your Honor.

Steve Mandell and Brian Saucier on behalf of the intervenors.

THE COURT:  Welcome back.

MR. MANDELL:  Thank you.

THE COURT:  So we have resumed to ask the government for its position on whether or not the transcript from this morning's proceeding should be unsealed.

MR. BOUTROS:  Your Honor, the government takes no position.

THE COURT:  And the defendants have all requested, I think, the unsealing.  Mr. Mandell has requested unsealing on behalf of the intervenors.

That motion will be granted.

There is a presumption of public access to court proceedings.  There is also a presumption of secrecy for grand jury proceedings.  Today's hearing was a bit of a hybrid as it was a court proceeding that involved matters that occurred before the grand jury.

My initial rationale for sealing the proceeding had

to do with the potential prejudice to the trial process, given that we were, as of this morning, a few days away from selecting a jury.  That is no longer the case.  The trial date has been vacated.  No new date has been set, and we may never get to the point of a trial in this case.

Given that, the presumption of public access to court proceedings wins in our dueling constitutional amendments discussion from this morning.

The Seventh Circuit has also held that I have the inherent authority to release grand jury material when it is in the interest of justice.  Here, I believe that it is.

United States citizens have a right to understand how their government is functioning.  And when things do not function as they should, they have a right to know that.  Our democracy does not work if public officials can hide what they're doing from public inspection and judgment.

The Supreme Court has outlined five reasons for maintaining grand jury secrecy.

First, to present the escape of those whose indictment may be contemplated, which is obviously not at issue here.

Second, to ensure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors.  Some of that applies here.  We'll talk about that in a moment.

48

Third, to prevent subornation or perjury or tampering of witnesses who may testify before the grand jury and later appear at the trial.  Given that our proceeding this morning did not discuss any witness testimony or any witnesses, that does not apply here.

Fourth, to encourage free disclosures by persons who have information with respect to the commission of crimes. Again, since this proceeding did not talk about any of the merits of the underlying case, that does not apply here.

And, fifth, to protect the innocent accused, who is exonerated from disclosure of the fact that he has been under investigation.  And, obviously, all of the defendants here have requested the disclosure, so that also does not apply.

What we discussed at today's hearing involved mainly the conduct of the prosecutors.  It did not involve any witness or the merits of the case.

Given that the only factor that would counsel in favor of secrecy is the discussion about the grand jurors' views of this case, which we had a little bit of, I'm going to redact out the portions of the transcript that talks specifically about the grand jurors' feelings about the case, which is, I would say, probably about 1 percent of what we talked about, with all the other parts being unsealed.

Given that high import of government transparency and the lack of interest in the statements being kept secret, I do

believe it is in the interest of justice to release the transcript.

I am not ruling at this time on the release of the grand jury transcripts that underlie the discussion today. The defendants still have not received those or had a chance to review them or to weigh in on that. We have already set a briefing schedule for them to do that, so that would be a separate discussion for later. But I thought it was important to at least get you access to the proceeding today as quickly as we can, keeping in mind we have logistical things we have to do to make that transcript actually available as well as redactions. So I am hoping that we will do that before close of business today.

I see no objection. We will try to make that happen.

So let me ask the parties this: I have set some deadlines. We have obviously struck the trial date. Is there anything else we need to do today?

MR. BOUTROS: Yes, Your Honor. If I could, Your Honor, be heard.

First, perhaps this will moot a lot of the deadlines that Your Honor has to set because I'm up here to dismiss the information.

And in doing so, I want to also, with the Court's permission, address some of the items that came up this morning. And so with the Court's indulgence, I'd ask to be

heard.

THE COURT:  Yes.  Let me ask first, is that dismissal with prejudice?

MR. BOUTROS:  With prejudice.

THE COURT:  That will be granted.

And you may be heard.

MR. BOUTROS:  Thank you, Your Honor.

So while this proceeding was taking place earlier this morning, I was actually in the chief judge's courtroom swearing in new AUSAs.  So it was ironic as this was happening that we were celebrating six new AUSAs being sworn in today, three in the civil division and three in the criminal.

I came down from that to learn that Your Honor was understandably quite upset.  And I understood that Your Honor was quite likely upset when I saw the minute order that was issued, I believe, yesterday seeking today's hearing.

It is my very sincere belief, Your Honor, that no prosecutor acted intentionally in misleading you, and that there was no desire to mislead the Court and no deliberate misconduct on the part of the prosecutors.

I know Your Honor has indicated that you may hold a hearing or will hold a hearing.  We obviously defer to Your Honor.  But I did want you to know from me, that from my assessment, having spoken extensively to the prosecutors, I do not believe that whatever errors were done specifically as it

relates to the redactions, were done intentionally or with a desire to mislead the Court.

And if Your Honor wants to hear more about that, I'm happy to come back and explain why that is the case.

I also want to put on the record now that these minutes have been unsealed pursuant to your order, that I was completely unaware of any vouching that took place in the grand jury, and only became aware of it on either April 27 or the 28th. And immediately when I learned about that vouching, the next day I moved to dismiss the indictment. That was the first time any issue of vouching rose to my level. And, frankly, to the level of anyone in the front office.

With respect to the excusing of grand jurors that took place, which was the second time that the prosecutor sought to return an indictment, that is an issue that I was aware of in realtime. And once I became aware of it, I immediately called off that grand jury session.

I then reached out to the chief judge to make her aware of what had happened, because she supervises the grand jury.

We then issued all-office guidance on -- as to how -- what you are to do as an AUSA if you confront grand jurors who don't want to deliberate or if there is tension in the grand jury. I met with the chief judge. We established a protocol, and then we sent out office-wide guidance for how AUSAs are to

respond in the future in the event that there is tension such as what took place in that grand jury.

And I also want to put on the record and for your benefit, Judge, that the reason we didn't go into a new grand jury was because we were concerned that by going into a different grand jury, we may be perceived as forum shopping, unwilling to respect the decision of the grand jury. And recognizing there is a difference in view as to the function of the grand jury. Some constitutional law scholars will say that the grand jury's job is to find probable cause and return a true bill when there is probable cause. Others will say that it is also the conscience of the community, and that it speaks for the community, and it dates back to the colonies when unfair kings were perhaps being oppressive to colonists. And so that the indictment and the grand jury process was codified in the Constitution to reflect the consciousness of the community.

And so given that view, it was important to me that I say we will go back into the same grand jury again and do it right as opposed to trying to go into a new grand jury, which would have certainly eliminated all of these issues, a fresh grand jury.

I will also tell Your Honor that I was completely unaware of any ex parte communications that took place in the third instance until I became aware of the grand jury

transcripts. And within the next day or 24 hours thereabout, we immediately dismissed Count 1.

So I was unaware of the vouching. I was unaware of the ex parte communications, all except at the time that right before we dismissed the indictment. And I made the decision to dismiss the indictment.

I do at least commend the prosecutor who was in the grand jury and who did have the ex parte contact that she had the wherewithal to put it on the record, so that it could be captured, because it also, Your Honor, as you know, what happens in the grand jury stays in the grand jury. So I do give that prosecutor credit for doing so.

I will tell Your Honor that as upset as you are and have been, I was upset as well. I too had not seen conduct like that like that, and it upset me, which is why we did dismiss that indictment and proceeded with an information.

In doing so, we wanted to moot whatever had taken place in the grand jury. And we were also removing the felony that had now been hanging out there.

And to be sure, we could have gone back and I could have instructed the prosecutors to go into a clean grand jury and to return a new indictment. But it was my decision to forego the felony charge and to proceed purely on the basis of a misdemeanor that was reflective of all the things that we have just finished talking about.

So I wanted Your Honor to hear from me. Specifically, I wanted the public to hear from me, because I do agree with you that we do have an open court system, and the public should know what's going on, and they should hear it from the chief federal law enforcement officer.

And I'm happy to answer any questions, Your Honor, but I did want to put all of this on the record. And I did want to emphasize that I truly do believe that all of these prosecutors here, no one acted with the intent to mislead Your Honor; and I think that they were following your order to give the law, and they provided the law. And in the case of two of the prosecutors, I believe they were either in the middle of trial when they were trying to prepare this stuff, literally in the middle of trial, or on the verge of being in trial and they were moving very quickly.

And, obviously, Your Honor knows, because you were here for it, when we dismissed that indictment on April 28th, the prosecutors did offer to give you the unredacted full copy. And I would submit very respectfully to Your Honor that's not the behavior of people who are trying to mislead to offer the transcript to the Court.

So we, obviously, defer to the Court's power and to its judgments on terms of next steps, but I did want you to hear from me as to what I believe took place with respect to the other things that I just finished putting on the record.

THE COURT:  Mr. Parente, I sense you want to be heard.

MR. PARENTE:  Thank you, Your Honor, this is the second case I've had with U.S. Attorney Boutros, and I commend his ability at the end of the day to stand up and do what is right.  The timing of these things is troubling, right.  Even as of yesterday, they were going forward with this case.  It wasn't until Your Honor expressed strong displeasure today that they are now dismissing this.  Up until yesterday he knew what was in those grand jury transcripts and he was still instructing his prosecutors to go to trial on this.  And it wasn't until you made your strong comments, which were appropriate, that he changed his mind.  I do want to note that and I do appreciate him dismissing this.

Second, I would ask that the office, and maybe because Andrew Boutros is here he can remove from the website this press release that says that these guys have all been indicted.  At least put a banner that the charges have now been dropped.  I would appreciate that for my client.

MR. BOUTROS:  There's no objection to that, Your Honor.  That is a small point.

MR. PARENTE:  Too, Judge, again, you repeatedly say there's only 30 lines.  There's only 30 lines.  These gentlemen were sitting here and heard the Court say that and now we find out there are missing pages.  I don't understand

56

how that is not misleading the Court. I understand Mr. Boutros advocating for his AUSAs, but having done the job, if I heard a Judge say, well, there is only 30 lines. I think it's IT related, what could it be. And I know in my mind what is going on here, how do you not approach the Court?

MR. HOGAN: I'd like to address that. The direction was to give the Court the law on 372 charge and there was a lot of other discussion in the grand jury. And the missing pages also account for the testimony of at least two witnesses. We just didn't turn over the testimony of one of the agents, for example, or both of the agents, I think.

THE COURT: Mr. Parente still has not seen the transcripts.

MR. HOGAN: There was some IT issues.

MR. PARENTE: I'm sure there were. But these are games that civil attorneys play. This isn't what someone whose job it is to always do the right thing should do. Again, this was personal, Judge. It was quoted in the paper, "Prosecutors blasted Parente for hysterically speculating about perceived misconduct in what was the normal practice" --

MR. HOGAN: -- that was --

MR. PARENTE: I'm not done -- "in Chicago's federal court. There was nothing remotely unusual, let alone nefarious about that state of affairs." How you can say that in this context is beyond me.

MR. HOGAN:  I'll tell you how because that was with respect to the motion to dismiss with prejudice.  It had nothing to do with the grand jury minutes at all.  Entirely different issue.

MR. BOUTROS:  Your Honor, I want to be heard on the first point Mr. Parente made.  Once I became aware of the conduct in the grand jury, within 24 hours we dismissed.  We then filed an information that has nothing to do with the grand jury, and I was prepared and still would have been prepared to go to trial on the misdemeanor count.  Because I do believe in the rule of law.  And, Your Honor, there was something that you said that really caught my attention and it made the press.

Mr. Parente and the defense had asked to take the jurors to go see the Broadview facility and the government didn't object.  And Your Honor said that you were not going to allow for that to happen because you didn't want to potentially subject the jurors to mob scene and to the chaos that ensued.  And that's what this case is about.  Section 111 prohibits any employee or federal official from being assaulted, intimidated, interfered in the carrying out of the exercise of their duties.  That applies to whether you're dealing with an elected official, a United States Senator, a congressman, a federal judge, a law clerk, a US attorney, an AUSA, or an ICE agent.  And the conduct that took place there,

58

if it had occurred to a federal judge or to a sitting member of Congress, we would not be having discussions about whether or not that was appropriate or not appropriate, and there would be uniform view in agreement that the conduct that took place is unacceptable in a civilized society. And it is for the grace of God that that agent moved at 2 miles an hour, that the agent didn't panic and strike on the accelerator and hurt somebody, that the agent didn't panic and pull out his gun and shoot somebody, that nobody on that scene perhaps had a gun and shot at the agent. And so I do want to say, we stand by the charges that we were prepared to bring, but when we became aware of the conduct in the grand jury, we corrected it by dismissing the indictment immediately. We tendered or at least offered to tender to the Court the transcripts unredacted and we were prepared to proceed on a misdemeanor, which as the defense knows, is a probable cause determination made by the United States Attorney. And this United States Attorney believes that there's probable cause that a crime was committed, and it was the 111 misdemeanor that we were prepared to go to trial on on Tuesday.

THE COURT: A few points. My turn. To be clear, I did not refuse to take the jurors on a field trip to Broadview because I didn't want them to be exposed to the mob like these defendants. That is not at all what I said. If you interpreted it that way, that is apparently on me for not

59

being clear.  What I said was, Broadview is a public place that has people from all walks of life.  It is an uncontrolled setting where I could not prevent the public from taking photos or recording our jurors, as I can in this building; nor could I prevent messages from being sent to the jurors about people's views of this particular case as I can in that jury.  So that's first.

Secondly, you are significantly undercutting your mea culpa here by standing behind the charges and continuing to vilify these particular defendants.

Third, what matters right now is not the defense attorneys or Mr. Boutros or the prosecutors.  It is these four defendants whose cases just got dismissed, who no longer have to go to trial on Tuesday.  So I suggest we all take a break.

The issue of sanctions can be decided after the dismissal, I believe.  Someone tell me if I'm wrong on the law on that.  But any type of sanctions for misconduct that occurred before this tribunal can wait until later.  But my thought would be that we get this dismissal on file.  We release these four people and hopefully they will never have to come back to this building again unless it's voluntarily so.  And we meet again later to discuss these other issues.

Mr. Parente, do you have an objection to that?

MR. PARENTE:  I just want to make an exhibit part of the record if you would allow.  It is just an email that I

sent to Mr. Hogan in this time of transparency, where I say, if the Court disagrees with your mootness argument tomorrow, could you bring at least one copy of the unredacted transcript to court.  He responded no.  So he can argue what he wants.  I just want this part of the record in case this does become an issue later on.  This is Defense Exhibit 1.

THE COURT:  We will make that part of the record.

Does anyone have anything else that they need to say now?

MR. CAMPBELL:  (Shaking head.)

THE COURT:  Thank you very much.  We will work on getting the transcript out.

(Concluded at 1:21 p.m.)

*    *    *    *    *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/s/Noreen E. Resendez*                          *May 21, 2026*
Noreen E. Resendez, CSR, RPR, CRR                     Date
Official Court Reporter