IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:26-cr-139-ECM-KFP |
| | ) | |
| SOUTHERN POVERTY LAW CENTER, INC. and HEIDI BEIRICH | ) ) | |

**RESPONSE OPPOSING THE SPLC'S MOTION TO COMPEL**

The Southern Poverty Law Center, Inc. (SPLC) argues that *Brady v. Maryland*, 373 U.S. 83 (1963), compels the prosecution team to search for and produce a broad swathe of information going back more than 46 years. (*See generally* Doc. 114.) The SPLC overstates the government's obligations. Certainly, under *Brady*, the prosecution must turn over evidence in its possession that is otherwise unavailable to the SPLC, if it is "material" to the charges. *See, e.g., United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011); *Riechmann v. Fla. Dep't of Corr*., 940 F.3d 559, 580 (11th Cir. 2019). But the SPLC already knows (or should know) the circumstances of when it provided information to law enforcement in the past. Indeed, the motion to compel demonstrates this fact. (*See* Doc. 114 at 5-6) (detailing three occasions when the SPLC says it provided information to law enforcement). There is no requirement that the government seek out evidence already available to the SPLC. Nor is the government required to seek information that may be in the possession of sources outside the prosecution team. Finally, based on the charges in this case, the overly broad information sought is not "material." Thus, the motion to compel should be denied.

## I. Background

This case concerns whether the SPLC misled donors by not telling them that donor funds were being provided to "leaders and organizers of racist groups [such as the] Ku Klux Klan, the

Aryan Nations, and the National Alliance" and used in ways that, among other things, expanded those groups. (Doc. 115 at 1.) Beginning in the 1980s, the SPLC began paying individuals "either associated with violent extremist organizations or who had infiltrated such organizations." (*Id.* at 3–4.) The SPLC paid these "field sources," more commonly referred to as "Fs," with the donated monies. (*Id.* at 4.)

Between 2007 and in or about 2023, the Fs used the donor money to, among other things: host rallies for their respective groups; recruit new members and raise additional funds to expand their extremist agenda; purchase racist regalia such as Ku Klux Klan robes; and otherwise live off the money given to them by the SPLC. (*Id.*) The SPLC knew a portion of the donor funds were being used in direct conflict with the SPLC's stated purpose, but its donors did not. (*Id.* at 1 and 4.) The SPLC even used the identity and the actions of Fs to directly raise additional funds; according to the indictment "the SPLC had an entire 'Extremist File' webpage dedicated to" one F that it then used "to solicit more public donations." (*Id*. at 8-9.) In other words, donor funds were used to create the very "extremist" individuals and conduct that were then used to solicit additional donor funds.

To hide its association with the Fs, the SPLC opened bank accounts using fictious entities to "secretly funnel donors' money to the Fs." (*Id.* at 5.) The only purpose and use of these entities was to pay the Fs on the SPLC's payroll. (*Id.* at 6.)

The Second Superseding Indictment alleges that, in hiding the full nature of the Fs from its donors, the SPLC committed wire fraud, bank fraud, money laundering, and conspired to do the same. (*See generally* Doc. 115.) The fact that the SPLC may have provided some information obtained through its Fs to law enforcement does not exculpate its failure to inform its donors that the F's were also using donor funds to maintain and expand their extremist organizations. Two

things can be true at the same time: the SPLC sometimes provided information to law enforcement generated from the Fs, while also defrauding donors by not disclosing that at least a portion of donor funds was funding the growth and activities of various extremist groups.

## II. The Government's Disclosure Obligations

Under *Brady v. Maryland*, the government generally has a duty to produce exculpatory material within its possession even without being asked to do so by the defense. *See United States v. Jordan*, 316 F.3d 1215, 1251–52 (11th Cir. 2003). But *Brady* "does not create a broad, constitutionally required right of discovery." *Jordan*, 316 F.3d at 1252. Nor is the government required "to disclose its entire file to the defense." *United States v. Rigal*, 740 Fed. App'x 171, 176 (11th Cir. 2018) (unpublished). Rather, the government fails to live up to its obligations under *Brady* if:

> (1) The government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different.

*Riechmann v. Fla. Dep't of Corr.*, 940 F.3d at 580 (quoting *United States v. Stein*, 846 F.3d 1135, 1145–46 (11th Cir. 2017)).[1]

## III. The prosecution team has fulfilled its *Brady* obligations.

[1] Notably, cases discussing alleged *Brady* violations usually involve the discovery of exculpatory information *after* trial. *See*, *e.g.*, *United States v. Agurs*, 427 U.S. 97 (1976); *Wood v. Bartholomew*, 516 U.S. 1 (1995); *United States v. Laines*, 69 F.4th 1221 (11th Cir. 2023). Nonetheless, the standard articulated is helpful to analyze the SPLC's requests. *See, e.g.*, *United States v. Ambrose*, No. 8:23-CR-13-KKM-CPT, 2024 WL 6473202, at *4–*5 (M.D. Fla. Apr. 8, 2024), *objections overruled*, No. 23-CR-13-KKM-CPT, 2025 WL 1633756 (M.D. Fla. June 9, 2025); *United States v. Wasserman*, No. 8:20-CR-207-CEH-JSS, 2022 WL 2116775, at *2 (M.D. Fla. June 13, 2022), *aff'd*, No. 8:20-CR-207-CEH-MRM, 2022 WL 17324445 (M.D. Fla. Nov. 29, 2022).

The SPLC's motion to compel seeks all information regarding its prior interactions with law enforcement and is essentially unlimited in time, scope, or source. The request demands that the government provide any documentation, regardless of form, showing prior interactions between the SPLC and any federal law enforcement agency over the course of the last four decades. (Doc. 114 at 11; Doc. 114-1 at 4.) Such a request is unsupported by the law and would cover wide swaths of information, bearing no relationship to the specific charges in this case.

Indeed, the SPLC's request is not even limited to occasions when it shared information with law enforcement that it obtained from the Fs. (*Id*. at 13) (seeking "[c]ommunications and other documents showing that the SPLC provided information about extremist groups to law enforcement, *whether or not the material references informants*") (emphasis added). It is difficult to imagine any relationship between the charges and the SPLC sharing information with law enforcement unrelated to the Fs, such as, its "Hate Map," information from a publicly available website or any other publicly available source. Nor is the SPLC's request limited to its own informants' interactions with law enforcement. Rather, the SPLC demands information derived from law enforcement's own use of confidential sources. (*Id.*) Again, it is difficult to imagine any relationship between such information and the specific charges here. Finally, without sufficiently explaining the connection, the SPLC seeks tax records to determine if any of the Fs received favorable treatment on any outstanding tax debts. (*Id.*) In sum, the SPLC's requests are overly broad in scope, time, and source. The motion to compel is unsupported by the law or the charges in this case. Thus, the motion should be denied for at least three reasons.

First, the SPLC's definition of the "prosecution team" here stretches the idea beyond recognition and would require the government to search the entirety of records possessed by different federal agencies on the chance that there may be information out there related to the

requests. But the SPLC's definition of the prosecution team is not well-founded. Second, the SPLC already knows, or should know, when and how it has previously shared information with law enforcement. Indeed, in its motion to compel, it identifies three occasions when it says it shared information with law enforcement; there is no reason why it would not have that information as to every occasion. (Doc. 114 at 5-6.) Finally, and perhaps most significantly, the information sought is not material to the charges in this case.

*a. The requested information is not within the prosecution team's possession.*

The SPLC requests all "documents or information," no matter the form, in the possession of different federal agencies that details its interaction with federal law enforcement since the 1980s. (Doc. 114 at 11.) But the government is only obligated to produce information held by its "prosecution team." *See Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002). Thus, the Court must first define who makes up the "prosecution team" before considering what information may be in the government's "possession." *Id.*

i. The SPLC overstates who makes up the prosecution team.

To determine the scope of the government's discovery obligation under *Brady*, the Court must first define the prosecution team. *See Moon*, 285 F.3d at 1309, ("We have held that a claimant must show that the favorable evidence was possessed by 'a district's prosecution team[.]'"). The "prosecution team" is generally understood to be comprised of "the prosecutor or anyone over whom he has authority." *Id.*; *see also Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995) (explaining that a government prosecutor "has a duty to learn of any favorable evidence known to the others acting *on the government's behalf in the case* (emphasis added)); *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) ("*Brady* and its progeny apply to evidence possessed by a district's prosecution team, which includes both investigative and prosecutorial personnel.")

Who compromises the "prosecution team" depends on the particular facts of the case. *Moon*, 285 F.3d at 1309. Indeed, courts should be hesitant to adopt a "monolithic view" of the government. *Id.* at 1310 (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d. Cir. 1998)). Instead, courts should look at the "extent of interaction and cooperation between" the involved agencies in determining who is part of the prosecution team. *Moon*, 285 F.3d at 1309.

Here, the prosecution team consists of agents from the Federal Bureau of Investigation (FBI), Internal Revenue Service (IRS), and the United States Postal Inspection Service (USPIS). The SPLC is generally right that these agencies commonly make up members of a prosecution team. (Doc. 114 at 12.) Where they go wrong, though, is suggesting that *the entirety of these agencies*, including their constituent parts and sub-offices, *make up the prosecution team here* irrespective of whether they have any involvement in this case. The SPLC's monolithic view would stretch the idea of who makes up the "prosecution team" beyond recognition. *See*, *e.g.*, *Avellino*, 136 F.3d at 255 ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis."); *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 844–45 (9th Cir. 2024). ("Oklah's arguments conflate the DoD components that participated in the investigation with the entirety of DoD.").

Simply put, the SPLC's idea of the prosecution team is inconsistent with the law in this Circuit. For example, in *Meros*, the Court did not impute the knowledge within the possession of two different United States Attorney's Offices to the office in the Middle District of Florida, explaining "*Brady* … applies only to information possessed by the prosecutor or anyone over whom he has authority [and] [a] prosecutor has no duty to undertake a fishing expedition in other

jurisdictions . . . every time a criminal defendant makes a *Brady* request[.]" *Meros*, 866 F.2d at 1309.

Similarly, in *Moon* the Eleventh Circuit did not impute knowledge held by a Tennessee state agency to a Georgia state agency even though a detective with the Tennessee agency testified at the trial of the defendant in the Georgia case. 285 F.3d at 1309–1310 ("We therefore refuse to impute to the Georgia prosecutor the evidence regarding DeJose possessed by Davenport . . . [as there was] no evidence that Tennessee law enforcement officials and Georgia prosecutors engaged in a joint investigation[.]").

Other circuits are of a similar mind when it comes to defining who makes up the "prosecution team." In *United States v. Taylor*, 942 F.3d 205 (4th Cir. 2019), the Fourth Circuit refused to impute the knowledge held by one federal agency to the prosecutors on an unrelated case even though both arose in the same office:

> *Brady*'s command is not so broad as to reach the circumstances of this case. Here, the ATF officers investigating Santiful were not part of the GTTF "investigative team," which was made up of FBI officers; the ATF officers were looking into an entirely separate case related to the Straight Kash Cartel. Imputing their knowledge to the prosecutors in this case would require us to stretch *Brady* beyond its scope and would effectively impose a duty on prosecutors to learn of any favorable evidence known by *any* government agent. *Cf. Fullwood v. Lee*, 290 F.3d 663, 685 n.12 (4th Cir. 2002) (imputing to prosecutors knowledge of the defendant's private conversation with a police officer *working the same case*); *United States v. Sutton*, 542 F.2d 1239, 1241 n.2 (4th Cir. 1976) (imputing to federal prosecutors the knowledge and actions of an FBI agent *working the same case*); *Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir. 1976) (imputing to prosecutors a promise made by state police *working the same case*); *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964) (imputing to state prosecutors the knowledge of Baltimore City Police officers *working the same case*).

*Taylor*, 942 F.3d at 225–26 (emphasis in original). Similarly, the SPLC would require this Court to "stretch *Brady* beyond its scope and . . . effectively impose a duty on prosecutors to learn of any favorable evidence known by *any* government" employee of the FBI, the IRS, and the USPIS. *Id.*

In two different cases, the Ninth Circuit rejected arguments like those offered by the SPLC: *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019) and *Alahmedalabdaloklah*, 94 F.4th at 844–45. In *Cano*, the defendant argued that the government violated *Brady* by not turning over evidence arguably within the possession of the DEA and FBI. *Cano*, 934 F.3d at 1024. Notably, both the FBI and DEA "rebuffed" requests by the prosecution team for *Brady* material and, although the defendant stressed that the agencies routinely work together, that did not matter as he failed to show that they worked on *his investigation*. *Id.* at 1024–25. Indeed, the *Cano* defendant failed "to identify any case in which the prosecutor was required to obtain discovery from an agency wholly unrelated to the investigation." *Id.* at 1026.

In *Alahmedalabdaloklah* (Oklah), the defendant argued that the prosecution team should have been required to search the entirety of the Department of Defense (DoD) for *Brady* material. 94 F.4th at 843. But this argument "conflat[ed] the DoD components that participated in the investigation with the entirety of DoD." *Id.* at 844. Indeed, the Ninth Circuit noted the size of the DoD and the numerous agencies and sub-agencies falling under its umbrella in explaining that the government "did not have 'access to' the entirety of DoD merely because it had the ability to send queries" *Id.* 844–45. More was required to trigger *Brady*'s requirements.

Again, the SPLC essentially asks the Court to define the "prosecution team" as the entirety of the FBI, IRS, and USPIS. But this "monolithic view" of the government has been repudiated by the Eleventh Circuit and other courts. And it is not hard to understand why. Such a stretched approach would "condemn the prosecution of criminal cases to a state of paralysis" as the government would have to spend countless time, money, and energy searching under every nook and cranny for possible *Brady* information simply because agents from one federal agency are

involved. *Avellino*, 136 F.3d at 255. The government's discovery obligations under *Brady* do not mandate such a result.

The FBI alone consists of 50-plus field offices across the United States employing thousands of different agents. None of these other field offices participated in the underlying investigation. Nonetheless, the SPLC would have each one of these field offices scour their records for the requested information.

The Court should not accept the SPLC's framing of the prosecution team. Rather, a more measured approach, one supported by the law in the Circuit, results in finding that only the specific offices involved in the underlying investigation should make up the "prosecution team" — not the entirety of the FBI, IRS, USPIS, or the Department of Justice. Accordingly, the SPLC's motion should be denied to the extent it asks the government to search the entirety of the records of the whole of any federal agencies involved in this case. Alternatively, at the very least, the SPLC is fully aware (or should be) of those instances where it shared information with federal law enforcement. Assuming (without conceding) it can meet the materiality aspect of the *Brady* analysis, the SPLC should be required to identify the circumstances of any instance where it shared information to narrow the scope of the search.

ii. <u>The prosecution team does not possess the sought-after evidence.</u>

Given the extent of the prosecution team, the motion to compel should be denied because the government has already disclosed all *Brady* evidence currently within its possession[2]. (*See* Doc. 114 at 7 n.1.) And it should not be made to "go on a fishing expedition" merely because the

[2] In addition to information provided to law enforcement, the SPLC seeks tax information concerning their Fs. The Government asserts that it, likewise, is not *Brady* material and that the IRS should not be ordered to search its files for and ultimately produce federal tax information related to individuals, none of whom have been charged in this case. Nevertheless, the Government has provided all tax information it has received via court orders in this case.

SPLC invokes *Brady* and speculates additional materials exist elsewhere. *See Moon* 285 F.3d at 1309. To be sure, the government may be required to conduct a "routine search of databases" depending on the particular facts of a case. *Ignasiak*, 2010 WL 11694932, at *3 (citing *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980); *United States v. Jones*, 34 F.3d 596, 599–600 (8th Cir. 1994)). But that is not what the SPLC seeks. Rather, it would have each of these agencies in their entirety conduct an exhaustive search for the possibility that there may be material related to the SPLC's sharing of information with law enforcement. Again, the law does not require such a fishing expedition.

iii. <u>The prosecution team should not be required to turn over information concerning the use of information shared by the SPLC or its use of informants.</u>

But if the Court agrees with the SPLC's monolithic view of what makes up the prosecution team, the government should not be required to produce anything outside of SPLC's past sharing of information obtained from the Fs with law enforcement.[3] In other words, the SPLC is not entitled to know how other offices used informants or how any information influenced investigations. Federal law enforcement agencies "have valid concerns over revealing sensitive information in cases wholly unrelated to the agencies' own workload; the agencies may be reluctant to cooperate in a particular investigation if it means opening their files in other investigations." *Cano*, 934 F.3d at 1025. That concern applies here as the SPLC asks the prosecution to turnover information from offices wholly unrelated to the investigation and resulting charges.

b. *The SPLC already has (or should have) access to information regarding any of its past cooperation with law enforcement.*

---

[3] And, as pointed out below, the government should not be required to produce even that because the SPLC already has knowledge of when it has shared information with law enforcement in the past.

*Brady* does not require the government to produce evidence that a defendant either already has or could get with reasonable diligence. *Riechmann v. Fla. Dep't of Corr.*, 940 F.3d 559, 580–81 (11th Cir. 2019). Said another way, *Brady* is "not a means for a defendant to require the prosecutor to do this work for him." *Cano*, 934 F.3d at 1026. Here, the SPLC already has access to the times and circumstances it shared information with law enforcement. (Doc. 114 at 3.)

Part of the SPLC's request is that the government turn over "documents or information showing cooperation between the SPLC and federal law enforcement, *including information provided by the SPLC* to law enforcement[.]" (Doc. 114 at 11 (emphasis added); *see also* Doc. 114-1 at 4 (requesting "All documents showing that the *SPLC provided information to any federal law enforcement agency* between 1980 and December 31, 2023." (Emphasis added).) As the provider of any such information, this should be readily available to the SPLC. In fact, the SPLC has (or should have) equal, or more likely, better access to the requested information than the prosecution team.

"[T]here is no suppression, and thus no *Brady* violation, if either the defendant or his attorney knows before trial of the allegedly exculpatory information." *Felker v. Thomas*, 52 F.3d 907, 910 (11th Cir.), *opinion supplemented on denial of reh'g*, 62 F.3d 342 (11th Cir. 1995); *see cf. United States v. Laines*, 69 F.4th 1221, 1231 (11th Cir. 2023) ("But, as the district court explained, we 'can presume that [Laines] knows the contents of his own cell phone.'" (alterations in original)); *United States v. Blankenship*, 19 F.4th 685, 693 (4th Cir. 2021) ("[T]he information was in Blankenship's own house and held by in-house witnesses close to him. At the very least, he knew of the availability of this type of information and where to find it."). Who would know better as to when and how the SPLC provided information to law enforcement in the past better

than the SPLC. The motion to compel itself demonstrates that the SPLC has the capacity to collect that information. (Doc. 114 at 5-6.)

To be sure, the SPLC might have to spend time and resources searching for this information within its own records. But the SPLC is required to do so, because the government does not have to turn over anything the SPLC could obtain "with any reasonable diligence." *Riechmann*, 940 F.3d at 580; *see also United States v. Stein*, 846 F.3d 1135, 1146–47 (finding no *Brady* violation when the defendant "Mr. Stein made no effort to establish" that he could not obtain the evidence with reasonable diligence).

*c. The requested information is not material to the charges in the Second Superseding Indictment.*

Lastly, *Brady* only requires the production of information that is "material." *See United States v. Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003) ("*Brady* obligates the government to disclose only favorable evidence that is 'material.'"). "The touchstone of materiality is a reasonable probability of a different result." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotations omitted)). Thus, "the government need only disclose during pretrial discovery (or later, at the trial) evidence which, in the eyes of a neutral and objective observer, could alter the outcome of the proceedings." *Id.*

The Second Superseding Indictment charges the SPLC with wire fraud, bank fraud, money laundering, and conspiracy to commit these offenses. (*See generally* Doc. 115.) Starting first with the wire fraud charges, the government must prove that:

> (1) the SPLC knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;
>
> (2) the false pretenses, representations, or promises were about a material fact;
>
> (3) the SPLC acted with the intent to defraud; and
>
> (4) the SPLC transmitted or caused to be transmitted by wire communication in interstate commerce to help carry out the scheme to defraud.

*See Eleventh Circuit Pattern Jury Instruction* O51 – Wire Fraud. "To prove an intent to defraud, the government must prove that the sellers either knew that they were making false statements or were acting with reckless indifference to the truth." *United States v. Bell*, 112 F.4th 1318, 1332 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025) (citing *United States v. Wheeler*, 16 F.4th 805, 819 (11th Cir. 2021)). "The deception must go to the 'nature of the bargain itself'—an ancillary lie will not suffice." *Id.* (quoting *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016)).[4]

Here, it is not so much what the SPLC said but what it did not say—that is the non-disclosure of certain information. *See United States v. Feldman*, 931 F.3d 1265, 1267 (11th Cir. 2019) (Pryor, C.J., concurring). The SPLC did not disclose the fact that donor funds were used to pay Fs that used some of the funds to grow the organizations the SPLC publicly opposed. Thus, the SPLC's overly broad request for all information regarding any contact between the SPLC and law enforcement—including that unrelated to the Fs—does not reflect a connection between the charges and the potential for exculpatory evidence.

The Second Superseding Indictment alleges that the SPLC secretly used donated funds to pay Fs who were "leaders and organizers of racist groups . . . at the same time that the SPLC was denouncing the same groups on its website" and pointing to those groups and their activities to raise additional funds. (Doc. 115 at 1.) These Fs then used donated funds to attend and host extremist group rallies, to recruit new members and raise additional money, to buy materials for

---

[4] Notably, *Takhalov* and its progeny were later abrogated by the Supreme Court's decision in *Kousisis v. United States*, 605 U.S. 114 (2025). There, the Supreme Court explained that the wire fraud statute is "agnostic about economic loss." *Kousisis*, 605 U.S. at 124. Meaning, it does not matter if a defendant "provides something—be it money, property, or services—of equal value in return." *Id.* at 123. The question is whether a party lied "to induce a victim into a transaction that will cost her money or property." *Id.* at 135.

cross burnings and other racist regalia like Ku Klux Klan robes, and to pay for living expenses. (*Id.* at 3–4.) Notably, the SPLC did all this without ever telling their donors that the funds were being used in this way. (*Id.* at 1.)

Conversely, this case is not about whether the SPLC ever turned over information to law enforcement. (Doc. 114 at 13.) SPLC can be taken at its word that it did so on occasions; indeed, it details past examples where information it provided may have led to criminal charges. (Doc. 114 at 5–6.) But the following statements can be true at the same time: (1) the SPLC turned over information gathered from the Fs program to law enforcement and (2) the SPLC defrauded donors by not telling them that their funds were being used to help fund the hateful activities of those they avowed to bring down.

The SPLC's argument, boiled down, is that the Fs program ultimately did what SPLC held it out to do — which is generate informational leads that could be used to take down these groups. In this sense, the SPLC is arguing that donors essentially got what they paid for (or perhaps, what they donated their money for). This is akin to arguments the Eleventh Circuit has rejected in other wire fraud cases. *See, e.g.*, *United States v. Horn*, 129 F.4th 1275, 1288–89 (11th Cir. 2025) ("Horn also argues that the evidence was somehow insufficient to establish injury or loss as a matter of law because Sunset's investors got what they paid for, since investors paid for a certain number of shares and received that number of shares from Sunset. Horn's argument is flatly wrong[.]") (internal quotations omitted)); *United States v. Bell*, 112 F.4th 1318, 1332 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025) ("The sellers argue that because investors received exactly [the dinar] they paid for, the prosecution's theory of fraud fails as a matter of law[.] We disagree. This argument misunderstands our precedents.") (alterations in original).

The key question at trial will be whether the SPLC's failure to accurately convey how donated funds were being used "misrepresent[ed] the value of the bargain." *Bell*, 112 F.4th at 1332. That is, whether the SPLC misrepresented the "essential qualities" or "core attributes" of the purpose of the donated funds. *Id.*; *see also Horn*, 129 F.4th at 1289. Or, did the SPLC mislead investors about what they were actually donating to? *Id.* at 1289 ("Horn and his co-conspirators misled investors about what investors were actually purchasing."). An example of this can be found in the situation of "F-30." There, the Second Superseding Indictment alleges that, at the same time the SPLC had a dedicated page to F-30 on their "Extremist File" webpage, F-30 was using SPLC monies to attend extremist rallies and to grow his extremist groups. (Doc. 115 at 8–9.) Whether the SPLC ever turned over information from F-30 to law enforcement has no bearing on whether they should have told investors that their funds were being used to fund F-30's activities.

Next, with the bank fraud offenses—that is, the charges under 18 U.S.C. § 1014—the government will have to prove the following at trial:[5]

(1) the Defendant made a false statement or report;

(2) the Defendant did so knowingly and with intent to influence an action of the institution described in the indictment regarding an application, advance, commitment, or loan, or a change or extension to any of those; and

(3) the deposits of the institution were insured by the Federal Deposit Insurance Corporation

*See Eleventh Circuit Pattern Jury Instruction* O39 – False Statement to a Federally Insured Institution.

[5] For simplicity, the government will not discuss the conspiracy charges that accompany the substantive offenses. But for the same reasons, the sought-after information is not material to the charges.

The SPLC has not shown how the requested information would be material to these charges outside their general assertion that "the purpose and use of the informant program [will be] the key issues for the jury" at trial. (Doc. 114 at 13.) But it is not apparent how past instances where the SPLC provided information to law enforcement and how law enforcement used that information is "material" in determining if the SPLC made a false statement to a bank.

To be sure, "what constitutes *Brady* material [can be] fairly debatable." *Jordan,* 316 F.3d at 1252. Nonetheless, the SPLC still must show "that there is a reasonable probability the evidence could affect the outcome of the trial." *Id.* at n. 81. They have not done that as it relates to the bank fraud offense. A "general request" for *Brady* material is rarely helpful because it requires the "the prosecutor [to] determine which information in the government's possession might constitute *Brady*." *Id.* It is difficult to imagine how evidence regarding the SPLC's previous sharing of information with law enforcement—including, per the request, information not related to the F's—is relevant or material to the bank fraud charges.

Nor is it apparent that this information *could eventually lead* to other admissible, exculpatory evidence. *See Bradley v. Nagle*, 212 F.3d 559, 567 (11th Cir. 2000) ("Thus, in order to find that actual prejudice occurred—that our confidence in the outcome of the trial has been undermined—we must find that the evidence in question, although inadmissible, would have led the defense to some admissible material exculpatory evidence.") Simply put, the requested information is not material as it would not "put the whole case in such a different light as to undermine confidence in [any potential] verdict." *Riechmann*, 940 F.3d at 580.

Nor is the requested information material to the money laundering charges brought against the SPLC. For these charges, the government would have to show:

(1) the Defendant knowingly conducted or tried to conduct financial transactions;

(2) the Defendant knew that the money or property involved in the transaction were the proceeds of some kind of unlawful activity;

(3) money or property did come from an unlawful activity; and

(4) the Defendant knew that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds.

*See Eleventh Circuit Pattern Jury Instruction* O74.2 – Money Laundering: Concealing Proceeds of Specified Unlawful Activity.

**IV. Process to Obtain the Requested Information**

For the reasons noted above, the SPLC's motion to compel should be denied. But, if the court is inclined to consider granting aspects of the SPLC's motion, the following is the process, as understood by the undersigned, that the FBI would follow to attempt to determine if any of the requested records are in its possession.

The FBI currently uses a case management system named Sentinel. The FBI would conduct a key word search within Sentinel for Southern Poverty Law Center and SPLC. Any document in the system which contains one or both key words would be retrieved by the system. On August 20, 2026, the Government asked the FBI to run that search. The result was in excess of 65,000 positive hits in over 170 cases. Each occurrence will then need to be read to determine if the document appears to be relevant to the SPLC's request. If a particular document appears to be relevant, the associated case file will need to be read to determine what information within the case file is relevant. The next step will be to determine what can actually be turned over. It is likely that there have been cases in which the SPLC provided some piece of information and the FBI had one or more other sources. Information about those sources could be classified at a level that prevents even the prosecuting attorneys from obtaining all of the information without requesting and being

granted approval for a declassification process. Sentinel has only been used since approximately 2012.

Prior to Sentinel, the FBI used a different system beginning in approximately the early-1990s called ACS. A search of that system would need to be conducted. Because that system was DOS-based, it is likely to be even less efficient in searching for relevant documents.

Prior to the DOS-based system, the FBI did not widely utilize a searchable electronic system. Files were largely kept in paper formant and are now boxed in a storage facility. Those boxes are archived at a central location. Searching those files is likely to be even less efficient than searching the DOS-based system. As previously pointed out, the SPLC's request implicates many more agencies than just the FBI.

**V. Conclusion**

Because the SPLC's definition of a prosecution team is overly broad, it already knows, or should know, when and how it has previously shared information with law enforcement, and, most significantly, the information sought is not material to the charges in this case, the motion should be denied. If the court disagrees, the Government requests that the court's order direct the SPLC to narrow its requests. The SPLC is fully aware (or should be) of those instances where it shared information with federal law enforcement. Assuming it can meet the materiality aspect of the *Brady* analysis, the SPLC should be required to identify the circumstances of any instance where it shared information to narrow the scope of the search.

Respectfully submitted on this 21st day of August, 2026.

THOMAS GOVAN
UNITED STATES ATTORNEY

/s/ Kevin P. Davidson
Kevin P. Davidson
First Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Tel: (334) 223-7280
Fax: (334) 223-7135
E-mail: kevin.p.davidson@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:26-cr-139-ECM-KFP |
| | ) | |
| SOUTHERN POVERTY LAW CENTER, INC. and HEIDI BEIRICH | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel on record.

Respectfully submitted,

/s/ Kevin P. Davidson
Kevin P. Davidson
First Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Tel: (334) 223-7280
Fax: (334) 223-7135
E-mail: kevin.p.davidson@usdoj.gov