IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>THE SOUTHERN POVERTY LAW CENTER, INC. *et al.*<br><br>Defendants. | Case No. 2:26-cr-0139-ECM-KFP-1 |

**THE SOUTHERN POVERTY LAW CENTER'S MOTION FOR A PRESERVATION ORDER AND FOR ISSUANCE OF A RULE 17(c) SUBPOENA**

**TABLE OF CONTENTS**

INTRODUCTION ... 1

FACTUAL BACKGROUND ... 3

ARGUMENT ... 15

I. The Court should issue a preservation order to F-9. ... 15

II. The Court should issue a Rule 17(c) subpoena for all documents related to the informant program. ... 17

CONCLUSION ... 23

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arkin v. Gracey-Danna, Inc.*, No. 8:16-cv-1717-T-35AAS, 2016 WL 3959611 (M.D. Fla. July 22, 2016) .......... 15, 16

*Brady v. Maryland*, 373 U.S. 83 (1963) .......... 17

*Degen v. United States*, 517 U.S. 820 (1996) .......... 15

*Dietz v. Bouldin*, 136 S. Ct. 1885 (2016) .......... 15

*Kyles v. Whitley*, 514 U.S. 419 (1995) .......... 17, 18

*Moon v. Head*, 285 F.3d 1301 (11th Cir. 2002) .......... 17

*Trump v. United States*, No. 22-13005, 2022 WL 4366684 (11th Cir. Sept. 21, 2022) .......... 15

*United States v. Antone*, 603 F.2d 566 (5th Cir. 1979) .......... 17

*United States v. Aziz*, 837 F. Supp. 3d 449 (E.D.N.Y. 2026) .......... 18

*United States v. Brooks*, 966 F.2d 1500 (D.C. Cir. 1992) .......... 18

*United States v. Corbett*, No. 2:19-cr-107-KJM-EFB, 2020 WL 6318434 (E.D. Cal. Oct. 28, 2020) .......... 16

*United States v. Meros*, 866 F.2d 1304 (11th Cir. 1989) .......... 17, 18

*United States v. Nabors*, 707 F.2d 1294 (11th Cir. 1983) .......... 15

*United States v. Nixon*, 418 U.S. 683 (1974) .......... 22

*United States v. Pelullo*, 399 F.3d 197 (3d Cir. 2005) .......... 17

*United States v. Silverman*, 745 F.2d 1386 (11th Cir. 1984) .......... 23

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) .......... 18

*United States v. Trump*, 753 F. Supp. 3d 17 (D.D.C. 2024) .......... 18

**Statutes**

18 U.S.C. § 3231 .......... 15

**Rules**

Fed. R. Crim. P. 16 .......... 23

Fed. R. Crim. P. 17 .......... 15, 17, 22, 23

## INTRODUCTION

The government's primary informant in this case was the Southern Poverty Law Center's longest-contracted informant, F-9. His work in the program was almost certainly the most rewarding role F-9 ever had, both financially and professionally. Apparently, F-9 chose not to pay taxes on his income for 30 years. In addition, while contracting as an SPLC informant, F-9 started a meaningful personal relationship. But between December 2021 and July 2023, everything changed. In that timeframe, F-9 learned his income from the SPLC would be significantly reduced, his personal relationship ended, and his relationship with the SPLC was terminated. In the midst of this, he was contacted by federal law enforcement about meeting with an IRS Criminal Investigation Division agent—at a time when he knew he faced serious criminal and financial exposure for his failure to pay taxes on decades of income.

Following these personal setbacks, F-9 pivoted from assisting the SPLC in its mission to dismantle hate groups to assisting the government in its criminal investigation against the SPLC. F-9 began what would become his deep involvement in the government's investigation. For its part, the government seems willing to overlook F-9's extreme biases, self-serving motives, and personal and professional misconduct, including covertly taking SPLC records and privileged information. Over hundreds of contacts with the government over the last several years, F-9 has transformed his role as a mere witness into an active member of the government's investigative team.

Starting in March 2022, F-9 began speaking to the team investigating the SPLC. That investigation ended without charges, but in 2025, with F-9's participation and urging, the investigation was revived. Just since November 2025, F-9 has met with the government more than 20 times—including at least four in-person meetings. He has exchanged approximately 1,800 text messages with the lead agents from the FBI and IRS. F-9 regularly sends the government's lead

FBI agent reports on how his search for evidence against the SPLC is going. He is not a lawyer, but he gave four "Intelligence Briefings" to the government, accompanied by 162 pages of PowerPoint slides that analyze what charges the government should bring against the SPLC, describe what evidence he believes supports the charges, identify possible witnesses, and suggest new investigative directions. Meanwhile, to show how much he has been influencing the investigation, when F-9 tells the government that it should not serve him with a subpoena for his documents and instead continue to allow him to cherry-pick what he provides to them, the government follows that direction.

To be clear, F-9 should have been merely a *witness* in this case. But the government has treated him like part of the prosecutorial team itself, choosing to allow F-9 to decide which of the documents, recordings, and photographs in his possession he will produce, and how and when he will produce them. F-9 admitted that he has a "house full of documents," some of which he has referenced plans to "shred." Despite the volume of material F-9 professes he possesses, and his reference to shredding some of that material, the government has never given him a subpoena or executed a search warrant or, as far as the defense knows, taken meaningful steps to ensure he preserves all the material he obtained from the SPLC. Instead, the prosecution team is content to allow F-9 to direct what documents will be provided to it and when. And it has broadly immunized F-9 from criminal charges, including for any misconduct related to his cooperation in this investigation that occurred before August 2026.

Because of this highly unusual relationship between F-9 and the government, and the possibility that the government is neither collecting nor preserving information relevant to the charges and defenses, the SPLC asks this Court to (1) issue a preservation order to F-9 to maintain the originals of everything in his possession, custody, or control; and (2) give leave to the SPLC

to serve F-9 with a subpoena for all documents or other material (e.g., recordings) that he has provided to or shared or reviewed with the government, related to the informant program and all communications he has had with the government about this investigation and prosecution.

## FACTUAL BACKGROUND

### A. F-9's Relationship with the Government

F-9 has spoken with the government over 30 times so far, at least four of which were in-person meetings; 24 of these conversations occurred between November 2025 and September 2026. In addition, F-9 and the lead FBI agent frequently communicate by text: 1,327 text messages between June 3 and September 19, 2026. F-9 sent 998 of those messages, which include 151 photos, recordings, and documents and 144 links. F-9 also regularly communicates with the lead IRS agent via text. Since December 2025, there have been about 500 text messages exchanged between them.[1]

F-9 has demanded a host of benefits from the government in exchange for information and documents in his possession, including immunity from criminal prosecution (which he was subsequently given), "payment," including an explicit request to be paid $10,000 "at least" *and* a monthly stipend in exchange for the information he has and will continue to provide to the government, and "compensat[ion]." 2025R00327-0099213 at 46; 2025R00327-0099227 at 16; 2025R00327-0099231 at 27; 2025R00327-0000987 at 11. With regard to F-9's tax liability, after understanding he was "on the hook for 30 years' worth of payments that are indeed taxable[,]" F-9 made his expectation plain: "My expectation in assisting you I think very conclusively in charging the Southern Poverty Law Center with mail fraud would be for me to have complete

[1] The SPLC has not attached full copies of these PowerPoint presentations, transcripts, or text message threads in light of their length and the fact they also contain sensitive and irrelevant information. Full copies can be provided under seal, should the Court desire.

immunity and indemnifying me from any kind of back taxes or anything like that." 2025R00327-0000795 at 8–9.

B. <u>The "Intelligence Briefings"</u>

The prosecution team, including the heads of the U.S. Attorney's Office, has spent hours hearing presentations from F-9 about what charges he thinks should be brought against the SPLC, and which "evidence" from his personal files supports such charges. F-9 has given the prosecution team at least four "Intelligence Briefings," which are PowerPoint decks that F-9 created. In these decks, F-9 cherry-picks "evidence" from the files in his possession to support "legal" theories that *he* has developed. Twice before the initial indictment, on December 15, 2025, and February 24, 2026, F-9 traveled to Montgomery and Mobile to conduct such "Intelligence Briefings," for an audience that included the then-Acting United States Attorney and several prosecutors and federal agents.[2] *His* PowerPoint decks contained the seals of the FBI, the IRS, and/or the U.S. Attorney's Office as though he were an actual member of the prosecution team:

[2] The December 15 meeting was attended by Acting U.S. Attorney Kevin Davidson; AUSA John Geer; AUSA Talley; FBI Agent Deanne Lindsey; FBI Agent Justin Lowrence; FBI Agent Parker Still; and IRS Agent Dave McDaniel. *See* Ex. B: 2025R00327-0099282. The February 24 meeting was attended by FBI Agent Deanne Lindsey; FBI Agent Parker Still; and IRS Agent Dave McDaniel. *See* Ex. A: 2025R00327-0099250.




2025R00327-0286463 at 4.

The 62-page deck F-9 presented on December 15, 2025, contained F-9's "analysis" of criminal charges against the SPLC related to its informant program. *See* 2025R00327-0286463. The deck he presented on February 24, 2026, included screenshots of internal SPLC documents and a photo of what appears to be a bag full of documents possessed by F-9 that he later described as containing the SPLC's confidential board of directors' materials. *See* 2025R00327-0294938 at 11, 18, 26, 39–44.




It is entirely unclear what some of the information means, such as this sample in the briefings:




2025R00327-0286463 at 16.

F-9 provided subsequent "Intelligence Briefings" on August 14, 2026, and as recently as September 9, 2026.[3] During the September 2026 "Intelligence Briefing," F-9 presented *his* legal theories to the sitting United States Attorney, Thomas Govan, in addition to Assistant U.S. Attorneys Davidson, Bodnar, and Feil. *See* Ex. C: 2025R00327-0294867. One slide has the FBI's seal and reads: "what ***we*** know and what ***we*** trying [sic] to do about it." 2025R00327-0294982 at 2 (emphasis added).




*Id*.

C. Documents Provided by F-9

F-9 has told the government that he has "a house full of documents." 2025R00327-0099248 at 15. Yet the government has apparently never given F-9 a subpoena or executed a search warrant to ensure it has all his documents related to the informant program or to the SPLC, even after F-9

[3] The August 14, 2026 meeting was attended by AUSA Joel Feil, First Assistant AUSA Kevin Davidson, AUSA Chris Bodnar, IRS Agent Dave McDaniel, USAO investigator Greg Holston, and FBI forensic accountant Clinton Bigham. *See* Ex. D: 2025R00327-0264979. The September 9, 2026 meeting was attended by U.S. Attorney Thomas Govan, First Assistant AUSA Kevin Davidson, AUSA Joel Feil, AUSA Chris Bodnar, and FBI forensic accountant Clinton Bigham. *See* Ex. C: 2025R00327-0294867.

refused to provide handwritten notes and referenced a prior plan to shred documents. *See* 2025R00327-0099213 at 13; 2025R00327-0099315 at 8. Instead, the government seems to accept the cherry-picked material that F-9 provides on his own schedule without showing any interest in obtaining everything for a thorough review and investigation.

Apparently without a subpoena, search warrant, or other formal request, and on a schedule and in a format of his own choosing, F-9 has provided a vast number of documents and recordings, but has done so in a selective fashion, including sending clips made from secret recordings when he possesses the full recording, seemingly sending only what supports his view of the SPLC. On July 9, 2026, during a meet and confer between the parties, the lead FBI agent informed the SPLC's counsel that F-9 had provided to the government seven external storage devices—five hard drives and two thumb drives totaling approximately 1.2 TB of data.

Other material F-9 provided to the government includes:

- On December 15, 2025, F-9 gave the government 15 exhibits, a 111-page document, and a thumb drive. *See* 2025R00327-0099346 at 25, 31, 44, 79.
- Between December 22, 2025, and February 6, 2026, F-9 sent photographs and screenshots of documents. *See* 2025R00327-0099315 at 10; 2025R00327-0099213 at 4, 6, 35; 2025R00327-0099352 at 10; 2025R00327-0099248 at 18–28.
- On February 24, 2026, F-9 gave the government roughly 35 to 40 pounds of documents, binders, and thumb drives. *See* 2025R00327-0099356 at 1, 18, 24.
- On February 24, 2026, F-9 gave the government some of the SPLC's board minutes. 2025R00327-0099356 at 1.
- On August 14, 2026, F-9 gave the government another thumb drive. *See* Ex. D: 2025R00327-0264979.

- Between August 31 and September 1, 2026, he provided four short audio clips via text message. *See* 2025R00327-0295195 at 60–62.
- On September 9, 2026, he turned over internal SPLC material related to the organization's Intelligence Project, the department that oversaw the informant program. *See* Ex. C: 2025R00327-0294867.

But F-9's interviews also make clear that he has not given the government everything. For example, F-9 has told investigators that he has 1,800 pages of notes from his time as an informant for the SPLC but stated that he is "not turning those over to the government." 2025R00327-0099213 at 13. It appears that F-9 has selectively provided the government with some notes but, once again, he has selected what he chooses to share. On December 9, 2025, F-9 told the government that he had a storage unit holding six steel file cabinets, about 37,000 photographs, and "handwritten notes, files . . . recordings." 2025R00327-0000964 at 7, 14–15. The defense does not know what, if anything, has been provided to the government or produced to the defense from the storage unit, or what the status of that material is.

Notwithstanding the large volume of materials F-9 has turned over to the government, a large production does not equal a *complete* production, nor does it relieve the government of its obligation to conduct a complete and thorough investigation. The government has deferred entirely to F-9's characterization of the material he has held back as not relevant and has not pushed him for anything other than what he voluntarily provided. As an example of this deference, in December 2025, a few months before the indictment, rather than serving a subpoena to obtain materials F-9 described as pertinent to the government's investigation, the lead FBI agent asked F-9 for F-9's *permission* for the government to serve him with a grand jury subpoena to obtain materials he described as relevant to the investigation into the SPLC.

On December 9, 2025, F-9 told the lead IRS agent on the case that he would be driving down to Montgomery with "a carload" of materials pertinent to the government's investigation. 2025R00327-0000964 at 7. He then added "But that's not all I have. Some of my stuff is up there in a storage garage now, stolen by this guy that wants 15 grand from me to turn over my life's work in six steel file cabinets and 37,000 color photographs I took." *Id*. The IRS agent asked, "Is there Center information in there that would be useful, you think, to us?" *Id*. F-9 replied "Oh, yeah." *Id*. F-9 went on to describe the contents of the storage unit as "tons of handwritten notes, audio files, and more hard drives," and specifically identified a category of material as "stuff that was used for lawsuits by the Center." *Id*. at 15, 24.

F-9 then provided visual evidence of what was in the storage unit. He texted the IRS agent photos. *See* 2025R00327-0099427; 2025R00327-0099428. One of the photos showed the storage unit with six steel cabinets with plastic containers on top. Another photo was of F-9 in a space he described as his office with those same steel cabinets and plastic containers visible. F-9 described those cabinets and containers as holding "about 30 years of work product." *See* 2025R00327-0099428. As stated in the indictment, F-9 provided services as an informant to the SPLC for over 20 years. By F-9's own words, the cabinets holding 30 years of work product largely overlap with his services to the SPLC, i.e., his work on the F program, on which the government bases the charges in this case.

By December 11, 2025, the lead FBI agent on the case was involved in recovering the contents of F-9's storage unit. The agent stated: "We have a grand jury subpoena for those documents. *Are you okay* if we, if we serve that subpoena and take possession of those documents? We will be able to copy everything and ultimately give those back to you." *See* 2025R00327-0000987 at 2 (emphasis added). Realizing that the government would take possession of the

contents of his storage unit, F-9 changed his position, stating "I don't believe I have any documents that are pertinent to criminal activity related to the Southern Poverty Law Center in these filing cabinets" and that he was "unclear as to why you were thinking that what I had in storage was pertinent or related to the Law Center." *Id*. The FBI agent backed off right away: "If there's not, that's okay. We don't have to[. . .]. *[W]e'll take whatever you bring to us* on Monday." *Id*. (emphasis added).

The defense is unaware of any grand jury subpoena issued to F-9 and does not know if any of the materials contained in the storage unit have even been produced to the government, or whether they are currently being preserved. It seems clear that there are documents in the storage unit that F-9 does not want the government (or the defense) to have.

D. <u>F-9 Provides the Government with Edited Audio Recordings</u>

Buried in the government's October 14, 2026 supplemental discovery production of 4,468 files and documents are 13 audio clips selectively edited by F-9 and provided to the government. *See* 2025R00327-0295195 at 47, 60–74. These audio clips are F-9's editing of longer audio recordings in order to provide the government (and thus, the defense) with only out-of-context statements and presumably to selectively exclude any exculpatory portions of the longer recordings. F-9 has also used this audio clipping method to provide the government with portions of seemingly attorney-client privileged conversations, removing the portion of the recordings where the speakers are clearly identified, making it impossible to conclusively determine whether the privilege applies.

The government is clearly relying on this manipulated evidence. In September 2026, the FBI sought "enhancement" of "several short audio clips," presumably from F-9. *See* Ex. E:

2025R00327-0295309 at 1 (FAVP Service Request). The government said that it intended to rely on these audio clips "to make a charging decision." *Id*.

In his September 2026 "Intelligence Briefing," the PowerPoint appears to include links to clips of audio recordings and the slides note that the clips are drawn from recorded phone calls of over an hour. *See* 2025R00327-0294982 at 11–15. The government produced only a PDF of the deck, so the SPLC cannot access the links with the recordings, and it has no way of determining which (if any) of the 13 produced audio clips correspond with this presentation.

E. F-9 Has Referenced "Shredding" Documents

In a December 2025 call, F-9 said "there's a shredder sitting under my desk that hasn't been used in five years, but there is also just boxes and boxes of crap from various projects, including the National Alliance, all sorts of stuff that has no real bearing or matter, ***that I had intended to shred***, including all this stuff. I didn't think that ever, any of this stuff would ever become pertinent." 2025R00327-0099315 at 8 (emphasis added). The IRS agent talking to F-9 did not caution or instruct him to preserve all of this potential evidence. Notably, the documents obtained by F-9 from the National Alliance are part of the indictment. ECF No. 115 ¶ 18(a).

F. F-9 Bias

Before contracting with the SPLC, F-9 was already doing undercover work. Starting in 1996, he became one of the SPLC's most active informant program participants. His work included infiltrating the National Alliance, a group that at one time was the most dangerous neo-Nazi organization in America. With F-9's help, the SPLC uncovered a bomb lab on the National Alliance's property, which allowed the SPLC to pass that information to law enforcement to get the contents seized. The indictment alleges that the SPLC paid F-9 at least $1.2 million over a 16-year period, or about $75,000 per year. F-9 has described his work for the SPLC as "the most

honorable and important work" he has ever done. 2025R00327-0286274 at 00:02:20. He described what he and the SPLC did as "God's work," *id*. at 00:10:30, and said he had "devoted [his] life for this last quarter century in providing the most accurate, relevant, timely, and actionable intelligence [he] could collect," 2025R00327-0286279 at 01:23:34. Based on his own account, serving in the informant program was obviously an important part of F-9's life for over 20 years.

Several key events happened in fairly short order that upended F-9's life: F-9 found out that there was some type of investigation into the possibility of SPLC informants not paying taxes; his long-term relationship with an SPLC employee ended; and the SPLC ended the informant program and he stopped getting payments under it. When law enforcement came to ask him questions, F-9's response was not to defend the SPLC and the important work he had done with the organization to dismantle hate groups for over two decades. It was to protect himself and turn on the SPLC. F-9's assistance to the government came with strings attached. This is just some of what F-9 said and exchanged with the government agents and prosecutors with whom he started to work. He asked for payment for his assistance to the government over and over again:

- On December 11, 2025: "I would expect to be compensated for my time." 2025R00327-0000987 at 11.
- On December 16, 2025: "Can you people lend me $15,000 to pay this idiot? I've given you quite a bit of stuff. This will make your case. I don't care whether you admit that or not. What I have will make your case. Can you lend me or pay me $15,000?" 2025R00327-0000993 at 7.
- On January 13, 2026, he said "I need payment in cash." 2025R00327-0099227 at 16.

- On February 2, 2026: "I need to be paid. I don't wanna come down there and not be paid. I spent a lot of time and resources now on this. You don't work for free. I am absolutely broke. I am now maxed on my credit cards. I've had to sell my car to pay this guy that I reported to the FBI. It cost me $15,000. I am out. Is there a probability—not a possibility—a probability, that the FBI will pay me? They used to pay me!" 2025R00327-0099231 at 6.

G. The Unusual Scope of F-9's Immunity from Criminal Prosecution

Discovery provided by the government reveals that F-9 had been asking for immunity for years. On no fewer than ***11 occasions*** between February 27, 2023, and February 2, 2026, F-9 demanded that he be immunized, including specifically for his failure to pay taxes for decades on the money he was paid. *See* 2025R00327-0000795 at 9; 2025R00327-0000796 at 5, 10; 2025R00327-0099344 at 5–6; 2025R00327-0000964 at 4; 2025R00327-0099213 at 46; 2025R00327-0099227 at 16; 2025R00327-0099231 at 35; 2025R00327-0099248 at 20. In August 2026, after F-9 had been providing information for *more than four years*, after he had been *interviewed over 30 times*, the government gave him immunity. And the scope of that immunity was highly unusual. It was not just for F-9's conduct related to the informant program. The government gave F-9 immunity for "actions you took regarding *U.S. v. The Southern Poverty Law Center* or for statements you have made to government personnel and government officials, up to this date." In other words, F-9 is immunized for false statements he may have made to the government, for taking documents without permission, or for any destruction of evidence that he may have engaged in—as long as it was before August 2026.

## ARGUMENT

**I. The Court should issue a preservation order to F-9.**

"Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 823 (1996). "[P]rinciples of deference counsel restraint in resorting to inherent power, and require its use to be a reasonable response to the problems and needs that provoke it." *Id*. at 823–24 (citations omitted). Still, there are occasions when the exercise of that authority is required. As the Eleventh Circuit has noted, "the court's exercise of its inherent authority is subject to two limits: (1) it 'must be a reasonable response to the problems and needs confronting the court's fair administration of justice,' and (2) it 'cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute.'" *Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *9 n.5 (11th Cir. Sept. 21, 2022) (per curiam) (quoting *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) (quotation omitted)). Federal law gives this Court nationwide authority. *See* 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States. Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."); *see also* Fed. R. Crim. P. 17(e)(1) (authorizing nationwide service of process of subpoenas).

The government, of course, has an obligation to preserve evidence. *See United States v. Nabors*, 707 F.2d 1294, 1296 (11th Cir. 1983) ("The government has a concomitant responsibility to try in good faith to preserve important material and to locate it once the defendant moves for discovery."). Courts in this Circuit regularly issue preservation orders in civil cases, including orders directed to nonparties. *See Arkin v. Gracey-Danna, Inc.*, No. 8:16-cv-1717-T-35AAS, 2016 WL 3959611, at *1 (M.D. Fla. July 22, 2016) (recognizing that "[a] federal court may issue

preservation orders as part of its inherent authority to manage its own proceedings" and ordering a nonparty to preserve records at risk of being destroyed). At least one court has issued a preservation order to a nonparty in a criminal case where there was a reasonable concern that evidence would not be preserved. *See United States v. Corbett*, No. 2:19-cr-107-KJM-EFB, 2020 WL 6318434, at *2 (E.D. Cal. Oct. 28, 2020) (exercising "the inherent authority to order a third party to preserve evidence" and ordering nonparty jail to maintain surveillance video). When analyzing a request for a preservation order, "[s]ome courts employ a two-prong test that requires the proponent to demonstrate that the order is necessary and not unduly burdensome." *Arkin*, 2016 WL 3959611, at *1.[4]

Under the first prong, a preservation order is "necessary" in this case to ensure that F-9 does not destroy or delete any material relevant to this case. F-9 bears deep resentment against the SPLC and thus has a motive to provide the government only the material he thinks inculpates the SPLC rather than the material that he thinks exculpates the SPLC or provides context for the material he has cherry-picked for the government to see. F-9 has a considerable amount of material at his home and in a storage unit—documents, recordings, photographs, and the like—that he has chosen not to disclose to the government. Perhaps most troubling, even when F-9 referenced "shredding" material in one recorded interview, the IRS agent said nothing about the need to

[4] *Arkin* also analyzed the motion before it under the alternative three-factor balancing test some other courts use, which considers "(1) the level of concern the court has for the continuing existence and maintenance of the integrity of the evidence in question in the absence of an order directing preservation of the evidence; (2) any irreparable harm likely to result to the party seeking the preservation of evidence absent an order directing preservation; and (3) the capability of an individual, entity, or party to maintain the evidence sought to be preserved . . . ." *Arkin*, 2016 WL 3959611, at *1. The SPLC satisfies that test as well: F-9 has referenced shredding material, has withheld notes and the contents of a storage unit, and has produced edited clips rather than complete recordings; the originals cannot be replicated if lost or destroyed; and F-9 already possesses the material, so maintaining it imposes no burden beyond the status quo.

preserve all material given the ongoing matter. In fact, the government gave F-9 immunity for anything he might have done with the documents up until two months ago, August 2026.

Under the second prong, requiring F-9 to maintain everything in his possession, custody, or control is "not unduly burdensome." It merely enforces the status quo given that the government has neither obtained and reviewed everything that F-9 has nor apparently given F-9 explicit instruction to preserve everything.

## II. The Court should issue a Rule 17(c) subpoena for all documents related to the informant program.

In addition, the SPLC seeks the leave of the Court to issue a Rule 17(c) subpoena to F-9 for all SPLC-related material in his possession, custody, or control, with a two-week return date. This request is further supported by the fact that F-9 has gone far beyond being a witness in the government's case. His actions described above demonstrate that he is very much part of the government's prosecutorial team; he is its agent. As such, the government has the responsibility to ensure that he provides all the information in his possession. One example is the government's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963). "*Brady* places an affirmative obligation on prosecutors 'to learn of any favorable evidence known to the others **acting on the government's behalf** in the case.'" *United States v. Pelullo*, 399 F.3d 197, 216 (3d Cir. 2005) (emphasis added) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). The Eleventh Circuit has long held that *Brady* and its progeny apply to evidence possessed by a district's "**prosecution team**," which "includes both investigative and prosecutorial personnel." *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) (emphasis added) (quoting *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979)).

The Eleventh Circuit has further defined a "prosecution team" as "the prosecutor or **anyone over whom he has authority**." *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002) (quoting

*Meros*, 866 F.2d at 1309) (emphasis added). While the state law enforcement agents in *Moon* were not under the authority of the Georgia prosecutor, given F-9's ongoing and close relationship and the terms of his immunity agreement, F-9 would be. *See United States v. Trump*, 753 F. Supp. 3d 17, 44 (D.D.C. 2024) (finding "a duty to search . . . files maintained by" certain entities "closely aligned with the prosecution," both because of their "working relationship" and because of "the nature of the files" that the required search would cover (quoting *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992))). The Second Circuit has specified that whether someone is part of the prosecution team "does not turn on the status of the person . . . , such as a law enforcement officer, prosecutor or other government official." *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). Rather, "the relevant inquiry is **what the person did, not who the person is**." *Id*. (emphasis added). Earlier this year, the Eastern District of New York surveyed Second Circuit precedent and determined that "[t]he touchstone inquiry is whether the [person] is 'acting on the government's behalf in the case.'" *United States v. Aziz*, 837 F. Supp. 3d 449, 470 (E.D.N.Y. 2026) (quoting *Kyles*, 514 U.S. at 437). "This question cannot be answered with a 'broad, categorial [sic] approach' and instead requires 'examining the specific circumstances' of the person alleged to be part of the prosecution team." *Id*. (quoting *Stewart*, 433 F.3d at 298). Any such inquiry would conclude that F-9 is acting as the government's agent in this case.

The text messages between F-9 and the lead FBI agent on the case show exactly that.

- On June 4, 2026, the agent asked F-9, "Any idea if [Person 1] is still alive." 2025R00327-0295195 at 2. On June 14, F-9 offered to reach out to [Person 1] himself, but the agent told him, "Not yet. Let me talk to the prosecutors tomorrow." *Id*. at 6. On July 14, the agent texted F-9 "If you have a number, please call [Person 1]," and a minute later, "We are in CA looking for him. He has moved from his last

known address." *Id*. at 12. About half an hour later, F-9 told the agent he was "[o]n the phone with [Person 1] right now." *Id*. at 12. The agent replied, "We are here and can meet him tonight if he's available." *Id*. The agent followed up twelve minutes later to ask F-9 if he was still talking to [Person 1] and indicated that [Person 1] is "just a witness" and they just "want to get facts from him." *Id*. F-9 informed the agent that [Person 1] told him the FBI had called him that day. *Id*. F-9 added "Telling him nothing. Denying any contact with feds" and then "Still talking." *Id*. The agent's response was "Copy." *Id*. The agent asked F-9 if he was good for a call. F-9 confirmed he was. The defense does not have this recording in discovery. The next morning, F-9 told the agent he had "[t]ried to keep him on the phone as long as possible to allow a triangulation lock by whatever geo tracking apps you might have in your work bag," and that [Person 1] "[m]ay be broke and open to a paid consulting gig." *Id*. at 14.

- On July 30, 2026, F-9 texted the agent, "You need a witness that can explain how the Center lost its way." The agent agreed and asked, "Do you have a recommendation on who would be best?" F-9 named a former SPLC employee and said, "He would be my first witness," and asked, "Want me to reach out? Or hold off?" The agent replied: "No sir, hold off." *Id*. at 21–22.
- On August 3, 2026, F-9 told the agent he "[m]ay have the receipt in an expense report." The agent replied, "Please try to find it. Do you still have other expense reports?" When F-9 answered, "Think so," the agent wrote: "Great, we need them." *Id*. at 26.

- On August 20, 2026, the agent asked F-9 to "[s]end anything you have on F-XX please sir," and F-9 replied, "Copy. Searching files." *Id*. at 48.
- On August 25, 2026, the agent asked F-9, "Did you record call where [document destruction] was mentioned?" *Id*. at 55. On August 31, F-9 texted "Slogging through thumbs. Think I found what you need. Sending two audio files." The agent responded, "Thank you. I will listen immediately." *Id*. at 60. The very next day, the FBI sent "several short audio clips regarding destruction of evidence" from "a cooperating witness" to its lab for enhancement so that it could make a "charging decision." 2025R00327-0295309. On September 7, the agent asked F-9 to "[p]lease bring the recordings and the original document on [F-XX]." 2025R00327-0295195 at 67.
- On September 6, 2026, while "[b]uilding [his] slide deck," F-9 asked the agent whether a particular video "has evidentiary value." The agent told him, "I would not include it for the meeting purpose." *Id*. at 65. The morning after F-9 presented to the prosecution team on September 9, 2026, he asked the agent, "Briefing well received?" and then, "We sell the Fraud by Omission?" *Id*. at 67.
- On August 4, 2026, the agent asked F-9, "Can you make August 14 work? Travel in on 13th and meet with us on 14th," and also let F-9 know that "[t]he USAO travel coordinator will be calling you today." *Id*. at 26–27. The government arranged F-9's travel to meet with the prosecutors to deliver his third "Intelligence Briefing."
- On September 16, 2026, he told the agent: "For more than nine months, I've gone above and beyond to search for the files you've requested." *Id*. at 71.

- On August 5, 2026, after waiting on a call from the agent, F-9 texted: "Problem?" "Standing by for two days, now." "How can I help?" The agent apologized ("I apologize we are running behind on a few things") and asked whether the travel coordinator had reached out. *Id*. at 28.
- On June 25, 2026, the agent asked F-9 whether he knew two individuals and whether he had "numbers by chance," explaining that "[w]e are still running down these merchant accounts." F-9 sent the agent a phone number. *Id*. at 9–11.
- On July 22, 2026, F-9 told the agent he had "[l]eft him alone the last couple days" and was "[w]aiting to see if he hears from [Person 2] or [Person 1]." Later that night, he added: "Feel like I can work [Person 1]. Not particularly hinked (so far.)" *Id*. at 17–18.
- On August 20, 2026, F-9 sent the agent his own analysis of the dates on which certain SPLC bank accounts were opened and asked, "Forward this traffic to IRS man?" *Id*. at 47.
- That same afternoon, he sent the agent what he described as "some potential angry victim donors," adding, "Might want to reach out to find out who and why." *Id*. at 48.
- On September 7, 2026, F-9 sent the agent a recording of a March 2019 SPLC senior leadership meeting in which the SPLC's Legal Director participated. *Id*. at 65–66.
- On August 27, 2026, F-9 told the agent that "the Grand Jury would surely issue a Mail Fraud by Omission indictment against the Center and [former SPLC personnel] in particular, yes?" *Id*. at 58. He added "That superseding indictment would be devastating . . . ." *Id*. An hour later, F-9 sent the agent research he had

conducted on "fraud by omission." *Id*. at 58–59. When the prosecutors did not take up another of his theories, he wrote: "Guessing your USA is not impressed with, or interested in, pursuing this traffic or prosecution strategy, yes?" and "Thought this would be another game changer." *Id*. at 66.

- On August 31, 2026, the agent told F-9, "New trial date is 1 February." F-9 replied: "Five months to firm up and find more. Thank you." *Id*. at 61.

Given the record here, a subpoena to F-9 is necessary to protect the integrity of these proceedings. The proposed early return date will ensure that all evidence for trial is produced well in advance of trial and will prevent any last-minute "surprise" productions by F-9 to the government. It will also permit the SPLC to engage an expert to determine whether F-9 has altered any of the material he has already provided and to potentially challenge the authenticity and legality of recordings provided by F-9.

To obtain early production under a Rule 17(c) subpoena, the party seeking the information must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*United States v. Nixon*, 418 U.S. 683, 699–700 (1974).

All four elements are met here. First, the documents held by F-9 are both evidentiary and relevant; in fact, the government plans to rely heavily on them in its own case-in-chief and has identified F-9 as a likely trial witness. Second, the SPLC cannot obtain the material possessed by F-9 in any way other than by issuing him a subpoena. He is adverse to the SPLC and working with the government to bring these charges. Third, given the amount of information that F-9 apparently

possesses—literal hard drives and rooms full of material—the SPLC cannot properly prepare for trial without inspecting this material ahead of trial. This inspection may involve forensic analysis of recordings. Without advance production of the material, trial may be delayed. Fourth, this is not a fishing expedition. The record shows that F-9 has a significant amount of material relevant to the charges in this case.[5] For these reasons, the Court should grant leave to the SPLC to serve a Rule 17(c) subpoena on F-9.

## **CONCLUSION**

For the reasons herein and the interests of justice, the SPLC requests that the Court enter the proposed Preservation Order attached as Exhibit G, and that the Court grant leave to the SPLC to issue the Rule 17(c) subpoena attached as Exhibit F.

---

[5] The Eleventh Circuit has said that Rule 17 "only reaches specifically identified documents that will be admissible as evidence at trial, provided that the application for the subpoena is made in good faith" and that it may not be used for discovery. *United States v. Silverman*, 745 F.2d 1386, 1397 (11th Cir. 1984). *Silverman* nonetheless affirmed enforcement of a Rule 17(c) subpoena because the documents "clearly possessed evidentiary potential for impeachment purposes." *Id*. The material sought here is of the same character: the complete recordings and documents from which F-9 excerpted the clips the government intends to use, and F-9's own notes and communications, which bear directly on his credibility. And if F-9 is, in fact, a government agent, the government is independently required to obtain this material and produce it under Rule 16 but has failed to do so, a situation *Silverman* does not address.

Dated: October 28, 2026

Respectfully Submitted,

/s/ *Addy R. Schmitt*
Addy R. Schmitt (DC Bar No. 489094)
Andrea L. Moseley (DC Bar No. 502504)
Sara E. Kropf (DC Bar No. 481501)
Kropf Moseley Schmitt PLLC
1100 H Street NW, Suite 1220
Washington, DC 20005
Telephone: (202) 627-6900
addy@kmlawfirm.com
andrea@kmlawfirm.com
sara@kmlawfirm.com

/s/ *Abbe David Lowell*
Abbe David Lowell (DC Bar No. 358651)
David A. Kolansky (NY Bar No. 5887765)
Isabella M. Oishi (DC Bar No. 90018056)
Lowell & Associates, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005
Telephone: (202) 964-6110
alowellpublicoutreach@lowellandassociates.com
dkolansky@lowellandassociates.com
ioishi@lowellandassociates.com

William C. Athanas (ASB-4639-A59A)
Brianna R. Stone (ASB-0400-Y40J)
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8996
bathanas@bradley.com
bstone@bradley.com

*Counsel for the Southern Poverty Law Center, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Addy R. Schmitt*
Addy R. Schmitt

**Certification Pursuant to M.D. Ala. LCR 16.1(c)**

In accordance with Rule 16.1(c) of the Local Rules of the United States District Court for the Middle District of Alabama, I hereby certify that I have conferred with Assistant U.S. Attorney Kevin Davidson in good faith to resolve the issues raised by this motion.

/s/ *Addy R. Schmitt*
Addy R. Schmitt