**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

UNITED STATES OF AMERICA

v.

THE SOUTHERN POVERTY LAW CENTER, INC. and HEIDI BEIRICH

**CASE NO. 2:26-cr-00139-ECM-KFP**

**DR. BEIRICH'S BRIEF IN SUPPORT OF HER MOTION FOR DISCOVERY REGARDING VINDICTIVE AND SELECTIVE PROSECUTION, OR, IN THE ALTERNATIVE, TO DISMISS THE INDICTMENT**

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. RELEVANT BACKGROUND INFORMATION .......... 7

A. The SPLC Has a Long History of Reporting on the Activities of Hate Groups, and This History Includes the Publication of Its "Hate Map." .......... 7

B. The SPLC Recently Began to Include in Its Reporting and Hate Map a Number of Conservative Groups, Including Several Groups Allied with the Trump Administration. .......... 8

C. The United States Attorney's Office and the FBI Criminally Investigated the SPLC from 2019 to Approximately 2021, Then Closed the Investigation. .......... 9

D. The Government Began Investigating the SPLC Again in 2025, on the Heels of Intense Criticism of the SPLC's Protected Political Speech. .......... 10

E. The Court's Ruling on the SPLC's Motion .......... 13

F. Dr. Beirich's Discovery Request .......... 14

III. THE PROSECUTION OF DR. BEIRCH IS VINDICTIVE .......... 15

A. Evidence Shows That the SPLC's Hate Map and the Perceived "Targeting" of Conservative Groups Was a Focus of the 2025 Criminal Investigation and Bears Directly on Prosecutive Decisions in This Case .......... 17

1. The first steps taken by the Prosecution Team after restarting the investigation in 2025 were to interview representatives of groups claimed to be aggrieved by the SPLC's political speech. .......... 17

2. The political concerns about "targeting" by the SPLC that were voiced by President Trump and others in September 2025 remained a focus of the Prosecution Team throughout their investigation. .......... 19

B. The Focus on the SPLC and Dr. Beirich's Protected Speech Activities During the Investigation Is Evidence of Vindictive Prosecution on Its Own and, Separately, Connects Animus Expressed by Officials Throughout the Executive Branch to the Local Prosecution Team. .......... 32

C. DOJ and FBI Policies, and Recently Released Information, Link the Alabama Investigation to Statements of DOJ Leadership. .......... 35

D. The Remarkable Consistency Between the Prosecution Team's Conduct and the Animus Expressed by Senior DOJ, FBI and Executive Branch Officials is "Some Evidence" of a Connection When Viewed in Context. .......... 39

IV. THE PROSECUTION TEAM SELECTED DR. BEIRICH AS A TARGET AND DEFENDANT WHILE DECLINING, FOR UNCONSTITUTIONAL REASONS, TO INVESTIGATE AND PROSECUTE OTHERS SIMILARLY SITUATED ....41

A. The Second Superseding Indictment ....43

B. The Selection of Dr. Beirich as a Subject of Investigation ....43

C. The Unconstitutional Selection of Dr. Beirich as a Defendant ....44

V. CONCLUSION ....47

# TABLE OF AUTHORITIES

## Cases

*Blackledge v. Perry*, 417 U.S. 21 (1974) .......... 15

*Hartman v. Moore*, 547 U.S. 250 (2006) .......... 15, 34

*Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022) .......... 34

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) .......... 41, 46

*United States v. Adams*, 870 F.2d 1140 (6th Cir. 1989) .......... 33

*United States v. Andrews*, 633 F.2d 449 (6th Cir. 1980) .......... 16

*United States v. Armstrong*, 517 U.S. 456 (1996) .......... 42

*United States v. Barner*, 441 F.3d 1310 (11th Cir. 2006) .......... 34

*United States v. Brantley*, 803 F.3d 1265 (11th Cir. 2015) .......... 42, 47

*United States v. Cannon*, 987 F.3d 924 (11th Cir. 2021) .......... 41

*United States v. Carey*, 816 F. Supp. 3d 129 (D.D.C. Jan. 20, 2026) .......... 34, 39

*United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) .......... 41

*United States v. Falk*, 479 F.2d 616 (7th Cir. 1973) .......... 46

*United States v. Floris*, Case No. 26-mj-00185 (D.D.C. Oct. 27, 2026) .......... 37

*United States v. Goodwin*, 457 U.S. 368 (1982) .......... 15, 34, 46

*United States v. Heidecke*, 900 F.2d 1155 (7th Cir. 1990) .......... 16, 33

*United States v. Jordan*, 635 F.3d 1181 (11th Cir. 2011) .......... passim

*United States v. Judd*, 579 F. Supp. 3d 1 (D.D.C. 2021) .......... 14, 16, 35, 42

*United States v. Kilmar Armando Abrego Garcia*, 833 F. Supp. 3d 811 (M.D. Tenn. 2026) .......... 38

*United States v. Koh*, 199 F.3d 632 (2d Cir. 1999) .......... 31, 33

*United States v. Napper*, 574 F. Supp. 1521 (D.D.C. 1983) .......... 41

*United States v. P.H.E.*, 965 F.2d 848 (10th Cir. 1992) .......... 40

*United States v. Pabian*, 704 F.2d 1533 (11th Cir. 1983) .......... 16

*United States v. Petrova*, Case No. 25-10272-LTS (D. Mass. Oct. 8, 2026) ............................... 47

*United States v. Sanders*, 211 F.3d 711 (2d Cir. 2000) ............................................................ 31

*United States v. Smith*, 231 F.3d 800 (11th Cir. 2000) ............................................................ 42

*United States v. Tuitt*, 68 F. Supp. 2d 4 (D.Mass 1999) ........................................................... 34

*United States v. Washington*, 869 F.3d 193 (3rd Cir. 2017) ................................................ 41, 42

*Vill. Of Willowbrook v. Olech*, 528 U.S. 562 (2000) ................................................................. 42

*Wayte v. United States*, 470 U.S. 598 (1985) ......................................................................... 15, 46

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................................................. 41

**Statutes**

Fed. R. Crim. P. 12 ........................................................................................................................ 7

Fed. R. Crim. P. 16 ........................................................................................................................ 7

**Other Authorities**

Patrik Jonsson, *Annual Report Cites Rise in Hate Groups, but Some Ask: What Is Hate?*, Christian Sci. Monitor (Feb. 23, 2011, 8:10 PM ET), https://www.csmonitor.com/USA/Society/2011/0223/Annual-report-cites-rise-in-hate-groups-but-some-ask-What-is-hate ....................................................................................................... 9

Sarah N. Lynch, *Defense Lawyers Seek to Poke Holes in DOJ's Case Against Ex-FBI Officials Over Hunter Biden Probe*, CBS News (Oct. 28, 2026, 5:24 PM EDT), https://www.cbsnews.com/news/defense-lawyers-doj-case-ex-fbi-officials-hunter-biden/ ...... 37

*Extremists, Groups, & Ideologies*, S. Poverty L. Ctr., https://www.splcenter.org/resources/extremist-files/?meta_extremist_type=ideology ............. 8

*Hate Map*, S. Poverty L. Ctr., https://www.splcenter.org/hate-map/ ............................................. 8

*Our History*, S. Poverty L. Ctr., https://www.splcenter.org/about/our-history/ ............................. 8

*Stephen Miller: The Breitbart Emails*, S. Poverty L. Ctr., https://www.splcenter.org/resources/guides/stephen-miller-breitbart-emails/ ............................ 9

*The Year in Hate and Extremism 2024*, S. Poverty L. Ctr. (May 22, 2025), https://www.splcenter.org/resources/reports/year-hate-extremism-2024/ ............................ 8, 10

Alan Feuer, *White House Has Tight Grip Over F.B.I. in Pursuing Trump Targets, Agent Says*, N.Y. Times (Oct. 27, 2026), https://www.nytimes.com/2026/10/27/us/politics/fbi-trump-patel-witt-testimony.html ........................................................................................................ 37

U.S. Dep't of Just., *The Attorney General's Guidelines for Domestic FBI Operations* (Sept. 29, 2008), https://www.justice.gov/archive/opa/docs/guidelines.pdf ....................36

Fed. Bureau of Investigation, *Domestic Investigations and Operations Guide* ....................36

U.S. Dep't of Just., *Justice Manual* § 8-3.120, https://www.justice.gov/jm/jm-8-3000-enforcement-civil-rights-criminal-statutes ....................37

Kash Patel (@FBIDirectorKash), X (Oct. 3, 2025), https://x.com/FBIDirectorKash/status/1974111445488185774 ....................13, 36

National Security Presidential Memorandum No. 7, *Countering Domestic Terrorism and Organized Political Violence* (Sept. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/ ....................12

Newsmax, *SPLC indictment is 'earth shattering': Harmeet Dhillion*, YouTube (Apr. 24, 2026), https://www.youtube.com/watch?v=jGiYsEWOZxY ....................13

*Trump Speaks at Kirk Memorial*, Rev (Sept. 22, 2025), https://www.rev.com/transcripts/trump-speaks-at-kirk-memorial ....................11

## I. INTRODUCTION

The Southern Poverty Law Center ("SPLC") was indicted in April 2026 on charges concerning its relationship with banks and how it raised and spent money. The SPLC moved to dismiss for vindictive prosecution, relying largely on public statements by senior Executive Branch officials. (ECF No. 49.) On August 7, 2026, the Court denied that motion (the "August 7 Order"). The Court did not question that those officials had spoken about the SPLC. Rather, it held that their statements did not "connect any vindictive animus to those making the challenged charging decisions," and that the record lacked "objective evidence" that the United States Attorney's Office for the Middle District of Alabama, "on its own accord *or* at the direction of others," prosecuted the SPLC for exercising its First Amendment rights. (August 7 Order at 23, 35 (emphasis added).) In doing so, the Court recognized that in the "rare case that warrants a closer look," a court "can and should" order discovery into the government's motives. (*Id.* at 34.)

Dr. Heidi Beirich, who was not a party to this case at the time of the Court's ruling, respectfully submits that the new evidence presented with this motion satisfies the standard for discovery set forth in the August 7 order and establishes that this case "warrants a closer look." Dr. Beirich is mindful of the Court's August 7 ruling and its framework. She does not ask the Court to infer a prosecutor's motive solely based on what officials said in Washington. This motion rests on something different and addresses the evidentiary gap the Court identified: what the Alabama team of prosecutors and agents (the "Prosecution Team") themselves said and did in the investigation, as reflected in interview transcripts and FBI records that were not before the Court in August; and, separately, whether the animus expressed by others could be linked to the decision to prosecute.

With respect to the conduct of the investigation, the evidence set forth in this motion shows that the newest iteration of the government's investigation into the SPLC and Dr. Beirich began with complaints about the SPLC's Hate Map and its perceived "targeting" of conservative groups—First Amendment-protected speech—and that subject remained a focus of the agents' inquiry through indictment. The sequencing of the investigation, the selection of witnesses the government interviewed, the interactions with those witnesses, and the prosecutive decisions that emerged all reflect a persistent focus by the Prosecution Team on the same animus towards the SPLC and Dr. Beirich that the SPLC described in its motion.

The renewed SPLC investigation began in 2025 with FBI interviews of representatives of groups that had complained about being targeted by the SPLC's reporting. In the ensuing months, the agents raised the alleged targeting of conservative groups with other witnesses on several occasions, even though the investigation's stated subject was financial fraud related to payments to confidential sources reporting on white supremacist groups. The significance of this perceived "targeting" and its connection to the ultimate charges is most clearly reflected in the agents' treatment of one witness, Individual-1.

The conspiracies charged against the SPLC and Dr. Beirich are alleged to have started no later than January 2007. (Second Superseding Indictment ("SSI") ¶¶ 20, 35, 49.) At that time, Individual-1 was overseeing the SPLC's "field source" program, and had been for more than a decade. Individual-1 left the SPLC in 2014. In January 2026, a former field source, F-9, urged the agents to interview Individual-1, describing him as a "salt of the earth guy" who left the SPLC in "disgust." F-9 told the agents that he believed Individual-1 likely harbored ill-feelings about the SPLC due to a perceived "anti-Christian" bias allegedly held by the SPLC.

On January 23, 2026, then-Acting United States Attorney Kevin Davdison and two Assistant United States Attorneys attended an interview in which Individual-1 stated that (a) he was responsible for running the "field source" program while he was employed by the SPLC, (b) he directed bank accounts to be set up in the names of various companies unrelated to the SPLC as "cover" to protect the sources, (c) he directed payments to the field sources from those accounts, and (d) he personally met with potential donors to encourage them to contribute by touting the SPLC's work in fighting hate groups. In short, Individual-1 acknowledged his direct and substantial involvement in the conduct at the heart of each of the three conspiracies alleged in the Second Superseding Indictment.

Less than a month before the April 2026 indictment of the SPLC, the agents met with Individual-1 again. At the outset of that meeting, the agents told Individual-1 that the government was not troubled by the conduct he had described during his January interview. Quite the contrary, they told him they considered him to be an "outstanding" person, and they did not see anything wrong with his bank-related activities. The lead FBI agent told him, "[w]e're not here to talk to you any about the bank and all that" and added, incorrectly, "[y]ou had obviously nothing to do with all that." The agent explained that the reason they wanted to meet with him again was not to talk about the "bank stuff," but to explore an ideological "shift" at the SPLC after he left in 2014. The agent told Individual-1 they were interested in how the SPLC had "gone off the rails with Dr. Beirich at the helm" and started "targeting" "conservative type organizations." After some prodding, Individual-1 adopted the agents' characterization of Dr. Beirich. He told the agents he thought Dr. Beirich's actions were "political," and suggested she was part of a "liberal" shift at the SPLC that purged "the Christians and the conservatives" from the organization. Despite admitting that he ran the field source program, he opened the

bank accounts in question to pay informants through those accounts, and he met with donors to encourage them to contribute to the SPLC based the organization's work fighting hate groups, Individual-1 has not been charged.[1] Dr. Beirich has.

Another aspect of the Court's inquiry with respect to the SPLC's motion was whether the animus expressed by others could be linked to, or "infected" the United States Attorney's Office for the Middle District of Alabama. Dr. Beirich presents here three categories of new evidence that bear on this inquiry. First, FBI policy requires the field office to "notify FBI Headquarters and the United States Attorney or other appropriate Department of Justice official" when it opens a predicated investigation involving a "sensitive investigative matter." DOJ policy also requires notification to the Civil Rights Division in Washington when civil rights cases are opened in local U.S. Attorney's Offices. The renewed investigation of the SPLC was given the official designation of "sensitive investigative matter" and officially coded as a civil rights matter, and the FBI began interviewing witnesses on September 26, 2025. These policies suggest at least some mandated communications between the Prosecution Team and certain of the high-ranking officials referenced in the SPLC motion regarding this case. Any notices, consultations, and responses should be documented and are in the government's exclusive possession.

Second, on April 30, 2026, the Ranking Member of the House Judiciary Committee wrote to Acting United States Attorney Davidson and Associate Deputy Attorney General Aakash Singh describing whistleblower reports that ADAG Singh "ordered the U.S. Attorney's Office for the Middle District of Alabama to rush through the indictment of the SPLC despite

---

[1] To be clear, Dr. Beirich does not contend that the activities of Individual-1 were improper, illegal, or justified criminal charges. But rather, that charging Individual-1's one-time subordinate for her alleged role in the same activity in which this "outstanding" person was involved is evidence of vindictive and selective enforcement and prosecution of Dr. Beirich.

serious concerns about the strength of the case." Dr. Beirich has not seen those reports and does not claim that they alone establish an improper motive. They bear, however, on whether the Prosecution Team acted at the direction of others to prosecute a case for reasons other than the strength of the evidence, which the Court in its August 7 Order said the record at that time could not answer.

Third, F-9, a former field source who has played a critical and "stalking horse" role in the government's investigation, repeatedly urged the Prosecution Team in Alabama to investigate and indict the SPLC, presented charging theories to prosecutors and agents during many meetings and in hundreds of text messages, and, among other things, advised the Prosecution Team about important evidence and witnesses. Then, on the eve of indictment, he succinctly tied his push for charges to the SPLC and its employees' First Amendment-protected speech, urging the Prosecution Team: "Shut them down… make them not go after conservative Christians or decent people again." Given F-9's extraordinary role in the investigation and prosecution of this case, his speech-based animus may be properly imputed to the prosecutive decisions and, in any event, the agent's response to F-9 of "Yes, sir" is independently meaningful when considering whether animus expressed by others affected the Prosecution Team.

The Prosecution Team's treatment of Individual-1 (and others), particularly when considered alongside the DOJ and FBI policies, a whistleblower's allegation of direction from Main Justice, F-9's unique and important role with the Prosecution Team, and the overall consistency between the Prosecution Team's conduct and animus expressed by Executive Branch officials, provides evidence that this Court previously found missing: evidence that animus towards Dr. Beirich's and the Southern Poverty Law Center's First Amendment activity affected the local Prosecution Team and animated charges in this case; and, separately, evidence

connecting Executive Branch officials who expressed animus to the actions of the local Prosecution Team. The evidence reflects that the Prosecution Team actively pursued the same claims espoused by the President and high-ranking DOJ and FBI officials that the SPLC is a "radical left" organization that has "targeted" conservative groups in its political speech, and provides at least "some evidence" that animus towards the SPLC and Dr. Beirich motivated this prosecution. The evidence concretely contradicts the government's contention in responding to the SPLC's motion that "the [SPLC's] general exercise of public speech…is not wrapped up in the charges" (ECF No. 68 at 8), and provides a basis for Dr. Beirich to obtain discovery to explore the reasons that she and the SPLC were charged—including connections between the Prosecution Team and officials in Washington with animus toward the SPLC's and Dr. Beirich's First Amendment-protected activities.

Moreover, the juxtaposition of the government's decision not to charge Individual-1—notwithstanding his acknowledged direction of, and extensive participation in, each of the conspiracies alleged in the Second Superseding Indictment—with the government's decision to charge Dr. Beirich is striking; standing alone it is "some evidence" of the selective enforcement and prosecution of Dr. Beirich, and thus an independent reason to grant Dr. Beirich's request for discovery.

Because Dr. Beirich is primarily focused on discovery at this time, the question before the Court is not specifically why the government prosecuted the SPLC and Dr. Beirich, but rather the narrower question of whether there is "some evidence tending to show the existence of [a vindictive or selective prosecution]" such that discovery is warranted. (August 7 Order at 13-

14.)[2] The evidence that Dr. Beirich now presents meets that standard. Accordingly, she respectfully moves, pursuant to Fed. R. Crim. P. 16, *Brady v. Maryland*, the Due Process Clause of the Fifth Amendment, Fed. R. Crim. P. 12(b)(3)(A)(iv), and this Court's inherent power to order appropriate discovery, for an order permitting discovery into the government's prosecutorial motives or, in the alternative, to dismiss the charges against her with prejudice.[3]

## II. RELEVANT BACKGROUND INFORMATION

Given the Court's familiarity with many of the relevant facts and the evidence already in the record, Dr. Beirich will strive to avoid repeating the facts set forth by the SPLC in its pleadings and the Court's recitation of those facts in the August 7 Order.[4] Certain of those facts, however, bear emphasis here in order to provide important context for the additional evidence Dr. Beirich presents in this motion.

### A. The SPLC Has a Long History of Reporting on the Activities of Hate Groups, and This History Includes the Publication of Its "Hate Map."

The SPLC is a non-profit legal center. Part of its work involves litigation. Part of its work involves research, education, and public advocacy. As for the latter, the SPLC created "Klanwatch" in 1981 to monitor and report on Ku Klux Klan activity across the country.

---

[2] To the extent the Court agrees that Dr. Beirich has presented evidence that creates a reasonable doubt as to the constitutionality of the prosecution, Dr. Beirich would also be entitled to an evidentiary hearing.

[3] As explained in the Motion submitted with this brief, Dr. Beirich believes that additional information in the government's possession will further demonstrate that this prosecution is vindictive and selective. Accordingly, Dr. Beirich first seeks discovery, followed by an evidentiary hearing, that will inform the motion to dismiss based on all relevant information available to Dr. Beirich and the Court. As a result, the Court need not resolve the alternative motion to dismiss now if it agrees that discovery is an appropriate first step, unless it is satisfied that dismissal is appropriate without a need to supplement the record with additional information.

[4] Dr. Beirich adopts and incorporates by reference the factual record developed in support of the SPLC's original motion, *see* ECF No. 49 and 74.

Klanwatch was later renamed the "Intelligence Project" in 1998 after the SPLC expanded its mission and began monitoring and reporting on hate groups other than just the Klan.[5]

Each year, the SPLC publishes the *Year in Hate and Extremism* that informs the often-cited "Hate Map."[6] The "Hate Map" appears on the SPLC's website and is described as an interactive map that tracks hate and anti-government groups.[7] In addition to those print and online publications, the SPLC's website also includes what it calls "Extremist Files" about individuals and groups with extremist ideologies, such as the "sovereign citizen movement," "alt-right," "racist skinhead," "Holocaust denial," "white nationalist," "neo-Nazi," "anti-immigrant," and "anti-Muslim."[8]

### B. The SPLC Recently Began to Include in Its Reporting and Hate Map a Number of Conservative Groups, Including Several Groups Allied with the Trump Administration.

As noted in the SPLC's motion, members of the Trump Administration and certain conservative groups have been included on the Hate Map and in the Extremist Files in recent years. For example, by 2019 the SPLC had included Trump Senior Advisor Stephen Miller in its reporting and, ultimately, its Extremist Files, citing his anti-immigrant and anti-Muslim

---

[5] *See Our History*, S. Poverty L. Ctr., https://www.splcenter.org/about/our-history/ (last visited Oct. 19, 2026).

[6] *See The Year in Hate and Extremism 2024*, S. Poverty L. Ctr. (May 22, 2025), https://www.splcenter.org/resources/reports/year-hate-extremism-2024/ (last visited Oct. 19, 2026).

[7] *See Hate Map*, S. Poverty L. Ctr., https://www.splcenter.org/hate-map/ (last visited Oct. 19, 2026).

[8] *See Extremists, Groups, & Ideologies*, S. Poverty L. Ctr., https://www.splcenter.org/resources/extremist-files/?meta_extremist_type=ideology (last visited Oct. 19, 2026).

statements.[9] The SPLC also included several groups it identified as having taken extreme anti-LGBTQ, anti-immigration, and/or white-Christian supremacist positions. These groups included Alliance Defending Freedom, Focus on the Family, Liberty Counsel, Moms for Liberty, and Turning Point USA.[10]

The SPLC's Hate Map and reporting on these groups have become a hot-button political issue since, at least, 2011.[11] The SPLC's motion and this Court's August 7 Order detail some of the statements by government officials and Members of Congress related to this political issue. (August 7 Order at 6-11.) As part of that political debate, Republican political leaders have publicly criticized the SPLC for including on its Hate Map certain groups that many consider "conservative" or aligned with the Republican party.[12]

### C. The United States Attorney's Office and the FBI Criminally Investigated the SPLC from 2019 to Approximately 2021, Then Closed the Investigation.

A criminal investigation of the SPLC was opened in 2019. (*See* August 7 Order at 4.) The investigation was conducted by the U.S. Attorney's Office for the Middle District of Alabama, along with the FBI (Special Agent J. Deanne Lindsey), IRS-CI (Special Agent David McDaniel), and the U.S. Postal Inspection Service. The investigating agents knew that the SPLC used paid informants, referred to as "field sources," to infiltrate and obtain information regarding

---

[9] *See Stephen Miller: The Breitbart Emails*, S. Poverty L. Ctr., https://www.splcenter.org/resources/guides/stephen-miller-breitbart-emails/ (last visited Oct. 19, 2026).

[10] *See* Ex. 2 (copies of SPLC Webpages for each listed group).

[11] *See, e.g.*, Patrik Jonsson, *Annual Report Cites Rise in Hate Groups, but Some Ask: What Is Hate?*, Christian Sci. Monitor (Feb. 23, 2011, 8:10 PM ET), https://www.csmonitor.com/USA/Society/2011/0223/Annual-report-cites-rise-in-hate-groups-but-some-ask-What-is-hate (last visited Oct. 19, 2026).

[12] *See id.*

white supremacist and hate groups across the country. The investigators also learned that the SPLC made payments to the field sources from bank accounts opened under names unrelated to the SPLC, including "Center Investigative Agency," "Rare Book Warehouse," "Tech Writers Group," and others.[13] Among the potential charging theories pursued by the investigators was that the payments to field sources constituted a fraud on the SPLC's donors.[14] That investigation was closed in 2021 or 2022 without any charges being filed. (*See* August 7 Order at 4-5.)

### D. The Government Began Investigating the SPLC Again in 2025, on the Heels of Intense Criticism of the SPLC's Protected Political Speech.

The FBI and U.S. Attorney's Office began investigating the SPLC again in 2025. In May of that year, the SPLC released its 2024 Year in Hate and Extremism report, which included a profile of Turning Point USA and its founder, Charlie Kirk. The report expressed the SPLC's view that Turning Point USA's "primary strategy is sowing and exploiting fear that white Christian supremacy is under attack by nefarious actors, including immigrants, the LGBTQ+ community and civil rights activists."[15]

In August 2025, Mr. Kirk, Liberty Counsel, and others complained in a letter to the White House about the SPLC's reporting on conservative organizations and including certain

---

[13] *See, e.g.*, Ex. 3 (Subpoenas issued to banks in the 2019 investigation for accounts related to "Rare Book Warehouse," "Southern Poverty Law Center," "Center Investigative Agency," "Northwest Technology," "Tech Writers Group," "Fox Photography," and "Kelly's Marine").

[14] *See* Ex. 4 at Bates Nos. 724-25. The Bates-stamp numbers referred to throughout this brief include only the last portion of the government's Bates stamps. Separately, some exhibits are redacted to remove personal information, information that could be used to identify uncharged third parties, or irrelevant information. The government has all of the information contained in the exhibits and Dr. Beirich will provide unredacted versions of any exhibits upon request. Individual-1 is noted as "Ind. 1" in the redactions.

[15] *See* SPLC, "The Year in Hate and Extremism 2024 (May 22, 2025), available at https://www.splcenter.org/resources/reports/year-hate-extremism-2024/ (last visited Oct. 19, 2026).

entities and individuals on its Hate Map.[16] The White House Letter asserted that the SPLC had "transparent bias against [its] conservative political enemies" and specifically identified the Hate Map as a "smear tactic" used against "traditional value and faith-based organizations" that disagree with the SPLC's "radical left-wing ideology."[17]

On September 10, 2025, Mr. Kirk was murdered. President Trump spoke at a memorial service for Mr. Kirk on September 21, 2025. During his remarks, President Trump publicly disclosed at least one investigation targeting groups and/or individuals he described in plainly political terms: "The Department of Justice is [ ] investigating networks of radical left maniacs who fund, organize, fuel and perpetrate political violence."[18]

Four days later, on September 25, President Trump issued a National Security Presidential Memorandum directing the Department of Justice's investigators and prosecutors to target "groups and entities" that express views "animating…violent conduct" including "anti-Christian[]" views, "extremism on migration, race, and gender," and "hostility towards those who hold traditional American views on family, religion, and morality."[19] The Presidential directive links such views directly to Mr. Kirk's murder.[20]

---

[16] *See* Ex. 5 (the "White House Letter"). Other groups that signed the White House Letter include "Liberty Counsel," "Alliance Defending Freedom," "Moms for Liberty," and "Turning Point USA," groups that had been subjects of SPLC reporting and included on the SPLC's website, as described earlier.

[17] *Id.*

[18] *Trump Speaks at Kirk Memorial*, Rev (Sept. 22, 2025), https://www.rev.com/transcripts/trump-speaks-at-kirk-memorial (last visited Oct. 19, 2026).

[19] *See* Ex. 6 at 2-3 (National Security Presidential Memorandum No. 7, *Countering Domestic Terrorism and Organized Political Violence* (Sept. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/ (last visited Oct. 19, 2026)).

[20] *Id.*

The very next day, and consistent with the Presidential Directive, the FBI revived its investigation of the SPLC by interviewing a representative of Liberty Counsel.[21] As the Court is aware, the case opening memorandum mirrors the language of the White House Letter, which had been provided to the FBI by Liberty Counsel immediately after the September 26th interview.[22] In the weeks that followed, the FBI interviewed representatives of other groups that signed the White House Letter.[23]

One week after the FBI began investigating the SPLC again, FBI Director Kash Patel publicly announced the termination of the FBI's long-existing partnership with the SPLC, calling the SPLC a "partisan smear machine" and citing the "hate map" before echoing both the White House Letter, the FBI's investigative justification, and President Trump's directives in the

---

[21] *See* Ex. 7 at Bates No. 585 (email regarding September 26, 2025, interview with Horatio Mihet of Liberty Counsel) and Bates No. 587-588 (FBI report of the same interview). Although there is some suggestion in the current record that the investigation that led to the indictments was merely a continuation of the 2019 investigation, the evidence indicates otherwise. *See* Proctor Declaration at ¶ 2. The U.S. Attorney's Office and the FBI opened entirely new cases with entirely new case numbers. Rather than building off the prior investigation, for example, the U.S. Attorney's Office opened a new investigation using number, 2025R00327, which reflects a new case opened in 2025. In 2025, the FBI also opened as many as three new investigative files with three new case numbers, rather than continuing to work under the old case number that had been assigned to the 2019 investigation. Based on counsel's understanding from the discovery provided to date, nothing has been added to the FBI's old case file since 2021. Instead, starting in September 2025, the FBI began a "Guardian" assessment of complaints about the SPLC's speech and Hate Map, which it turned into a "full investigation" in October 2025 and used to open two new case files, including a "sensitive" civil rights case. Then, around November 2025, the FBI opened the case file associated with this prosecution under another new case number, which overlaps in the FBI's system with the 2025 civil rights investigation. The investigations have run in parallel, and the civil rights investigation has been active through, at least, March 2026, well after the "Guardian" assessment was "closed." Agents assigned to the "sensitive" civil rights case are also assigned to this prosecution with others from the 2019 investigation.

[22] *See* Ex. 7; *see also* Exs. 8 and 9.

[23] *See* Proctor Decl. at ¶ 3.

National Security Presidential Memorandum by suggesting that the SPLC had "defame[d] mainstream Americans" and "even inspired violence."[24]

After the original indictment against SPLC was unsealed in April 2026, the President and the Assistant Attorney General for the Civil Rights Division made the comments described in the SPLC's motion, which focused on the political speech of the SPLC.[25] AAG Dhillon even suggested that the SPLC's political speech justified the criminal charges. *Id.*

### E. The Court's Ruling on the SPLC's Motion

In denying the SPLC's motion, the Court stressed the absence of evidence establishing animus on the part of the Prosecution Team and, separately, of any connection between the animus expressed by President Trump, FBI Director Patel, and AAG Dhillon to the actions of the local prosecutors. Specifically, the Court found that the SPLC had "fail[ed] to offer some evidence tending to show animus on the part of the prosecutors involved in bringing this case and that such animus resulted in the prosecution." (August 7 Order at 1.) The Court emphasized that it is "the motivations of the United States Attorney's Office for the Middle District of Alabama that are central," not the motivations of members of Congress, the FBI Director, or other Executive Branch officials, absent objective evidence connecting those outside actors to the actual charging decision—for instance, evidence that the prosecutor "was prevailed upon to

---

[24] *See* Ex. 10 (Kash Patel (@FBIDirectorKash), X (Oct. 3, 2025), https://x.com/FBIDirectorKash/status/1974111445488185774 (last visited Oct. 19, 2026).)

[25] For example, the President called the SPLC "one of the greatest political scams in American History" and linked it to what he believes is a "Democrat Hoax." *See* Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 24, 2026). AAG Dhillon said the charges against the SPLC were "personal" for her because the SPLC had "targeted" her "friends" and groups that she had "represented." *See* Newsmax, *SPLC indictment is 'earth shattering': Harmeet Dhillion*, YouTube (Apr. 24, 2026), https://www.youtube.com/watch?v=jGiYsEWOZxY (last visited Oct. 19, 2026).

bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse.'" (*Id.* at 22.) Applying that framework, the Court found that the record lacked objective evidence tying the various statements reflecting animus against the SPLC to the actual decision-making of then-Acting United States Attorney Davidson or his office. (*Id.* at 23-32.)

Dr. Beirich is mindful of the Court's conclusion that the statements made by high-ranking officials on a politically charged issue, standing alone, did not satisfy the SPLC's burden to obtain discovery in this criminal case. But the statements of animus against the SPLC based on its Constitutionally protected speech are nevertheless relevant to this motion. As the August 7 Order notes, if that animus can be connected to the local Prosecution Team by "some evidence" (August 7 Order at 13), further inquiry and discovery is appropriate to determine whether the government based "its decision to prosecute on some unjustifiable standard, such as a defendant's political beliefs." *United States v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021). The evidence set forth in this motion demonstrates that the Prosecution Team in Alabama charged the SPLC and Dr. Beirich because of the SPLC's disfavored, but First-Amendment protected speech about certain groups.

**F. Dr. Beirich's Discovery Request**

Dr. Beirich asked the government for the requested discovery by letter dated September 27, 2026, which is attached as Exhibit 1. Dr. Beirich's request sought, among other things, communications with DOJ, FBI, and other Executive Branch officials mentioned throughout this brief, as well as documents from the FBI's case file that have not been produced in discovery. The omitted documents include specific, serialized case documents[26] from the Fall

---

[26] "Serials" are used to record acts and communications of FBI agents and would typically include significant internal communications regarding an investigation.

of 2025, a critical period near the beginning of the FBI's renewed effort to investigate the SPLC in 2025 and around the time the Prosecution Team selected Dr. Beirich as a target for investigation. The discovery provided to Dr. Beirich reveals that at least nine serials between approximately September 2025 and December 2025 have been withheld by the government, and those serials were included in the information required in Dr. Beirich's letter.[27] On October 7, 2026, the government declined in whole Dr. Beirich's request.

## III. THE PROSECUTION OF DR. BEIRCH IS VINDICTIVE

The applicable legal standard and relevant caselaw is set forth in the August 7 Order. (August 7 Order at 11-14.) The relevant authority makes clear that due process forbids prosecutorial action motivated by a desire to punish a defendant for doing what the law permits. *United States v. Goodwin*, 457 U.S. 368, 372, 384 (1982); *Blackledge v. Perry*, 417 U.S. 21, 27–29 (1974). While the government may prosecute unlawful conduct supported by legitimate enforcement considerations, it may not use investigation or prosecution to punish a person for protected speech, advocacy, criticism, association, or petitioning activity. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."); *Wayte v. United States*, 470 U.S. 598, 608–10 (1985). And, "the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's political beliefs." *Judd*, 579 F. Supp. at 4.

Such a prosecution can be analyzed as vindictive, selective, or both. Though the labels differ, the central constitutional question is whether protected expression caused the government

[27] *See, e.g.*, Ex. 1, #5 (listing serials 8, 9, 10, 12, 13, 15, 17, 18, and 22). Based on counsel's understanding, those are not the only documents that the government has withheld in discovery.

to investigate, select, charge, or intensify its treatment of the defendant. Where a prosecution is brought for an improper purpose, dismissal of criminal charges is the remedy. *United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983) ("Federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States.").

Although courts are generally reluctant to scrutinize prosecutive decisions, courts have long recognized that, under certain circumstances, a defendant may be permitted to obtain discovery that sheds light on whether an enforcement action or prosecution was motivated by an unconstitutional purpose. To obtain that kind of discovery, a defendant must put forward "some evidence tending to show" that a "reasonable person" would think that she was prosecuted because of vindictiveness or discrimination based on a protected trait or the exercise of a protected activity. *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011); *see also United States v. Andrews*, 633 F.2d 449, 454 (6th Cir. 1980) (*en banc*) (applying "objective standard" that "considers whether a reasonable person would think there existed a realistic likelihood of vindictiveness" (cleaned up)).[28] "[T]o obtain an evidentiary hearing . . . , 'the defendant must present facts sufficient to create a reasonable doubt about the constitutionality of a prosecution.'" *Jordan*, 635 F.3d at 1188 (cleaned up).

---

[28] The Seventh Circuit explained the pragmatic reasons for the lower, "some evidence" threshold to warrant discovery: "[T]he defenses of selective prosecution and vindictive prosecution both require the defendant to probe the mental state of the prosecutors. Requiring the defendant to prove more than a colorable claim before compelling discovery might prematurely stifle a legitimate defense of vindictive prosecution for lack of evidence." *United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990) (cleaned up).

With this motion, Dr. Beirich presents, at least, "some evidence tending to show" that her prosecution is the result of vindictiveness, and, in doing so, establishes a "reasonable doubt about the constitutionality of [her] prosecution."

### A. Evidence Shows That the SPLC's Hate Map and the Perceived "Targeting" of Conservative Groups Was a Focus of the 2025 Criminal Investigation and Bears Directly on Prosecutive Decisions in This Case.

The timeline of events and the language of the FBI case opening documents indicate that the SPLC's alleged "targeting" of "conservative groups" in its reporting and on its Hate Map—its disliked and controversial but protected speech—played a substantial role in the FBI's decision to re-start the case in 2025. More importantly, the evidence set forth below shows that the Prosecution Team continued to focus on and pursue these claims of targeting throughout their entire investigation, up through and beyond the time of indictment.

#### 1. The first steps taken by the Prosecution Team after restarting the investigation in 2025 were to interview representatives of groups claimed to be aggrieved by the SPLC's political speech.

The renewed investigation of the SPLC and its employees began no later than September 26, 2025, with the first in a string of Fall interviews of conservative groups that signed the White House Letter complaining about the SPLC's political speech.[29] As the Court is aware, then-Acting United States Attorney Davidson approved opening that investigation, and while these interviews had little, if anything, to do with paying sources to investigate hate groups or bank accounts used for such payments, they had much to do with the SPLC's targeting of conservative organizations and the Hate Map and they reflect the prioritization of this targeting within the Prosecution Team. Of course, by the time the 2019 investigation closed around 2021,

---

[29] *See* Proctor Decl. ¶ 3.

SA Lindsey and SA McDaniel had already: (1) learned that the SPLC was paying field sources, including members of extremist groups, to report on the groups' activities; (2) obtained evidence of payments to the field sources through bank accounts opened by the SPLC in various names; (3) heard that, for a period of time, Dr. Beirich had been the Director of the Intelligence Project, the group that oversaw the SPLC's field source program; and (4) subpoenaed banks for documents that would show Individual-1, Dr. Beirich, and others' roles in opening and maintaining the SPLC's various bank accounts.[30] In other words, the Prosecution Team was well aware of the basis for each of the allegations in the Second Superseding Indictment[31] long before they began investigating the SPLC anew in 2025. Instead of investigating that fraud-related information as part of a change in "administrative priorities" as the government told this Court,[32] the Prosecution Team's first steps to reinvestigate the SPLC in 2025—after Charlie Kirk's murder and President Trump's directive—were to interview the groups that sent the White

---

[30] *See* Ex. 11 (Feb. 25, 2020, interview of a field source, "Witness A," by SA Lindsey, SA McDaniel, and an AUSA); Ex. 12 (Memorandum of Interview for Dec. 2020 interviews by SA McDaniel and former USPIS Inspector J.D. Tynan of a field source, "Witness B," discussing, among other things, specific records of payments received from the SPLC); Ex. 13 (Apr. 20, 2021, Memorandum of Interview of a field source, "Witness C," discussing SPLC employees including Individual-1, and Heidi Beirich, as well as bank accounts created or used by Individual-1 and others to pay for his services from accounts like "Rare Book Warehouse" and "Northwest Technologies"). Not only were the agents aware of the fact that various bank-account names were used—they knew the precise names and the banks at which the accounts were opened. *See, e.g.*, Ex. 2 (2019 investigation subpoenas).

[31] In an attempt to plead around the statute of limitations, the government includes certain April 2023 financial transactions in the substantive wire fraud counts (Counts 2-7 of the Second Superseding Indictment). Obviously, the records of those 2023 transactions were obtained after the conclusion of the prior investigation, but the factual allegations offered in support of the wire fraud scheme and the other counts of the Second Superseding Indictment were known years earlier and the discovery is replete with financial transactions like those that are now alleged to be criminal.

[32] ECF No. 68 at 18 (citing a press release about the creation of a new fraud-enforcement division at DOJ that occurred in 2026, well after the renewed investigation of the SPLC began.)

House Letter complaining about the SPLC's speech, which remained a focus of the renewed investigation moving forward.

In ruling on the SPLC's motion, the Court determined that reinvestigating the SPLC in 2025, the opening memorandum related to the White House Letter, and the FBI's contact with Liberty Counsel did not establish presumed or actual vindictiveness "without more." (August 7 Order at 19-21, 25-29.) But when viewed together with the new evidence that Dr. Beirich now provides, this information helps to explain the Prosecution Team's later conduct, which itself is at least "some evidence" showing that the reason for restarting the investigation in 2025—the SPLC's speech about "conservative" groups—was an important and animating motivation through indictment.

**2. The political concerns about "targeting" by the SPLC that were voiced by President Trump and others in September 2025 remained a focus of the Prosecution Team throughout their investigation.**

While Dr. Beirich acknowledges that she cannot yet know with absolute certainty the explicit motivation for the FBI's initial spate of interviews of the groups who wrote the White House Letter, the salient point is that the government's focus on evidence related to supposed "targeting" of conservative groups did not end after the initial contact with the conservative-group witnesses in late-2025.

a. The Prosecution Team's persistent focus on the political issues that triggered the revival of the SPLC investigation is best exemplified by how they interacted with Individual-1.

Individual-1 was the former Director of the Intelligence Project and ran the field source program until he left the SPLC in 2014. For a period of time, he was Dr. Beirich's supervisor.

Although the investigating agents had heard of Individual-1 before,[33] it appears they were encouraged to contact Individual-1 by another witness, F-9.[34] F-9 is a former SPLC field source who has played a critical role in the government's investigation.[35]

On December 15, 2025, F-9 made an hours-long presentation, with a 61-slide PowerPoint deck, to the investigating agents and the United States Attorney's Office (including Assistant United States Attorney John Geer, who was then leading the investigation, and then-Acting United States Attorney Davidson, the current lead prosecutor), advocating for various legal theories of prosecution that F-9 believed the government should pursue against the SPLC.[36] Among those theories were that the SPLC had committed: (a) mail and wire fraud by concealing from donors that it had been secretly paying leaders of hate groups; and (b) money laundering by paying these field sources through fictitious companies.[37] F-9's theories, in fact, constitute the gravamen of the pending charges against the SPLC and Dr. Beirich.

---

[33] Agents Lindsey and McDaniel knew of Individual-1's involvement based on their 2019 investigation. For example, SA McDaniel interviewed a field source, "Witness C," who told him that Individual-1 had been his contact at the SPLC and Individual-1 helped to set up the bank accounts used to pay field sources. *See* Ex. 13 at 2.

[34] "F-9" is the moniker assigned to this individual by the SPLC to protect his identity. That moniker is used in the Second Superseding Indictment to refer to this person and is used in this pleading as well.

[35] Based on the discovery, F-9 met with investigators in person or on the phone more than 20 times since November 2025 and exchanged approximately 1,800 text messages with the lead FBI and IRS-CI agents. In the months leading up to the original indictment, F-9 met with prosecutors at least four times to present "briefings" on potential charging theories. *See* Proctor Decl. ¶ 4.

[36] The presentation (referred to by F-9 as an "Intelligence Briefing") was part of a multi-hour interview of F-9 at the U.S. Attorney's Office in Montgomery. Included as Exhibit 14 are the first five slides from the presentation prepared by F-9. The last two pages of the exhibit describe the prosecutive theories F-9 urged the government to pursue.

[37] *Id.*

As part of his effort to convince the government to pursue charges based on his theories, on January 7, 2026, F-9 told SA McDaniel the government should interview Individual-1, who had directed the SPLC's field source program for decades before his departure in 2014.[38] F-9 described Individual-1 as a "salt of the earth guy," who left the SPLC in "disgust." F-9 told SA McDaniel that he believed Individual-1's bad feelings about the SPLC were "because of [the SPLC's] anti-Christian and, specifically, anti-Catholic bias."[39] The government took F-9's advice. They interviewed Individual-1 twice prior to the original indictment in this case.

i. The January 2026 interview

The Prosecution Team first interviewed Individual-1 on January 23, 2026, approximately two weeks after F-9 told the agents that he believed Individual-1 was disgusted with the SPLC due to a perceived anti-Christian bias.[40] That interview, which lasted more than two hours, was attended by AUSA Geer, Acting U.S. Attorney Davidson, and AUSA Christine Levi from the Montgomery U.S. Attorney's Office, along with FBI Special Agents Still and Lindsey, and IRS-CI SA McDaniel.[41]

During the January interview, Individual-1 told the government, among other things that: (a) at his direction, the SPLC paid field sources to infiltrate and inform on white supremacist and extremist groups; (b) Individual-1 had checking accounts set up at local banks under various business names to protect the sources' identities from the groups they had infiltrated; and (c) Individual-1 personally solicited donors to contribute to the SPLC (and fund the IP) by

---

[38] Ex. 15 at 41-42 (pages from transcript of Jan. 7, 2026, F-9 interview).

[39] *Id.* at 41.

[40] *See* Ex. 16 at 2:1-2:11 (pages from transcript of Jan. 23, 2026, Individual-1 interview).

[41] *Id.*

promoting the SPLC's work fighting hate groups.[42] In other words, he put himself at the center of the alleged conspiracies the government would later charge in the indictments.

ii. The March 2026 interview

The same case agents interviewed Individual-1 again on March 23, 2026, approximately one month before the grand jury returned the original indictment against the SPLC.[43] The interview took place at an FBI Field Office in Tennessee. Before asking any questions of the witness, the lead FBI agent, SA Still, set the table for the interview by letting Individual-1 know where he stood in the eyes of the Prosecution Team and why the agents had come all the way to Tennessee to talk with him again.[44]

Despite the fact that Individual-1 had admitted to the agents and prosecutors during the January interview that he had engaged extensively in the conduct that would later form the basis for the charges in this case,[45] SA Still began the March interview by telling Individual-1 that "we"—presumably the Prosecution Team—had heard nothing but great things about Individual-1, and assured him that the team had concluded that he had "nothing to do with" the "unusual stuff with the banks," including the "accounts that were opened under shell companies."[46] SA

---

[42] *Id.* at 1-2:11, 26:6-30:12, 37:21-38:11, 124:21-130:21.

[43] *See* Ex. 17 at 1-2:6 (pages from transcript of Mar. 23, 2026, Individual-1 interview).

[44] SA Still's introductory remarks lasted three minutes. Relevant portions of these remarks are quoted below, and a transcription is attached as Exhibit 17. Dr. Beirich can provide an audio file of these introductory remarks to the Court upon request.

[45] As noted above in footnote 33, the Prosecution Team had learned of Individual-1's involvement during the prior investigation. By the time of the March interview, agents had interviewed numerous other witnesses who told them about Individual-1's involvement with the Intelligence Project, handling field sources, using various bank accounts to pay field sources, and raising money for the SPLC.

[46] Ex. 17 at 2:20-5:22. The agent told Individual-1: "And I'll tell you, the only thing that's been consistent through this, our investigation, is one thing, and that's been you. That no matter what

Still told Individual-1: "We're not here to talk to you any about the bank and all that. You had obviously nothing to do with all that."[47]

Instead, the agents told Individual-1, they wanted to talk about how things, in the agents' words, had "gone off the rails" at the SPLC. Before asking a single question, SA Still framed the issue as follows:

> [I]t just appears like it kind of got a little out of control with what it looks like. And then they ultimately started *targeting also some specific organizations, more what probably most people would say conservative type organizations* throughout the country. And the program just kind of got off the rails with well, kind of with Dr. Beirich [] at the helm, really.[48]

At first, Individual-1 appeared not to have picked up on the agents' focus—he began his response by contradicting SA Still's premise about his involvement and reaffirming that he had "set up through accounting various bank accounts in different names. . . [T]hey were fictitious names centered around the person that would, would be getting the check."[49] Eventually, however, he responded to SA Still's statements about the SPLC "targeting conservative type

---

is, [who] we meet, or talk to anybody, they say [Individual-1], stand up guy that assisted law enforcement. That was -- and that's checked out 100 percent." *Id.* at 3:1-10. *See also id.* at 55-12 ("But like I said, the only thing that's been consistent through this whole thing is you . . . That everybody has said, 'outstanding fellow.' I mean, even some old sources we talked to, 'outstanding.'").

[47] *Id.* at 5:13-17.

[48] *Id.* at 4:7-15 (emphasis added). Because the conduct ultimately charged in the indictments began under Individual-1 and did not materially change after his tenure (*see* SSI ¶¶ 15, 18, 23, 38-39), whatever "off the rails" meant, it did not describe a change in that conduct. The government will likely assert that the practice of paying sources via ACH payments was a material change in the SPLC's conduct (*see* SSI, ¶56 and Ex. 17 at 4:2-22 (SA Still: "where it got our concern was in the banking system where they started even using the automated clearinghouse, the ACH process"), but that change occurred in August 2020, long after Dr. Beirich left the SPLC.

[49] *Id.* at 6:12-18.

organizations" and said that he believed "there was some kind of coup, long-term coup going on there between some, what I would – what I heard were some pretty liberal people, extreme people that had other ideas about what we were doing[.]"[50] Picking up on the prompt SA Still had given him at the beginning of the interview, that the "problems" at the SPLC began when Dr. Beirich took over the Intelligence Project, Individual-1 told the agents:

Individual-1: I mean, everything was intact when I left.

SA Still: Yeah.

Individual-1: And then after that, it started crumbling.[51]

On several occasions during the March interview when Individual-1 veered off the agents' preferred course and started talking about other topics arguably more relevant to the upcoming indictment, the agents steered Individual-1 back to the SPLC's perceived targeting of "conservative type organizations" and whether Dr. Beirich was responsible for it. Several examples follow:

- SA McDaniel: You mentioned just a minute ago, you know, what y'all were doing then was different than the crap they're doing now. What … exactly do you mean by that?[52]

- SA Still: [D]id Heidi ever talk, or anybody ever talk, at that time? I mean, I know it really started after you . . . left, but the targeting of the conservative type organizations, the shift over to that?[53]

---

[50] *Id.* at 10:23-11:5.

[51] *Id.* at 19:8-12. Of course, among the things that were "intact" when Individual-1 left were the system of disguised payments to field sources through the bank accounts that he had created and that are referenced in the indictments.

[52] *Id.* at 48:16-20.

[53] *Id.* at 51:10-15.

- SA Still: I just find it fascinating this walking them out, you know, in '13 and then everything kind of shifts.[54]

Eventually, after extended prompting by the agents about the "changes" and "shifts" at the SPLC after Individual-1 left, Individual-1 adopted the narrative that SA Still had laid out at the beginning of the March interview and identified Dr. Beirich as a "liberal" at the SPLC:

| | |
|---|---|
| SA Still: | Because we're just trying to understand, like, Heidi, why, you know, some of the stuff she did later on, again, after you were gone. |
| Individual-1: | To me, just if—just my off—off the gut impression, it would have to have been political . . . . She, you know, like a lot, and not all liberals hate conservatives, but I think there's a, a good degree of hatred for kind of conservatism. I think that's who they ran off first were the Christians and the conservatives. . . . [T]hen the rest, they just replaced with people they liked, you know, that agreed with them politically.[55] |

The significance of this evidence is not in *Individual-1's* account of his current views regarding the SPLC or Dr. Beirich, but rather the *agents' own framing of the questions and the direction and focus of the interviews.* The agents, not Individual-1, first characterized the relevant events as things having "gone off the rails with Dr. Beirich at the helm," and it was the agents who repeatedly steered a fraud interview toward a discussion of supposed "political" changes under Dr. Beirich's leadership rather than the financial mechanics Individual-1 had already admitted to designing and implementing.[56] In doing so, the agents' questions reveal

[54] *Id.* at 53:5-8. SA Still is referring to the view that the SPLC fired certain individuals connected with the Intelligence Project due to their conservative beliefs, as further discussed below.

[55] *Id.* at 76:19-77:15.

[56] Of course, the "shift" in the internal politics at the SPLC after 2014 has no relevance to the financial crimes charged in the indictment. Not only is that not part of the Second Superseding Indictment, but the timing does not line up. Each of the conspiracies Dr. Beirich is charged with in the Second Superseding Indictment allegedly began no later than 2007, and the same financial conduct alleged to be problematic—paying sources through various bank accounts to conceal

what was most important to them in making decisions about the SPLC and, specifically, Dr. Beirich. It wasn't her role in the financial transactions described in the indictment—Individual-1 had already admitted that *he* directed those transactions and invented the practice of disguising the payments to sources to protect their identities, and the agents told him they had no concerns about him.[57] Rather, *the agents wanted to know Dr. Beirich's role in the SPLC's supposed "targeting" of conservative groups*. The agents' focus is consistent with a motivation tied to the SPLC's and Dr. Beirich's speech. And, in charging Dr. Beirich (and no other individual) for participating in the very conduct that Individual-1 admitted having implemented and directed for the first several years of the alleged conspiracies, the Prosecution Team demonstrated that this same motivation influenced their prosecutive decisions. At the very least, this is evidence that Dr. Beirich was prosecuted because of her supposed role in "targeting" conservative groups.

b. The Prosecution Team's interactions with other witnesses were similar.

The Individual-1 interviews were not the only instances where the agents focused on SPLC's perceived targeting of conservative groups and its employees' political beliefs in the months leading up to the original indictment.

---

their identities—continued in the same manner after Individual-1 left the SPLC in 2014. Accordingly, there was no basis to continually focus the Individual-1 interview on events after he left in 2014, other than to draw the witness to this "political" issue.

[57] At a minimum, if the agents were interested in understanding the nature and scope of the conspiracies the government was about to charge, one would expect them to ask Individual-1 whether and to what extent Dr. Beirich (or others) participated in the discussions with respect to the opening of the subject bank accounts and the supposed agreement to defraud donors and launder proceeds. They did not explore any of those issues.

In a February 3, 2026, interview with another former field source, SA Still asked about targeting "conservative type organizations," which is the exact same term he used with Individual-1:

> [D]id they ever tell you, say, hey, look at--because some of the issue with the Center over the years, while not, you know, necessarily what we're talking about today, is some of the, like, Alliance Defending Freedom, some of those type websites out there that have more, I'll term, *conservative type organizations*, did they ever direct you to any of those, to look at those?[58]

Later that month, on February 23, 2026, FBI agents interviewed yet another field source and again asked about targeting "conservative" or "right wing groups" and the SPLC's Hate Map:

| | |
|---|---|
| Agent: | So, about this Hate Map . . . do you recall ever a time where they started putting different types of groups on the Hate Map? |
| | . . . |
| Witness: | There were some weird things that I did notice. There was like, they were going like after right-wing groups also. And I don't know who was in those or anything like that. |
| Agent: | When did that start, you think? |
| Witness: | I wanna say probably the last year I was with them. I started noticing that pop up on there. |
| | . . . |
| Agent: | So I think I kinda interrupted you earlier when you said that you started to notice them starting to put on like conservative or right wing . . . groups on [the Hate Map]. And you said that was [20]20? |
| | . . . |

---

[58] *See* Ex. 18 at 65:13-21 (pages from transcript of Feb. 3, 2026, interview of a field source, "Witness D"). Notably, in that exchange, SA Still asked specifically about the "Alliance Defending Freedom," a group that signed the White House Letter and that the FBI interviewed as part of its renewed investigation.

Witness: I started noticing that like these "Mother" groups were getting on there.

Agent: Like Mothers Against Drunk Driving?

Witness: No, like something of Liberty, Mothers of Liberty[59] or something like that . . . They were basically going against, they were a group that was against putting all these like [LGBTQ] things in the schools, and they wanted to stop all that stuff so the parents had more rights . . . than the schools.[60]

When the former field source veered away from the agent's questions about potentially receiving direction from the SPLC to target conservative groups, the agent redirected the witness to the intended theme of his questions. Notably, the agent even redirected the witness from mention of "white supremacy groups"—that the government now alleges the SPLC propped up—to "conservative groups" that the SPLC included on its website and Hate Map:

Agent: Did you ever notice any other groups that were on there?

Witness: There was, it was basically all white supremacy groups. There was—

Agent: Specifically, the conservative groups at all.

Witness: Yeah, pretty much.

Agent: But I mean, like, do you remember other conservative groups that were on there?

Witness: I can't think of the names.[61]

---

[59] Moms for Liberty is a group that signed the White House Letter. The FBI also communicated with an individual associated with Moms for Liberty in September 2025. *See* Proctor Decl. ¶ 3.

[60] *See* Ex. 19 at 35-41 (pages from transcript of Feb. 23, 2026, interview of a field source, "Witness E").

[61] *Id.* at 42-43.

c. Evidence reflects that the focus on perceived targeting of conservative groups by the SPLC persisted to the literal eve of the indictment of the SPLC.

On April 20, 2026, the day before the indictment was presented to the Grand Jury, F-9 spoke with SA Still and SA McDaniel. During the April 20 call, the agents signaled to F-9 that they would be presenting the case for indictment:

SA Still: We're really, we're in a time crunch and I think when I call you at the end of the week, you'll, uh, you'll see kind of why. So, uh, we look forward to talking to you again really soon, [F-9].

. . .

F-9: Shut them down, take all their money, make them not go after conservative Christians or decent people again.

SA Still: Yes, sir . . . [W]e'll, like I said, we'll be in touch, [F-9], and have some stuff to share with you this week and we sincerely appreciate everything.

F-9: I will testify before a grand jury. . ..[62]

Dr. Beirich understands that, ordinarily, a comment by a witness to an agent does not establish that the agent adopted the sentiment expressed in the comment; however, the circumstances of this particular comment, by this particular witness, at this particular time, warrants the Court's attention. First, the comment tracks precisely the line of questioning the agents pursued with several witnesses in the preceding months, as well as the expressions of animus by the high-ranking officials in Washington. Second, the words of encouragement were not made by an ordinary fact witness, but rather someone who extensively communicated with and briefed the Prosecution Team, and whose advice the Prosecution Team followed.

[62] Ex. 20 at 6 (page from transcript of Apr. 20, 2026, call with F-9) (emphasis added).

As noted above, the discovery demonstrates that F-9 had a close relationship with the agents and played a significant role in this investigation.[63] He had been contacted or interviewed dozens of times, and has engaged with the lead agent in a robust text message conversation that included *hundreds* of text messages—messages in which F-9 and the lead agent discussed prosecutive theories, as well as potential witnesses and evidence that might support those theories.[64] F-9 had also been invited to present detailed "briefings" in person to the Prosecution Team—including the sitting U.S. Attorney and, prior to that, the Acting U.S. Attorney—at least four times, during which he outlined theories of prosecution and evidence he claimed supported those theories, *including the charging theories set forth in the indictments*. Moreover, the Prosecution Team *followed* F-9's advice about which people to interview during the most-recent investigation, including Individual-1, and *sought* F-9's advice on selecting trial witnesses who could explain, in his words, "how the Center lost its way" and "started pandering to donors over politics."[65] And, even if F-9's statements cannot be attributed to the Prosecution Team based on his extraordinarily close working relationship with them, the lead case agent's affirmation of this particular statement, by responding "Yes, sir" and encouraging F-9 to wait for an imminent update about the case is at least "some evidence" that the agents shared F-9's stated objective.

---

[63] On October 28, 2026, the SPLC filed a motion that presents additional information about F-9's unique and close relationship with the Prosecution Team in this case. *See* ECF No. 184. It included, for example, a September 2026 PowerPoint slide that F-9 apparently created with the FBI logo and the phrase, "what we know and what we trying [sic] to do about it." *Id.* at 11. Dr. Beirich adopts the facts presented with the SPLC's motion about that relationship.

[64] The text message extraction that the government produced between Agent Still and F-9 shows that the agents chose to extract and produce *only* messages exchanged between "2026-06-03 to 2026-09-21." There is no known similar extraction of text messages from agents' phones with F-9 for the critical period leading up to the indictment, including around the time of this call.

[65] *See* Ex. 24 (page of text messages between F-9 and SA Still).

Separately, F-9's close working relationship with the prosecutors and agents is also evidence of his status as a "stalking horse" whose expressed animus may be attributed to the Prosecution Team. *See United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000). When the Court ruled on the SPLC's motion, it cited *United States v. Wells* and determined that the "grievances" expressed by groups that had signed the White House Letter could not establish prosecutorial vindictiveness because "[t]here is no evidence that the conservative groups 'targeted' by the SPLC pushed for an indictment." (*See* August 7 Order at 27-28.) F-9 is different.

F-9 explicitly pushed for charges in multiple, hours-long meetings with prosecutors where he presented charging theories that are similar to those in the indictments. He provided advice on witnesses and building the case. When he said: "Shut them down, take all their money, make them not go after conservative Christians or decent people again," he directly connected the prosecution to the SPLC's and its employees' exercise of First Amendment-protected speech related to certain groups.

Unlike *Wells*, where there was no evidence tying the third party's request for prosecution to a desire to limit the defendant's First Amendment rights, such evidence is present here and expressly links F-9's desire for a prosecution to his desire to stop the SPLC's speech about certain groups. This, too, warrants discovery as it is additional evidence that this prosecution was vindictive and motivated directly, or indirectly, by animus based on the exercise of First Amendment-protected activities. *See United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999) (a defendant can show vindictiveness where the prosecutor "was prevailed upon to bring charges by another with animus").

### B. The Focus on the SPLC and Dr. Beirich's Protected Speech Activities During the Investigation Is Evidence of Vindictive Prosecution on Its Own and, Separately, Connects Animus Expressed by Officials Throughout the Executive Branch to the Local Prosecution Team.

The Prosecution Team's conduct alone is evidence of vindictive prosecution because it reflects their focus on what mattered to them: the SPLC's and Dr. Beirich's views of conservative and Christian groups. It indicates the Prosecution Team's perspective on what information is important and who should be charged, whether motivated locally or from Executive Branch leaders in Washington. While the prosecutors themselves were not present for all witness interviews, they were present for many, including the critical January interview of Individual-1, and their prosecutive decisions were reflected in the comments to, and treatment of, Individual-1 during the March interview.[66] The agents cleared Individual-1 in no uncertain terms two months after the prosecutors attended his January interview, and Individual-1 is not named in the indictment that was returned one month after that. Moreover, the prosecutors met with Individual-1 again in June 2026, when Individual-1 again described with additional detail his substantial role in the charged conduct; yet, Individual-1 was not named in the Second Superseding Indictment that was returned after that meeting, while Dr. Beirich was. This sequence is evidence that the prosecutors concurred in the sentiments expressed by the agents

---

[66] Notably, Mr. Davidson and another AUSA (Bodner) *were* present during a follow-up interview of Individual-1 in June 2026 when, among other things, Individual-1 again acknowledged that he helped set up the system that paid the field sources, that he "opened a number" of bank accounts in various names, that he was the "gatekeeper" for payments to field sources, that some field sources were members of extremist groups with one even as "head of the group," and that field sources gave money to hate groups. *See* Ex. 21 at 6:13-9:14, 64:12-65:5, 104:15-107:16, 111:19-112:8 (pages from transcript of June 10, 2026, Individual-1 interview). Individual-1 also confirmed that he was "responsible" for the field source program until he left the SPLC. *Id.* at 65:21-66:3 (AUSA Bodner: "I know you left in '13, but when kind of was your time when you were kind of getting out of running the F program?" Individual-1: "I never got out of it. I was responsible for it.").

during the March interview of Individual-1. But the Court need not resolve that question now because the standards for discovery and an evidentiary hearing do not require it. Even if the agents were acting on their own in clearing Individual-1 while expressing an interest in pursuing Dr. Beirich due to her First Amendment-protected activity, that would be sufficient now as the agents have been a critical and necessary part of the Prosecution Team in this case. *See Koh*, 199 F.3d at 640 (a defendant can show vindictiveness where the prosecutor "was prevailed upon to bring charges by another with animus"); *United States v. Adams*, 870 F.2d 1140, 1146 (6th Cir. 1989) (discovery warranted based on "some evidence" that EEOC—not necessarily the prosecutor—harbored animus towards the defendants and may have induced the prosecution); *see also United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990) ("Requiring the defendant to prove more than a colorable claim before compelling discovery might prematurely stifle a legitimate defense of vindictive prosecution for lack of evidence.").

The Prosecution Team's persistent questioning of other witnesses regarding supposed "targeting" of conservatives right up until the indictment of this case is further evidence of their motivations. The government previously told this Court that "the [SPLC's] general exercise of public speech...is not wrapped up in the charges...which involve financial fraud, false statements to financial institutions, and money laundering" or, in its words, "a standard white collar fraud prosecution." (ECF No. 68 at 4, 8.) But the fact that the government continued to focus on the SPLC's and Dr. Beirich's speech and political views during this ostensible fraud prosecution also bears upon the motivation for the prosecution. The Prosecution Team's focus on apparently disfavored speech activities—the reporting and Hate Map listing of "conservative type organizations" that in the agents' words caused the SPLC (under Dr. Beirich) to "go off the rails"—and then prosecution of the SPLC and *only* the individual that the team was led to believe

was responsible for that speech tends to show vindictiveness. *See United States v. Barner*, 441 F.3d 1310, 1318 (11th Cir. 2006) (citing *Goodwin*, 457 U.S. at 383–84); *see also United States v. Carey*, 816 F. Supp. 3d 129, 141 (D.D.C. Jan. 20, 2026); *Hartman*, 547 U.S. at 256 ("the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out.") (emphasis added) (cleaned up). The fact that prosecutors only charged the person that the Prosecution Team believed was responsible for the SPLC supposedly going "off the rails" by targeting "conservative type organizations," and not someone similarly situated but who was *upset* with the SPLC's purported shift, strengthens that conclusion.

That the questioning regarding alleged "targeting" came on the heels of the 2025 Presidential Directive that law enforcement target groups tied to "anti-Christian" views and show "hostility towards those who hold traditional American views on family, religion, and morality," provides important context and also calls for further examination as to whether the prosecution was motivated by the SPLC's and Dr. Beirich's political speech. *See United States v. Tuitt*, 68 F. Supp. 2d 4, 18 (D.Mass 1999) (allowing discovery where "the *prima facie* evidence presented by Defendant reflects possible choices on the part of law enforcement personnel, if not the prosecutors themselves, which raise an eyebrow high enough as to require a further explanation"). *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) ("[T]he First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech.") (quoted in the August 7 Order at 18).

The Prosecution Team's conduct tends to show both *animus* (in the focus on speech and political views), and *causation* (in, at least, the prosecutor's decision to charge only the person believed to be responsible for the SPLC's politically driven shift). *See Wilson*, 262 F.3d at 314

(elements of prosecutorial vindictiveness are animus and causation); *see also Judd*, 579 F. Supp. 3d at 4 ("the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's political beliefs"). That showing alone justifies Dr. Beirich's request for discovery.

### C. DOJ and FBI Policies, and Recently Released Information, Link the Alabama Investigation to Statements of DOJ Leadership.

The evidence now before the Court shows that the local Prosecution Team expressed the same concerns about the "targeting" of conservative groups expressed by high-ranking Department of Justice and Executive Branch officials. The link between the local Prosecution Team and those officials, and the likelihood that the animus expressed by the officials (including FBI Director Patel and AAG Dhillon), has affected this prosecution is bolstered by the mandated reporting and consultation policies that governed the instant investigation, as well as recently released information tying the case in Alabama to supervisory officials in Washington.

Within days of Charlie Kirk's murder in September of 2025, the U.S. Attorney's Office and FBI began investigating, and then opened entirely new investigations of, the SPLC. The investigation was opened as a "SIM" or "sensitive investigative matter"[67] and a civil rights

---

[67] The Attorney General's Guidelines for Domestic FBI Investigations define a "sensitive investigative matter" as "an investigative matter involving the activities of a . . . religious or political organization or individual prominent in such an organization, or news media, or any other matter which, in the judgement of the official authorizing an investigation, should be brought to the attention of FBI Headquarters and other Department of Justice officials." *See* U.S. Dep't of Just., *The Attorney General's Guidelines for Domestic FBI Operations*, at 44 (Sept. 29, 2008), https://www.justice.gov/archive/opa/docs/guidelines.pdf (last visited Oct. 20, 2026). Those same Guidelines provide that "[a]n FBI field office shall notify FBI Headquarters and the United States Attorney or other appropriate Department of Justice official of the initiation by the field office of a predicated investigation involving a sensitive investigative matter." *Id.* at 22 (emphasis added). The FBI's Domestic Investigations and Operations Guide defines a "sensitive investigative matter" the same way and requires notice to FBI Headquarters in Washington, DC. *See* Fed. Bureau of Investigation, *Domestic Investigations and Operations Guide* ("DIOG") at 10.1.2.1 (defining SIM), 7.7.1.1(C)(1) (notice requirements for predicated SIMs opened in a field

investigation.[68] DOJ and FBI policies require coordination with FBI Headquarters and DOJ officials in Washington in these types of cases.

The FBI, for example, was required to "notify FBI Headquarters and the United States Attorney or other appropriate Department of Justice official[69] of the initiation by the field office of a predicated investigation involving a sensitive investigative matter.[70] The FBI began conducting interviews in these new "sensitive investigation matters" no later than September 26, 2025. FBI Director Patel publicly terminated the FBI's long-standing collaboration with the SPLC the very next week, citing the SPLC's perceived politics, explicitly referencing the Hate Map, and criticizing it as a "partisan smear machine."[71] The timing and similarity between the FBI's actions in Alabama and the FBI Director's statements, coupled with this requirement, is some evidence of a connection between the two in this case.[72]

---

office), 5.6.3.1.4 (requirements for SIMs opened as initial assessments), available at https://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29/fbi-domestic-investigations-and-operations-guide-diog-2024-version/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29%202024%20Version%20Part%2001/view (last visited Oct. 29, 2026).

[68] *See* Ex. 4; Ex. 22.

[69] Because there was no Senate-confirmed U.S. Attorney in the Middle District of Alabama at the time, and because the FBI opened the investigation as a civil rights case, there is reason to believe that FBI Headquarters would have coordinated with an official in the Civil Rights Division as the "other appropriate Department of Justice official" referenced in the Attorney General's Guidelines and DIOG.

[70] *See* U.S. Dep't of Just., *The Attorney General's Guidelines for Domestic FBI Operations*, at 22 (Sept. 29, 2008), https://www.justice.gov/archive/opa/docs/guidelines.pdf (last visited Oct. 20, 2026); *see also* FBI DIOG at 5.6.3.1.4 (requirements for SIMs opened in a field office as initial assessments); 7.7.1.1(C)(1) (predicated SIMs opened in a field office).

[71] *See* Ex. 9, Kash Patel (@FBIDirectorKash), X (Oct. 3, 2025), https://x.com/FBIDirectorKash/status/1974111445488185774 (emphasis added) (last visited Oct. 20, 2026).

[72] An FBI agent recently testified under oath in a criminal case in Washington, D.C., that Director Patel had directly contacted his field office to open a case against a former FBI

Separately, U.S. Attorney's offices are required by the Department of Justice's "Justice Manual" to notify the Civil Rights Division, in writing, of newly opened civil rights investigations and assess whether the investigation is one of "national interest."[73] Ultimately, it is the Assistant Attorney General of the Civil Rights Division who determines whether a case is of "national interest" pursuant to Justice Manual policies. During the relevant time period, that person was Harmeet Dhillon. Thus, by virtue of the DOJ's own policies, it is reasonable to conclude that the local Prosecution Team adhered to DOJ policies and consulted with AAG Dhillon with respect to this investigation.

---

intelligence official one day after President Trump gave a speech directing DOJ to investigate an "alleged cover-up by intelligence officials" related to the 2020 election, and that the FBI Director was "closely monitoring [the field agents'] progress on the case" based on "routine[]" updates that the agents provided in addition to the Director's participation in video conferences with the case team. *See* Sarah N. Lynch, *Defense Lawyers Seek to Poke Holes in DOJ's Case Against Ex-FBI Officials Over Hunter Biden Probe*, CBS News (Oct. 28, 2026, 5:24 PM EDT), https://www.cbsnews.com/news/defense-lawyers-doj-case-ex-fbi-officials-hunter-biden/ (last visited Oct. 29, 2026) (reporting on *United States v. Floris*, Case No. 26-mj-00185 (D.D.C. Oct. 27, 2026).) The FBI agent also testified that he worked the case despite his concerns that it was "political" and viewed by some within his field office as a "witch hunt." *See* Alan Feuer, *White House Has Tight Grip Over F.B.I. in Pursuing Trump Targets, Agent Says*, N.Y. Times (Oct. 27, 2026), https://www.nytimes.com/2026/10/27/us/politics/fbi-trump-patel-witt-testimony.html (last visited Oct. 29, 2029) (same case). The similarities in timing of events in that case and this case are striking, particularly the FBI Director's direct interest and involvement in a case shortly after a presidential announcement directing a DOJ response. This testimony about the FBI Director's direct involvement in an investigation and prosecution, together with evidence of his agents' conduct in this investigation, his public statements about the SPLC just after his agents began the renewed investigation, DOJ and FBI policies, and all of the other evidence that Dr. Beirich now offers, warrants additional discovery. Dr. Beirich's request for such discovery and witness testimony during an evidentiary hearing could reveal similar conduct under similar circumstances and may be one of the only ways to complete the record regarding the constitutionality of this prosecution.

[73] *See* U.S. Dep't of Just., *Justice Manual* § 8-3.120, available at https://www.justice.gov/jm/jm-8-3000-enforcement-civil-rights-criminal-statutes#8-3.100 (emphasis added) (last visited Oct. 20, 2026).

These policies, along with the clear overlap between the Alabama team's conduct and the statements of DOJ officials, satisfy the standards for discovery and an evidentiary hearing. (*See* August 7 Order at 13 (quoting *Jordan*, 635 F.3d at 1188).) However, even if the Prosecution Team never provided notice to officials in Washington—which is highly unlikely, in light of the applicable DOJ and FBI policies—the common theme between FBI Director Patel's statements, AAG Dhillon's statements, and the *agents' own questions and comments* during the investigation, provide "some evidence" for a reasonable person to find a causal connection and chain of animus at work.

Information recently released by the Ranking Member of the House Judiciary Committee also bears on whether the Prosecution Team in Alabama acted at the direction of high-level officials in Washington. On May 1, 2026, the Ranking Member released a letter that he sent to Acting United States Attorney Davidson and Associate Deputy Attorney General Akash Singh describing "whistleblower reports" that the Judiciary Committee had received indicating that ADAG Singh "ordered the U.S. Attorney's Office for the Middle District of Alabama to rush through the indictment of the SPLC despite serious concerns about the strength of the case."[74] Notably, ADAG Singh is the same official whose oversight connected Main Justice to the U.S. Attorney's Office for the Middle District of Tennessee in a prosecution that the district court dismissed as vindictive based on, among other things, public statements by other high-level Department of Justice officials. *See United States v. Kilmar Armando Abrego Garcia*, 833 F. Supp. 3d 811, 825, 828-29, 836 (M.D. Tenn. 2026). While Dr. Beirich is not privy to the details

---

[74] *See* Ex. 23 (House of Representatives, Committee on the Judiciary, Ranking Member's April 30, 2026, letters to Associate Deputy Attorney General Aakash Singh and then Acting United States Attorney Kevin Davidson).

of the whistleblower reports, the disclosure of the substance of those reports additionally ensures that Dr. Beirich has met the evidentiary threshold for further discovery and a hearing, particularly in light of ADAG's Singh's related conduct in a separate vindictive prosecution and the other evidence set forth in this motion.

### D. The Remarkable Consistency Between the Prosecution Team's Conduct and the Animus Expressed by Senior DOJ, FBI and Executive Branch Officials is "Some Evidence" of a Connection When Viewed in Context.

That the Prosecution Team's conduct described in this Motion is entirely consistent with Executive Branch activities and statements—including the President's announcement of an investigation, the National Security Presidential Memorandum, Director Patel's announcement, and AAG Dhillon's statements—is also consistent with Executive Branch pressure on the team to prosecute the SPLC and the person responsible for the perceived targeting of conservative groups, and justifies Dr. Beirich's discovery request. The fact that it all largely coincided with the National Security Presidential Memorandum is important. The case of *United States v. Carey*, 816 F. Supp. 3d 129, 141 (D.D.C. Jan. 20, 2026), is notable. In that case, the court found that discovery regarding actual vindictiveness was warranted *and* presumed vindictiveness because of a presidential executive order that directed "prosecutors to find charges to pin on flag burners" along with "officers' statements suggesting that the order might have played a role in [the defendant's] prosecution." *Carey*, 816 F. Supp. 3d at 144.[75] In this case, President Trump's

[75] This Court cited *Carey* in the August 7 Order and, among other things, included it as an example of cases that addressed presumed vindictiveness in prosecutions "predicated upon...protected activity." (August 7 Order at 21, fn. 9.) The *Carey* court considered *both* actual and presumed vindictiveness, *and* whether discovery was warranted. *Carey*, 816 F. Supp. 3d at 143-44. Although Dr. Beirich does not ask the Court at this time to evaluate whether dismissal is warranted because of actual or presumed vindictiveness, the *Carey* court's discovery analysis and consideration of an Executive Order that "singles out people who engage in

directive to the Department of Justice is largely consistent with the newly presented statements and questions of the Prosecution Team (as well as statements made by other high-level officials) about the SPLC and Dr. Beirich's exercise of protected rights; warranting discovery and making "the odds of vindictiveness [ ] high." *Id.* ("Any time a policy directs the Department of Justice to find charges to bring against people who exercise their rights in disfavored ways, the odds of vindictiveness are high indeed."); *cf. United States v. P.H.E.*, 965 F.2d 848, 860-61 (10th Cir. 1992) (a DOJ policy targeting companies that distributed sexually explicit material was sufficient for the defendants to meet "their burden of showing that the indictment is the tainted fruit of a prosecutorial attempt to curtail [their] future First Amendment speech" despite the involvement of a neutral prosecutor).

Unlike the record before the Court in August, this newly offered evidence, presented in the larger context of Executive Branch actions and statements, does "more than simply 'identify a potential motive for prosecutorial animus.'" (August 7 Order at 23 (quoting *Bucci*, 582 F.3d at 114)). It provides real evidence of a "colorable claim" that the prosecution team in Alabama investigated and prosecuted the SPLC and Dr. Beirich because of First Amendment protected conduct related to the SPLC's Hate Map and reporting about "conservative type organizations." That evidence is tied directly to the agents and prosecutors who made critical decisions. And it, together with the circumstances of the investigation and DOJ/FBI policies, provides an objective link to other officials' stated animus about the SPLC and its First Amendment activities, including AAG Dhillon's and FBI Director Patel's. Accordingly, Dr. Beirich has met the standard for discovery based on actual or presumed vindictiveness. Upon receipt and review of

---

disfavored speech and tells prosecutors to find crimes to charge them with" is instructive. *Id.* at 144.

that discovery, Dr. Beirich requests an evidentiary hearing to determine the nature and extent of any direct participation by DOJ or FBI officials in the prosecutive decisions in this case. *See Jordan*, 635 F.3d at 1188 (quoting *United States v. Silien*, 825 F.2d 320, 322 (11th Cir. 1987)).

## IV. THE PROSECUTION TEAM SELECTED DR. BEIRICH AS A TARGET AND DEFENDANT WHILE DECLINING, FOR UNCONSTITUTIONAL REASONS, TO INVESTIGATE AND PROSECUTE OTHERS SIMILARLY SITUATED

This prosecution is also driven by an unconstitutional discriminatory purpose: to target and prosecute Dr. Beirich, and not other similarly situated individuals, because the government disfavors Dr. Beirich's perceived political views and First Amendment-protected speech.

"For almost one hundred years, the federal courts have recognized that it is unconstitutional to administer the law 'with an evil eye and an unequal hand so as practically to make unjust and illegal discrimination between persons in similar circumstances . . . .'" *United States v. Napper*, 574 F. Supp. 1521, 1523 (D.D.C. 1983) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886)). "If the Executive selectively prosecutes someone based on impermissible considerations, the equal protection remedy is to dismiss the prosecution . . . ." *In re Aiken County*, 725 F.3d 255, 264 n.7 (D.C. Cir. 2013). The same logic applies where law enforcement selectively targets individuals for investigative actives based on impermissible "selective enforcement" considerations. *See United States v. Washington*, 869 F.3d 193, 213-21 (3rd Cir. 2017); *see also United States v. Cannon*, 987 F.3d 924, 939 (11th Cir. 2021) (referring to both "selective prosecution" and "selective enforcement" when reviewing a discovery request).

Whereas selective prosecution claims focus on the prosecutors' motives and conduct, selective enforcement claims focus on law enforcement officers and agents. *See United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (*en banc*); *Washington*, 869 F.3d at 197.

Ultimately, there are two elements to a *substantive* selective prosecution or enforcement claim. The defendant must show that the challenged decision had a "discriminatory effect" and a

"discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *see also Washington*, 869 F.3d at 214 (noting that while the standard to obtain discovery may be different for selective prosecution and selective enforcement claims, the ultimate standard to prove a substantive violation is the same). Discriminatory effect requires a showing that other similarly situated defendants were not prosecuted for the same offense. *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011). A "similarly situated" individual is "one who engaged in the same type of conduct" as the defendant. *United States v. Brantley*, 803 F.3d 1265, 1271 (11th Cir. 2015) (quoting *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)) (cleaned up). Discriminatory purpose requires a showing that the government prosecuted the defendant "at least in part because of, not merely in spite of," her race, religion, or protected activity. *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985) (cleaned up). The lower standard for discovery and an evidentiary hearing that apply to claims of vindictive prosecution also apply to claims of selective prosecution. *Armstrong*, 517 U.S. at 468–70; *Smith*, 231 F.3d at 810–12.[76]

The evidence presented at least "tend[s] to show" that the government's perception of Dr. Beirich's political beliefs and role at the SPLC "targeting" "conservative type organizations" is why she, but no other individual, was prosecuted. That is unconstitutional. "[T]he Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's political beliefs." *Judd*, 579 F. Supp. 3d at 4. The Court need look no further than the indictment, how Dr. Beirich was selected as a target, the agents' stated views regarding

---

[76] While selective prosecution claims most commonly arise from discrimination against an individual for their participation in a protected class, a defendant may also show that they are a "class of one," meaning that they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Dr. Beirich, and the government's favorable treatment of Dr. Beirich's former boss to conclude that Dr. Beirich has met the standard for discovery and an evidentiary hearing.

### A. The Second Superseding Indictment

Dr. Beirich is not charged in any substantive counts; she is only charged in conspiracy counts based on allegations of conduct that occurred between 2007 and 2021.[77] The indictment's 11 other counts—all substantive—do not charge any individual defendant. Seven of the substantive counts, Counts Two through Seven and Count Fourteen, relate to payments made to multiple field sources in 2023. (*Id.* ¶¶ 32, 56, 59). Dr. Beirich had left the SPLC by then, and at least one person with knowledge of the field source program had to approve those payments, yet no individuals are charged with that conduct. The other four substantive counts, Counts Nine through Twelve, relate to four different allegedly false statements made to banks in 2016 by Employee-1, not Dr. Beirich, yet Employee-1 is not charged with that conduct. (*Id.* ¶ 46).[78]

### B. The Selection of Dr. Beirich as a Subject of Investigation

When the FBI, IRS-CI, and U.S. Attorney's Office for the Middle District of Alabama shuttered its 2019 investigation of the SPLC and various employees including Dr. Beirich, they knew much of what they know now *and* much of what is featured in the Second Superseding Indictment.[79] Yet, Dr. Beirich was not charged with a crime.

---

[77] *See* SSI (ECF No. 115) ¶¶ 15 (listing accounts opened in 2007 and 2008), 18.a.ii (payments made to a field source in 2014); 23 (discussing accounts used to pay field sources), 38-39.

[78] As noted above with respect to Individual-1, Dr. Beirich does not contend that any of the actions of SPLC employees referenced in the Second Superseding Indictment were improper, illegal, or justify criminal charges. Quite the contrary. Rather, the decision by the Prosecution Team to charge *only* Dr. Beirich for these activities provides compelling evidence that she was selected for prosecution for an improper reason.

[79] *See supra*, Section III.A.1.

Then, in 2025, and as outlined above, some of the same members of the Prosecution Team, including SA Lindsey and SA McDaniel, opened new investigations into the SPLC and its employees. After the FBI interviewed individuals from groups that signed the White House Letter, the Prosecution Team met to discuss next steps. That meeting, on November 12, brought together members of the U.S. Attorney's Office, FBI, and IRS-CI.[80] An "Electronic Communication" in the FBI's files summarized the meeting:

> On 12 November 2025, FBI Mobile met with the IRS and the US Attorney's Office for the [M]iddle [D]istrict to discuss the investigation into Southern Poverty Law Center (SPLC) and [another person]. During the meeting *it was decided by the group* Beirich would be a subject of investigation. Beirich was previously investigated by FBI, USPS, and IRS for soliciting charitable funds under false pretenses, wire fraud, and mail fraud in 2020.[81]

By the time of that meeting, agents had done little more in their new investigation than to collect information from certain of the groups that had signed the White House Letter; there is no indication they had engaged in any substantive and new investigative activity regarding Dr. Beirich. But the agents did have an interview report from a field source who had suggested to agents in 2021 that "Beirich ha[d] a hand in making the change against groups who oppose gays and lesbians."[82]

### C. The Unconstitutional Selection of Dr. Beirich as a Defendant

With Dr. Beirich as a focus, the Prosecution Team interviewed witnesses. As detailed above, the agents' views of Dr. Beirich are apparent from their own statements during those

---

[80] *See* Ex. 4 at Bates No. 724-725.

[81] *See id.* (emphasis added). This Electronic Communication is also notable because it records that the decision to make Dr. Beirich a subject was made by the entire group that met, which included agents and prosecutors from the U.S. Attorney's Office.

[82] Ex. 13 at 4.

interviews. As also detailed above, even after Dr. Beirich's former boss, Individual-1, acknowledged during three separate interviews his central role in the conduct giving rise to the current charges, the prosecutors and case agents embraced Individual-1 and sought his assistance in bolstering the theory that Dr. Beirich directed an SPLC attack on conservative groups. Ultimately, Dr. Beirich would be charged in three conspiracy counts based on allegations related to that conduct. But Individual-1 was not charged in any of those counts.

Individual-1 told agents that he ran and paid field sources to report on various hate groups—including "people that were involved with these groups" not "angels," even if they were the "head of the group"—he reimbursed expenses paid to the groups, he made payments from various bank accounts he had set up, and he met with donors to raise money without disclosing details of the field source program; yet Individual-1 was not charged in Count One, as was Dr. Beirich, which alleges that, since at least 2007, SPLC "sought donations" to "'dismantle' violent extremist groups" without telling donors that a portion of that money would be used to pay "high-level leaders" of the groups from bank accounts opened in various names. *See* SSI ¶¶ 20-25. Nor was he charged in Count Eight, as was Dr. Beirich, which alleges a conspiracy since 2007 to submit false statements to banks "for the purpose of influencing banks to open and maintain bank accounts" like Center Investigative Agency and "Rare Book[] Warehouse," which Individual-1 told prosecutors and agents in multiple interviews he had opened and used to secretly pay field sources. *See* SSI ¶¶ 38-39. Nor was he charged in Count Thirteen, as was Dr. Beirich, which alleges a money laundering conspiracy since 2007 based on payments made through the very same accounts that Individual-1 said he set up and used. *See* SSI ¶¶ 50-54.[83]

[83] This comparison of Dr. Beirich and Individual-1 does not mean that Individual-1's activities were improper, illegal, or justified criminal charges.

This evidence, and the other evidence like it described above, presents at least a colorable claim of selective enforcement and prosecution and creates a reasonable doubt about the constitutionality of this prosecution. Individual-1's conduct fits squarely within the same counts as Dr. Beirich based on his own statements and the evidence gathered during the 2019 and 2025 investigations. But he wasn't indicted and Dr. Beirich was. The Prosecution Team viewed him the same way F-9 viewed him, as an "outstanding" "salt of the earth" conservative who was frustrated by the SPLC's "targeting" of certain groups. Dr. Beirich, on the other hand, was portrayed as one of the "liberals" at the SPLC and part of the "coup" responsible for the disfavored, but First Amendment-protected, reporting on "conservative type organizations."

As the Supreme Court explained in *Wayte*, "although prosecutorial discretion is broad, it is not 'unfettered' [and] [s]electivity in the enforcement of criminal laws is . . . subject to constitutional constraints." *Wayte*, 470 U.S. at 607; *see also* August 7 Order at 15 ("Prosecutors must ensure that individuals are "penalized for violating the law," not "for exercising a protected statutory or constitutional right." (citing *Goodwin*, 457 U.S. at 372)). Choosing to prosecute Dr. Beirich because of her perceived politics and role at the SPLC in including certain groups on its website or Hate Map, while declining to prosecute a similarly situated person with different political views, is quintessential discrimination based on impermissible considerations and demonstrates both discriminatory effect and purpose. *See United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973) ("[J]ust as discrimination on the basis of religion or race is forbidden by the Constitution, so is discrimination on the basis of the exercise of protected First Amendment activities, whether done as an individual or, as in this case, as a member of a group unpopular with the government."); *see also In re Aiken County*, 725 F.3d at 264 n.7 ("If the Executive selectively prosecutes someone based on impermissible considerations, the equal protection

remedy is to dismiss the prosecution . . . ." ). As a result, there is, at the very minimum, a *prima facie* case of selective prosecution and Dr. Beirich has shown "some evidence tending to show the existence of the essential elements of the defense," *Jordan*, 635 F.3d at 1188 (quoting *Armstrong*, 517 U.S. at 468) (quotation marks omitted), that is, she was selected for investigation and prosecution "at least in part because of, not merely in spite of," her exercise of First Amendment protected activities, *see Brantley*, 803 F.3d at 1272. *See also United States v. Petrova*, Case No. 25-10272-LTS, 2026 WL 3025894 at *3-4 (D. Mass. Oct. 8, 2026) (granting defendant's request for discovery based on selective and vindictive prosecution without requiring, at that stage, the defendant to specifically identify others who acted identically).

The Court should order discovery for the independent reason that Dr. Beirich has met her burden to present sufficient evidence of selective enforcement and prosecution.

## V. CONCLUSION

The evidence now in the record provides critical new information about the motivations that have driven decisions throughout the renewed effort to investigate and prosecute the SPLC and Dr. Beirich. It shows that animus towards Dr. Beirich's and the SPLC's disfavored, but First Amendment-protected, speech occupied a critical role among the local Prosecution Team in how to investigate and who to charge. It shows that the animus that affected the local Prosecution Team and critical witnesses was virtually identical to the animus expressed by Executive Branch officials with authority in this case. And, separately, all of the circumstances together are evidence that the Executive Branch officials with animus actually affected local decisions.

On this record, a court would be well within its discretion to dismiss the charges. But Dr. Beirich believes that additional information about the unconstitutional motivations is within the government's possession, including, but not limited to: documents and communications contained in various case files but withheld from discovery; communications among and

between prosecutors, agents, and witnesses; communications, and evidence of communications, with officials in Washington; policy compliance documents; and, opening and closing documents, memoranda, and approvals. As a result, Dr. Beirich respectfully requests that the Court first order the government to produce targeted discovery related to investigative and prosecutorial motives. Dr. Beirich also requests that, following production and review of that discovery, the Court order an evidentiary hearing on her motion to dismiss so that the Court can decide the motion with the benefit of documents, communications, and the testimony of case agents and critical witnesses. If, however, the Court is satisfied that dismissal is appropriate based on the newly presented evidence without a need for additional discovery, Dr. Beirich respectfully requests that the Court grant her alternative request now and dismiss the charges against her with prejudice.

Dated: November 2, 2026

Respectfully submitted,

*/s/ Michael J. Proctor*

Michael J. Proctor (CA State Bar No. 148235)
Marc S. Harris (CA State Bar No. 136647)
IVERSEN PROCTOR LLP
1325 Palmetto Street
Los Angeles, CA 90014
Telephone: 213-787-7699
michael@iversenproctor.com
marc@iversenproctor.com

*/s/ Augusta S. Dowd*

Augusta S. Dowd (ASB-5274-D58A)
WHITE ARNOLD & DOWD P.C.
2001 Park Place North, Suite 1400
Birmingham, AL 35203
Telephone: (205) 323-1888
Facsimile: (205) 323-8907
adowd@whitearnolddowd.com

*Counsel for Defendant Heidi L. Beirich*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd of November, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participant counsel of record.

*/s/ Augusta S. Dowd*
OF COUNSEL