# EXHIBIT 21

United States vs. SPLC

Audio Transcription

Parker Still and Ind. 1

[redacted]

[redacted]

PARKER STILL: Get started.

JUSTIN LOWRANCE: Okay. All right. Today's date is June 10th, 2026. It's approximately 2:02 p.m. We're at the [redacted] FBI office, and in the room is Ind. 1 with the US Attorney's Office is Chris Bodner and Kevin Davidson. And with the FBI, there's myself, Justin Lowrance, and Parker Still.

PARKER STILL: All right, Mr. Ind. 1 So we'll go ahead and get kicked off again. Thank you for being here. I think this is our third meeting.

Ind. 1 It is.

PARKER STILL: One is I like coming to [redacted], so we're going to start spending the night.

Ind. 1 Well come a little further east of Cleveland if we'll --

PARKER STILL: Yeah.

Ind. 1 I'll take you to dinner.

PARKER STILL: Yeah, we'll

PARKER STILL: Yeah, because that -- and that's what we were saying. We read some stuff about him and and saw his name. And then we saw -- and it was on the -- some of the Oklahoma stuff. And out there did -- and some city that was out there that he wrote a lot of stuff about, like Elohim.

Ind. 1 Elohim City?

PARKER STILL: Elohim City. And he had written quite a bit of stuff about that.

Ind. 1 Right. Yep. He was real interested in the Christian Identity Movement, which is -- it's kind of like Christianity except it's for white supremacists, you know? But it's it's -- he knew a lot about it.

PARKER STILL: Yes, sir. Now, did [redacted] did he have Fs that he kind of ran? Did [redacted] do that?

Ind. 1 I know he you know, he was a newspaper reporter before he

[redacted]

worked for us, so I know he had sources that
he developed kind of on his own.

PARKER STILL: Okay.

Ind. 1 But he -- I'm sure
that he interacted with some of the Fs.

PARKER STILL: Okay.

Ind. 1 In particular
areas just for his stories and that kind of
stuff.

PARKER STILL: Right, right.

Ind. 1 But I couldn't for
the life of --

PARKER STILL: Would he be
involved in paying of Fs or anything like
that?

Ind. 1 No.

PARKER STILL: Okay.

Ind. 1 The only -- as I
said earlier, when we set this program up, I
was kind of the gatekeeper on that.

PARKER STILL: Okay.

Ind. 1 And up until about
five or ten years before I left, and then I

[redacted]

handed it off to [redacted] just because I got tired of fooling with it because we had a bunch of moving pieces and you had to do a different check for, you know, for each person. And [redacted] would've never done any of that. Now he may have asked for money, like to send them somewhere, you know, for expenses or something like that.

PARKER STILL: Yeah. Was he -- would he have been aware though of the overall program, [redacted]

Ind. 1 Not really. Towards the end, everybody I say everybody, the the administration of the intelligence project became aware of it. [redacted] and Heidi, of course, [redacted] and probably some of the others. I don't know how much detail they knew, but I know [redacted] and Heidi knew, you know, all of it.

PARKER STILL: Right, right.

Ind. 1 And towards the end there.

PARKER STILL: Right.

[redacted]

Ind. 1 Yeah.

PARKER STILL: Because they're the ones that kind of, I think in our last interview, talked about was taking it more towards the magazine.

Ind. 1 Right. Well, when I first started setting this thing up, the I I believed in just nobody knowing about it except for, you know, for for a handful of people, just because for their protection.

PARKER STILL: Sure.

Ind. 1 And the integrity of the network, you know, if a hundred people know about it, it's not going to last very long. And we were -- we were very tight-lipped about it, even within the department. But as time went on and I kind of lost control of it because I was director and then I stepped down to chief investigator or back to chief investigator. Excuse me. And then [redacted] and Heidi became privy to it. And and of course [redacted] helped me with it, so she was privy to it.

But it was, you know, we we tried to keep it in-house as much as we could, unless we had some kind of legal problem, then we'd go like that 1099 issue.

We went and asked the lawyers. I mean, we had a -- we had probably one of the best legal departments in the country because they recruited them from, you know, Harvard and places like that.

PARKER STILL: Sure, sure.

Ind. 1 But I don't -- I would've been the -- besides myself and [redacted] we would've been the only ones physically sending money out.

PARKER STILL: Okay.

Ind. 1 And when I was doing it, it was checks.

PARKER STILL: Right.

Ind. 1 And if I'm not mistaken, you mentioned the debit cards or something like that. Yeah. I think they she they switched to that under her.

PARKER STILL: Under Heidi?

[redacted]

Ind. 1 Under [redacted]

PARKER STILL: Under [redacted]

Ind. 1 Right.

PARKER STILL: Okay.

Ind. 1 Not under her, but
I mean, when she -- she used to do the
checks and then they switched it to cards
just because it was a lot simpler.

PARKER STILL: Yes, sir.
Okay. Do y'all remember -- like so we know
that what the bank would've been -- what
bank y'all used back then, Mr. Ind. 1

Ind. 1 We started off
with Central Bank and then we went to River,
and I can't remember if there was anybody
else in there.

PARKER STILL: Okay.

Ind. 1 First National
might have been. I mean, Regions may have
even been in there, but I don't know. I
just don't remember.

PARKER STILL: Colonial?
Is that what it is?

Ind. 1 Colonial could have been one.

PARKER STILL: All right. Sounds good. A couple more names that have popped up. One, I mean, it's funny. One is this this attorney that's out here, [redacted] [redacted] You ever come across [redacted] [redacted] before?

Ind. 1 Yeah, [redacted] he's an attorney, but he's a movement guy.

PARKER STILL: Yeah.

Ind. 1 I can't remember for the life of me which which group he was with. I just don't remember, but I know I mean, we wrote a lot about him.

PARKER STILL: Because it looked like [redacted] and then he was [redacted] [redacted] or [redacted]. He was more --

Ind. 1 [redacted] Yeah.

PARKER STILL: Oklahoma type individual out there. He was associated with him on some of --some of the

didn't seem like our foes were not -- it was more political than it was anything else.

CHRIS BODNER: Did you ever hear anyone at the SPLC or any meeting say something along the lines of, "We need new Nazis. Our Nazis are broken"?

Ind. 1 No. No. Well, I did say that one time in a in a meeting. I think I referred when we sued [redacted] and his trailer fell apart. I said, "I think we broke [redacted]," you know, that kind of thing. But nothing -- I know what you're looking for, but that no, I don't remember anything like that.

CHRIS BODNER: Okay.

KEVIN DAVIDSON: For expenses, the F, when you were running the Fs, how detailed were you looking for on expense reports back to you and what they were spending money on?

Ind. 1 Honestly, not very. I mean, they couldn't say, "Hey, I spent $5,000 going to Atlanta to work on

this rally." You know, I wouldn't let that fly. But, you know, I would give them a reasonable amount of, you know, for gas and mileage and, you know, what you would get when you did your expense reports, you know, it's like whatever the whatever the going rate was per mile. And they they, you know, they'd paid the mileage, I'm sure, that kind of stuff. They may -- they may stay at a Motel 6 and say they were at the Hilton or something like that, but you know --

KEVIN DAVIDSON: What about like, I mean, if they were going to buy paraphernalia, they go to a rally, they buy a shirt, a hat, you know, whatever.

Ind. 1 Oh yeah. Now I would have them buy stuff for me, just where we would have it in our archives. If it was something -- not everything, but I mean, if it -- if it let's say, you know, if it said kill all politicians, you know, I might would buy a shirt like that because if we sued them and they had killed a politician,

that would be Exhibit A, right? We we would have that in the archives to to use against them. But no, we didn't. Sometimes we would order stuff out of their publications and that kind of stuff, but no, we didn't. When they went to a rally, they just went, you know, and the -- usually what I would get them to do is I would have them like at the rally field, I'd have them, you know, walk out into the field on their phone like they were talking to somebody and just start -- they would call their home phone to their answering machine and then they would just start reading the license plates off into it and that kind of, you know, stuff like that.

But they weren't -- they didn't have to take anything, you know, for the rally. I mean, usually all that was already done by the organization. Most of it was.

CHRIS BODNER: And so when was the -- I know you left in '13, but when kind of was your time when you were kind of

getting out of running the F program?

Ind. 1 I never got out of it. I was responsible for it.

CHRIS BODNER: Okay.

Ind. 1 It it started going from me doing it to it was run by committee. You know, it was like these little intel meetings and and that kind of stuff. So -- but the mechanics of it, the getting the money out to them and that kind of thing, you know, finding them, you know, because they they would come and go. I think I noticed there was some -- they were using some numbers yesterday at the hearing and I can't remember where my numbers ended. I mean, it was in the 20s or or maybe right at 30 or something. But I don't after that, I mean, I just can't remember anymore. But the -- so apparently they were still recruiting people after I left because the there were a lot of numbers I didn't, you know, --and we always referred to them by the number, you know, [redacted] and I did or in

Ind. 1 Oh yeah.

PARKER STILL: Yeah, and do that kind of stuff.

Ind. 1 We'd get calls occasionally, and I would get the the police to send us the flyer, but they'd ride around, especially in minority neighborhoods or Jewish neighborhood or whatever, nailing up their little flyers, you know, the KKK is watching you or something crap like that. Yeah.

PARKER STILL: Yeah.

Ind. 1 They don't -- they quit doing that because they started getting stopped, I think, and they'd get them for littering or something like that.

PARKER STILL: Yeah. Sounds good. Anybody else?

CHRIS BODNER: Yeah, I'm sorry, go ahead.

JUSTIN LOWRANCE: Well, I just have one more thing. Earlier, Chris was asking you questions about that hate

map, and it was when you were talking about you started off, I think, only putting the chapter headquarters or something --

Ind. 1 Right.

JUSTIN LOWRANCE: On the map.

Ind. 1 Or the group. In other words, the American Knights of the KKK had one headquarters.

JUSTIN LOWRANCE: Then you said after a while, and I think you said you bought into it, that you started adding every chapter.

Ind. 1 Right.

JUSTIN LOWRANCE: And then I think you said that it made the map more impressive.

Ind. 1 Yeah.

JUSTIN LOWRANCE: More impressive to who?

Ind. 1 To whoever read it. I mean, I don't know. Law enforcement was our main readership.

JUSTIN LOWRANCE: Okay.

Ind. 1 You know, it would be a national map. I mean, you probably -- I'm sure you've seen it.

JUSTIN LOWRANCE: Yeah.

Ind. 1 It's got the little dots on it. We used to use -- we'd have like clan heads and skinheads and that kind of little icons and that kind of stuff. But it was more impressive. And in other words, if you had -- there were only maybe 12 or 15 categories of hate groups. If you only had 12 dots or 15 dots on your map, that's not much of a map. But if you have a total of 287 chapters, you know, that's a much more impressive map because it's more detailed, more you know, it's got more information. And, you know, [redacted] and I were the ones that sold them on and maybe [redacted] too, about the -- we had a a huge need for law enforcement, to cooperate with law enforcement and be kind of a -- have them on our side. Because back in those days, they didn't know much about the Klan.

[redacted]

You know, if the Klan blew something up, then they would start getting information and investigate and collecting information on them. But other than that, they didn't know anything about hate groups. They didn't really know anything about the militia. You know, it's why when Oklahoma City blew up, we had like 10 flags of things that were happening on that day as to why it might have been domestic and not foreign. And as we researched it, we we passed it up the line.

But and both [redacted] and I were both prior law enforcement, so we had a leaning that way anyway. And we wanted to be able -- we said, "Well, we've got all this intelligence. We're writing about it. We're doing this newsletter." I think we were sending it out to our donors or something. And I said, "Why don't we do a monthly magazine or quarterly magazine or whatever and send it out to to law enforcement?" And then we started using it

as a handout at our -- when we'd do classes on and that kind of stuff. So we were real interested from an -- to make it look like an intelligence bulletin because that's what it was, so the cops could just pick it up and be up to speed on it and, you know.

JUSTIN LOWRANCE: Was that the same hate map that like donors could see as well?

Ind. 1 Yeah. Yeah.

JUSTIN LOWRANCE: Okay.

Ind. 1 And eventually it was the same one that was up on the website.

JUSTIN LOWRANCE: Okay.

CHRIS BODNER: So during the time period that you were there, we know that there were various different bank accounts that were open, names of like Fox Photography, J&J Marine, Rare Books. Do you remember when those accounts were opened?

Ind. 1 Yeah, I opened a number of them.

CHRIS BODNER: Okay.

Ind. 1 I know I did
Center Investigation because it was CIA. I though that was funny. And they made a little comment about it. I looked at [redacted] yesterday and I said, "That was one of mine." And I did -- I would have to look at the dates on the accounts, but if I opened Fox, it was probably because I used to work or had a good friend. I didn't work there, but I had a good friend that worked at Fox Photo in Montgomery, you know, so that kind of stuff. And what I tried to do, let's say you were a carpenter, I may make it sound like a carpenter business or that kind of thing. Just so when you got your check, if anybody ever saw your check laying there in your house, it wouldn't be from SPLC or Klanwatch. It would be from some company that was -- sounded legitimate.
And basically that's how we
set them up. And pre-9/11, it wasn't a big deal to go to the bank and open up a business checking account. Somewhere in

there, I can remember it got tougher because they started changing the banking laws. And I don't know if it was River or Colonial or who it was, but they -- one of the accounts I tried to open met some resistance. They didn't want to do it. And I said, "Well, I got to have a checking account. I can pay these people." And, you know, that may be when they switched to the cards to where they didn't have to have the checking accounts, but I don't see how that's possible. I think you have to have a checking account to have a card. But anyway, the -- there was some resistance to it. I don't know if it was banking regulations or what, but Center, I think Center, I kept my post office box from my PI firm and used it with the CIA account just to -- when I -- think I want to say I kept that account to or used that account to subscribe to a lot of the publications that were out of state, you know, and they would mail them back to that PO box and it had the

[redacted]

PO box on the check. So I remember that one. What were some of the other ones?

CHRIS BODNER: Like Fox Photography?

Ind. 1 I may have done Fox. I'm not certain about that.

CHRIS BODNER: J&J Marine, Rare Books Warehouse?

Ind. 1 Rare Books, I did. And actually Rare Books, the reason I used Rare Books is because we were buying these Klan publications, Nazi publications. It was kind of a rare publication. So I came up with the idea for Rare Books. So I remember that one.

JUSTIN LOWRANCE: Tech Writers?

Ind. 1 Who?

JUSTIN LOWRANCE: Tech Writers.

Ind. 1 Tech Writers?

JUSTIN LOWRANCE: Tech

[redacted]

Writers Group?

Ind. 1 I don't think that was me. That sounds like [redacted] or Heidi, because they were both writers. Let's see. Who else did I have? I had a paint company, I think, because one of my guys was a painter. And really, that was the only checks that were written, were reimbursements and their consulting fees.

CHRIS BODNER: So, but there was no -- these were fictitious. They were no -- they're shell companies essentially, right?

Ind. 1 Right. Well, actually Center, I think, and Center was one of the first ones I set up, and I think we had a business license and I had a PI license through that company. Because back then, if you were doing investigative work, you had to, in Montgomery, you had to -- there was some -- you had to have a PI license. And actually, it turned out to my advantage because the ID card was signed by

the chief of police. It looked like a police ID. It was a photo ID and signed by the Montgomery Police Department Chief, you know, whoever signed the -- signed your your PI ID. And if you had that in a badge holder, even though it said private investigator, you know, when you showed it to one of these klansmen you were trying to interview out in the field, he was like -- a lot less likely to cause you any harm and more likely to talk to you or run your, you know, not talk to you, to call his lawyer.

But it worked out really good because we -- when I was working the Klan case over in Georgia, I'd go -- I would go out and rent a LTD, you know, back when they were popular and put my suit on. And it was most of about 80% of them talked to me. You know, they were though they had to.

KEVIN DAVIDSON: Other than the the names of people we've already talked about, are there any other Fs that -- like names you remember?

Ind. 1 I remember -- let's see. I told you about [redacted]. He was four. He's dead now. He -- I think he's dead. I'm not certain, but I'm pretty sure.

PARKER STILL: He is. Yeah.

Ind. 1 Man, if I had my -- if I had my records, I could give you a lot more. Just -- it would remind -- it would wake up a couple of these dead brain cells. But I think five might have been out in [redacted] or [redacted], but I don't remember his name. Yeah, I would just have to look. If I had my paperwork, I could I could help.

KEVIN DAVIDSON: Well, if you think of any other names --

Ind. 1 Or if you call them, I might would remember them. But let's see who we haven't talked about. I told you about [redacted].

PARKER STILL: Yeah.

Ind. 1 Of course, [redacted]

[redacted]

[redacted]
PARKER STILL: [redacted]
[redacted] Does that one ring a bell?
Ind. 1 No.
PARKER STILL: Yeah.
Ind. 1 There was some girl that was -- you mentioned [redacted] one time.
PARKER STILL: I did.
Ind. 1 Yeah. I think it was his girlfriend or ex-wife or somebody, but her I don't think her name was [redacted] but she tried to give us information, but we didn't -- it didn't work out. But we may have set you know, we may have set it up and then she just never sent us anything.
PARKER STILL: I know you said [redacted] last time.
Ind. 1 [redacted] was -- I say [redacted] was a big problem because he went -- he was the head of the group.
PARKER STILL: Yeah.
Ind. 1 And man, it was a

-- that was not good for my blood pressure because I was on him all the time, you know, because of -- it was just like the speeches he would -- things he would say to the media and stuff like that at rallies. And I was like -- I said, "Look, dude, we're going to either have to cut ties or you're going to have to rein it in because you're, you know."

PARKER STILL: Yeah. Yeah.

Ind. 1 This ain't going to fly. You're making too much -- you're calling too much attention to yourself. And he was just, you know, he was just an old -- I think he ended up losing his leg and getting diabetes and all kinds of stuff.

PARKER STILL: Right. Going back on the -- that [redacted], who you said may have been been one, Mr. Ind. 1 do you remember seeing her if I showed you a picture of [redacted]?

Ind. 1 Yeah, I would remember if I saw her picture.

PARKER STILL: Let me see